**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. CR-20-240-F** |
| | ) | |
| **BOBBY CHRIS MAYES, CHARLES** | ) | |
| **GOOCH, and COURTNEY WELLS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**JURY INSTRUCTIONS**

**STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE**

## JURY INSTRUCTIONS INDEX

**Jury Inst. No.**

1. **Opening**
2. **Duty to Follow Instructions**
3. **Introduction to the Charges**
4. **"Indictment" – Defined**
5. **Key to Initials**
6. **The Indictment**
7. **Plea and Presumption of Innocence**
8. **Burden of Proof**
9. **Reasonable Doubt**
10. **Evidence – Defined**
11. **Evidence – Direct and Circumstantial – Inferences**
12. **Credibility of Witnesses**
13. **Impeachment**
14. **Non-Testifying Defendant**
15. **Law Enforcement Witnesses**
16. **Immunity**
17. **Voluntariness of Statement by Defendant**
18. **Evidence of Good Character or Honesty and Integrity**
19. **Date of Alleged Offenses**
20. **Investigative Techniques**
21. **Charts and Summaries**
22. **Recorded Conversation**
23. **Caution – Consider Only Crimes Charged**
24. **Multiple Defendants – Multiple Counts**
25. **Proof of Intent**
26. **Knowingly – Deliberate Ignorance**
27. **Count 1 – Conspiracy to Commit Wire Fraud – 18 U.S.C. § 1349 – Essential Elements**
28. **Conspiracy and Interdependence – Defined**
29. **Counts 2-13 – Wire Fraud – 18 U.S.C. § 1343 – Essential Elements**
30. **Counts 14-19 – Uttering Forged Security – 18 U.S.C. § 513(a) – Essential Elements**
31. **Counts 20-25 – Aggravated Identity Theft – 18 U.S.C. § 1028A(a)(1) – Essential Elements**
32. **Counts 2-25 – Aiding and Abetting – 18 U.S.C. § 2 – Essential Elements**
33. **Caution – Punishment**
34. **Transcript**
35. **Verdict**
36. **Closing**

**Verdicts**

**INSTRUCTION NO. 1**
**<u>OPENING</u>**

Members of the jury, you have heard the evidence in this case and will hear the closing arguments of counsel.  It is now the duty of the court to instruct you as to the law applicable to this case, both from the viewpoint or position of the government, as the plaintiff, and from the viewpoint or position of the defendants.

Nothing said in these instructions or nothing in any form of verdict prepared for your convenience is to suggest or convey in any manner any information as to what verdict I think you should find.  You, as jurors in this case, are the sole judges of the facts, and it is your duty to determine the true facts herein.  Your only interest is to determine whether the government has proven a defendant guilty beyond a reasonable doubt of any of the crimes charged against that defendant in the indictment.

**INSTRUCTION NO. 2**

**<u>DUTY TO FOLLOW INSTRUCTIONS</u>**

You, as jurors, are the judges of the facts.  But in determining what actually happened—that is, in reaching your decision as to the facts—it is your sworn duty to follow all of the rules of law as I explain them to you.

You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you. You must not substitute or follow your own notion or opinion as to what the law is or ought to be.  It is your duty to apply the law as I explain it to you, regardless of the consequences.

It is also your duty to base your verdict solely upon the evidence, without prejudice or sympathy.  That was the promise you made and the oath you took.

## INSTRUCTION NO. 3
## <u>INTRODUCTION TO THE CHARGES</u>

By indictment, the government has accused the defendants, Bobby Chris Mayes, Charles Gooch, and Courtney Wells, of committing crimes against the United States. This is only a charge.  A defendant is presumed to be innocent. Therefore, you may find a defendant guilty only if you are convinced, beyond a reasonable doubt, that the defendant committed a crime charged in the indictment. If you are not convinced beyond a reasonable doubt that the defendant committed the crime charged in a particular count of the indictment, then you must find the defendant not guilty on that count.

At times during the trial, you saw the lawyers make objections to questions asked by the other lawyers, and to answers by witnesses. This simply meant that the lawyers were requesting that I make a decision on a particular rule of law. Do not draw any conclusion from such objections or from my rulings on the objections. These are only related to the legal questions that I had to determine and should not influence your thinking.

It is my job to decide what rules of law apply to the case. I have explained some of these rules to you in the course of the trial, and I will explain others to you now before you go to the jury room. You must not follow some rules and ignore others. Even if you disagree or do not understand the reasons for some of the rules, you are bound to follow them.

If you decide that the government has proven beyond a reasonable doubt that a defendant is guilty of any of the crimes charged in the indictment, it will also be my job to decide what the punishment will be. You should not try to guess what the punishment might be or express opinions as to what it ought to be. Punishment should not enter into your consideration or discussions at any time.

**INSTRUCTION NO. 4**

**"INDICTMENT"— DEFINED**

The indictment is simply the means by which a defendant is placed upon trial and sets forth in a formal way the offenses of which a defendant is accused.  It is in and of itself no evidence of the guilt of a defendant, and you should not allow yourselves to be influenced against a defendant by reason of the return and filing of the indictment.

**INSTRUCTION NO. 5**

**KEY TO INITIALS**

The indictment and the court's later instructions with respect to the wire fraud counts (counts 2-13), the uttering forged security counts (counts 14-19) and the aggravated identity theft counts (counts 20-25) refer to individuals by initials rather than by name.  The following table shows the initials and names of the individuals and the specific counts that refer to the individuals.

| Initials | Name | Count(s) |
|----------|------|----------|
| T.G. | Tamia Gray | 2 |
| T.C. | Tony Clanton | 3, 14, 20 |
| S.O. | Shaniece Ormond | 4, 15, 21 |
| J.D. | Jeffrey Davis | 5 |
| C.M. | Charles Miller | 6 |
| M.C. | Mandi Chambers | 7, 16, 22 |
| F.A. | Fermin Avila | 8, 17, 23 |
| Mr. B.C. | Brandon Clark | 9, 18, 24 |
| Ms. B.C. | Brittany Cox | 10, 19, 25 |
| D.D. | Deangelo Davis | 11 |
| B.W. | Brian White | 12 |
| A.B. | Angela Barnes | 13 |

INSTRUCTION NO. 6

**THE INDICTMENT**

The indictment reads as follows:

The Federal Grand Jury charges:

**Introduction**

At all times relevant to this Indictment:

1. **BOBBY CHRIS MAYES** was a resident of the Western District of Oklahoma and owner or part owner of a group of car dealerships located in the Western District of Oklahoma, including BRSI LLC (d/b/a Big Red Sports/Imports), Big Red Kia, Tower Motorsports, LLC (d/b/a Norman Yamaha Motorsports), NMD Holding LLC (d/b/a Norman Mitsubishi), and DKR LLC (d/b/a Mayes Kia) (collectively, the "Big Red Dealerships"). He was the President and Chief Executive Officer of the Big Red Dealerships, along with several other companies, including Trident Warranty Advisors ("Trident").

2. **CHARLES GOOCH** was a resident of the Western District of Oklahoma and Vice President and Compliance Officer of the Big Red Dealerships from approximately 2014 until approximately August 2018. GOOCH also had an ownership interest in Trident, Mayes Kia, and Norman Mitsubishi. As Compliance Officer, GOOCH reviewed the documentation for every vehicle sale and its terms at the Big Red Dealerships before the documentation was approved and transmitted to various lenders for financing. GOOCH was also sole owner, President, and Chief Executive Officer of Norman Pawn & Gun, which was created in or about February 2015.

3. **COURTNEY WELLS** was a resident of the Western District of Oklahoma and Comptroller of the Big Red Dealerships. As Comptroller, WELLS oversaw the finance and accounting department of the Big Red Dealerships. Among other duties, she prepared checks, reviewed bank statements, paid invoices, helped prepare tax returns, and managed the accounting system for the Big Red Dealerships. WELLS also managed the accounting system and helped

8

prepare tax returns for Norman Pawn & Gun.  WELLS had an ownership interest in Trident.

<u>Lenders</u>

4.    **Ally Financial Inc.** was a financial institution headquartered in Detroit, Michigan, that held deposits insured by the Federal Deposit Insurance Corporation ("FDIC").  Among other services, Ally Financial Inc. provided consumer loans for the purchase of vehicles across the United States.

5.    **American Credit Acceptance** was a business headquartered in Spartanburg, South Carolina, that provided consumer loans for the purchase of vehicles across the United States.

6.    **Americredit Financial Services Inc.**, now GM Financial, was a business headquartered in Fort Worth, Texas, that provided consumer loans for the purchase of vehicles across the United States.

7.    **BBVA Compass** was a financial institution headquartered in Birmingham, Alabama, that held deposits insured by the FDIC.  Among other services, BBVA Compass provided consumer loans for the purchase of vehicles across the United States.

8.    **Consumer Portfolio Services** was a business headquartered in Irvine, California, that provided consumer loans for the purchase of vehicles across the United States.

9.    **Credit Acceptance** was a business headquartered in Southfield, Michigan, that provided consumer loans for the purchase of vehicles across the United States.

10.    **Crescent Bank & Trust** was a financial institution headquartered in New Orleans, Louisiana, that held deposits insured by the FDIC.  Among other services, Crescent Bank & Trust provided consumer loans for the purchase of vehicles across the United States.

11.    **Encore Automotive Acceptance Corp.** was a business headquartered in Plano, Texas, that provided consumer loans for the purchase of vehicles across the United States.

12.     Exeter Finance Corporation was a business headquartered in Irving, Texas, that provided consumer loans for the purchase of vehicles across the United States.

13.     FinancePoint was a business headquartered in Del City, Oklahoma, that provided consumer loans for the purchase of vehicles across the United States.

14.     First Investors Financial Services was a business headquartered in Houston, Texas, that provided consumer loans for the purchase of vehicles across the United States.

15.     Flagship Credit Acceptance was a business headquartered in Chadds Ford Township, Pennsylvania, that provided consumer loans for the purchase of vehicles across the United States.

16.     Foursight Capital LLC was a business headquartered in Salt Lake City, Utah, that provided consumer loans for the purchase of vehicles across the United States.

17.     Global Lending Services, LLC, was a business headquartered in Atlanta, Georgia, that provided consumer loans for the purchase of vehicles across the United States.

18.     Globe Acceptance, Inc. was a business headquartered in West Des Moines, Iowa, that provided consumer loans for the purchase of vehicles across the United States.

19.     Kia Motors Finance was a business headquartered in Fountain Valley, California, that provided consumer loans for the purchase of vehicles across the United States.

20.     OU Federal Credit Union was headquartered in Norman, Oklahoma, and a member of the National Credit Union Administration, with its accounts insured by the National Credit Union Share Insurance Fund.  Among other services, OU Federal Credit Union provided consumer loans for the purchase of vehicles.

21.     Peak Acceptance, LLC, was a business headquartered in Dallas, Texas, that provided consumer loans for the purchase of vehicles across the United States.

22.     Prestige Financial Services was a business headquartered in Draper, Utah, that provided consumer loans for the purchase of vehicles across the United States.

23.     Santander Consumer USA was a business headquartered in Dallas, Texas, that provided consumer loans for the purchase of vehicles across the United States.

24.     Sierra Auto Finance, LLC, was a business headquartered in Dallas, Texas, that provided consumer loans for the purchase of vehicles across the United States.

25.     Skopos Financial, LLC, was a business headquartered in Irving, Texas, that provided consumer loans for the purchase of vehicles across the United States.

26.     Tinker Federal Credit Union was headquartered in Oklahoma City, Oklahoma, and a member of the National Credit Union Administration, with its accounts insured by the National Credit Union Share Insurance Fund.  Among other services, Tinker Federal Credit Union provided consumer loans for the purchase of vehicles.

## Big Red Dealership Operations

27.     Beginning no later than 2012 and continuing until the spring of 2019, the Big Red Dealerships sold vehicles to customers that were financed by the lenders identified in paragraphs 4–26 ("Lenders").

28.     The Big Red Dealerships had relationships and agreements with certain Lenders, who had lender policies and guidelines for indirect lending to dealership customers.  When a customer needed to finance the purchase of a vehicle, the Big Red Dealership employees would prepare sales contracts, financing applications and related documents for the deal.  These materials would be reviewed and approved by supervisory employees of the Big Red Dealerships, including GOOCH, before they were submitted to the Lenders. The Big Red Dealership employees would sometimes directly contact the Lenders and transmit documentation relating to the proposed transaction.  Specifically, Big Red Dealership employees transmitted sales contracts, loan applications, and

financing documents to the Lenders by email or fax for their review and approval. When a loan was finalized, the Lender would fund the loan and the proceeds would be disbursed to the applicable Big Red Dealership selling the vehicle by wire transfers, checks, or cash concentration disbursements, a type of direct transfer used from the Lenders to dealerships.

29.    The Big Red Dealerships could also access financing for customers through online aggregator services that allow dealerships to electronically submit sales terms and borrower information to numerous lenders simultaneously.  Again, the Big Red Dealership employees would prepare the same type of documentation relating to the sale.  This documentation would again be reviewed by supervisory employees at the Big Red Dealership, including GOOCH.  Big Red Dealership employees submitted customer information and sales terms to the aggregator over the Internet, and Lenders could offer loans, issue counteroffers, negotiate, and approve financing arrangements and contracts on the same digital interface with the Big Red Dealership employees.  When a loan was finalized on the digital platform, the Lender would fund the loan and the proceeds would be disbursed to the applicable Big Red Dealership selling the vehicle by wire transfer, check, or cash concentration disbursements.

<u>COUNT 1</u>
(Conspiracy – MAYES, GOOCH, and WELLS)

30.    The Federal Grand Jury incorporates paragraphs 1–29 by reference.

31.    From in or around January 2014 until in or around March 2019, in the Western District of Oklahoma and elsewhere,



-------------------------------------- BOBBY CHRIS MAYES,
                        CHARLES GOOCH, and
                        COURTNEY WELLS -------------------------------------

knowingly, intentionally, and with interdependence, combined conspired, and agreed with each other and with others known and unknown to the Federal Grand Jury to commit the offense of wire fraud, in violation of Title 18, United States Code, Section 1343.

### The Object of the Conspiracy

32.     The object of the conspiracy was to obtain millions of dollars of loan proceeds from various banks, credit unions, and automobile financing lenders based on: (1) material misrepresentations and omissions to the Lenders about the type, source, and amount of borrowers' down payments or vehicle trade-ins; and (2) unlawful payments and bribes paid to at least one financial institution employee designed to bypass the scrutiny the loan officer was obligated to provide before approving such loans.

### Manner and Means

33.     The object of the conspiracy was accomplished as follows:

A.     From approximately January 2014, through the spring of 2019, the Big Red Dealerships, under the control of MAYES, GOOCH, and WELLS, advertised on local radio stations and elsewhere that they were able to sell cars and secure financing for vehicle purchases to individuals with bad credit or no credit.  Big Red Dealerships advertised that they had cultivated relationships with the most forgiving lenders, enticing customers to Big Red Dealerships who frequently would not qualify for lending under banking guidelines.  Lenders who provide financing for individuals with bad credit or no credit often require a substantial down payment or a trade-in with significant value in order to qualify for financing.  This requirement is designed to verify the borrower's ability to make payments on the loan over time and to ensure that they are invested in the loan, which in turn incentivizes them to make the necessary loan payments and avoid default.  MAYES, GOOCH, and WELLS were all familiar with these requirements and the importance of down payments and trade-ins in order for the Big Red Dealerships to sell vehicles to the no credit or poor credit customers that they targeted in their advertising.

B.     In order to circumvent these requirements, MAYES, GOOCH and WELLS engaged in a number of schemes designed to falsely induce Lenders to finance customer purchases that they would not otherwise approve.  Each of these schemes is described in more detail below, but includes the following:  (1) paying the down payment for the customer but falsely representing to the Lender that it

was a legitimate cash down payment; (2) creating false pawn shop transactions that made it appear that the customer had pawned personal property of significant value which generated a false down payment, the nature of which was concealed from the Lender; (3) orchestrating false trade-in transactions where a customer was induced to "trade in" a vehicle (whether it was operational or not or even whether the customer actually owned the vehicle) and then buy it back for $1; and (4) at least in one instance bribing a loan officer with one Lender to avoid bank scrutiny of bad loan deals.

**Acts in Furtherance of the Conspiracy**

34.    To effect the object of the conspiracy, MAYES, GOOCH, and WELLS committed the following overt acts, among others:

**KING CASH**

A.    From approximately 2012 to 2014, MAYES, GOOCH, WELLS, and others operating under their direction and control at the Big Red Dealerships generated sales contracts and financing documents that were wired to Lenders falsely indicating the car buyer had provided a certain cash down payment required by the Lenders.  In reality, the car buyer had provided no down payment or a smaller cash down payment.   On internal Big Red Dealership documents, salespeople, sales managers, and finance office staff were taught to write that the down payment was comprised of "King Cash."   However, in the paperwork submitted to the Lenders, the Big Red Dealerships falsely represented that customer had made the full down payment.  Customers were also coached to tell lenders, if they were contacted by one, to repeat the lie that they had made the down payment as indicated.  In or around late 2014, MAYES instructed employees and officers at the Big Red Dealerships to no longer offer "special financing" with King Cash.

**NORMAN PAWN & GUN**

B.    In or around January 2015, MAYES suggested to GOOCH that the Big Red Dealerships could replace King Cash fake down payments with another method of faking down payments to secure loans for customers by using a pawn shop.

C.    On or about February 20, 2015, MAYES and GOOCH filed Articles of Organization with the Oklahoma Secretary of State for Norman Pawn & Gun LLC. GOOCH was the sole owner for Norman Pawn & Gun LLC and opened a bank account with Republic Bank and Trust in Norman, Oklahoma.

D.    In or around February 2015, MAYES, GOOCH, and WELLS instructed managers and car salespeople at the Big Red Dealerships to offer individuals interested in buying vehicles who did not have cash for a down payment that they could instead pawn items with Norman Pawn & Gun.

E.    MAYES, GOOCH, and others acting at their direction instructed salespeople to suggest that potential vehicle buyers could satisfy the Lenders' cash down payment requirements by pawning items.  When a salesperson or manager was negotiating with a customer about a potential sale, they would ask the customer to identify items they would be willing to pawn to satisfy the down payment requirement and complete a pawn slip or pawn ticket describing the items.  GOOCH, the manager, or the salesperson would typically write an appraisal value of the items that matched the amount needed to satisfy a Lender's cash down payment requirement.

F.    Sales managers, salespeople, and finance office workers at the Big Red Dealerships—operating at the direction of WELLS, MAYES, and GOOCH—submitted proposed sales terms and down payment amounts to Lenders through Internet-based loan aggregators to secure financing for the sales of vehicles. When items were offered to satisfy a cash down payment requirement, the Lenders were instead provided information that the customer had provided cash as a down payment.

G.    Between approximately February 23, 2015, and October 31, 2017, sales managers and salespeople at the Big Red Dealerships, acting at the direction of MAYES, and with GOOCH and WELLS's approval, completed retail sales contracts and finalized loan contracts approximately 476 times, indicating a cash down payment had been made in the amount required by the lender and not disclosing that the customer had agreed to provide pawned items and not cash.  Specifically, Big Red Dealerships secured financing based on fictitious cash payments from the

following Lenders, without disclosing the source or nature of the down payment in connection with pawned items:  Ally Financial Inc., American Credit Acceptance, Consumer Portfolio Services, Crescent Bank & Trust, Encore Automotive Acceptance Corp., Exeter Finance Corporation, FinancePoint, First Investors Financial Services, Flagship Credit Acceptance, Foursight Capital, LLC, Global Lending Services, LLC, Globe Acceptance, Inc., Kia Motors Finance, OU Federal Credit Union, Prestige Financial Services, Santander Consumer USA, Sierra Auto Finance, LLC, and Skopos Financial LLC.

H.     MAYES, GOOCH, and others acting at their direction and control instructed sales managers and salespeople to coach the customers that when a Lender called, the customer should explain that they had provided a cash down payment to the Big Red Dealership.  The customers were warned not to tell the Lenders about the purported pawn shop.

I.     After the Lender funded a loan and disbursed the funds to the applicable Big Red Dealership, GOOCH generated a check from Norman Pawn & Gun to the car buyer for the amount on the pawn slip, usually describing the pawned item(s) in the memo line.  GOOCH, WELLS, and others acting at their direction then forged the customer's signature on the back of the check and endorsed it over to the relevant Big Red Dealership.  MAYES, GOOCH, WELLS, and others acting at their direction then deposited the check into the account of the relevant Big Red Dealership.

J.     MAYES, WELLS, and others operating under their direction and control regularly transferred funds from the Big Red Dealerships to Trident for the amounts of Norman Pawn & Gun checks that had been endorsed over to the Big Red Dealerships.

K.     WELLS and MAYES regularly prepared checks from Trident to Norman Pawn & Gun to reimburse the amounts of Norman Pawn & Gun checks that had been endorsed over to the Big Red Dealerships.

**BRIBERY OF A FINANCIAL INSTITUTION EMPLOYEE**

L.      Between January and April 2016, a Big Red Dealership manager—operating at the direction and control of MAYES—met routinely with a loan officer at a local financial institution and made approximately $30,000 total in cash payments in exchange for her approval of loans for customers at Big Red Dealerships.  The Big Red Dealership manager sometimes would call the loan officer to give notice that a questionable loan application was being sent over or otherwise direct the loan application to the attention of that loan officer.  Some of those loans were for vehicles for which employees at the Big Red Dealership had generated their own invoices to support prices above the manufacturer's suggested retail price.

**DOLLAR BUYBACKS**

M.      From around January 2014 until in or around the spring of 2019, MAYES, GOOCH, WELLS, and others operating under their direction and control encouraged sales managers and salespeople at the Big Red Dealerships to offer financing to customers if the customer was willing to document a vehicle trade-in, even when the customer was not actually providing the trade-in vehicle to Big Red Dealerships.  MAYES, GOOCH, WELLS, and others operating under their direction and control referred to these trades as "In and Outs" or "Dollar Buybacks."

N.      To execute the Dollar Buybacks or In and Out transactions, at the direction of MAYES, GOOCH, and WELLS, Big Red Dealership employees prepared hundreds of sales contracts and financing documents that were wired to lenders in which the documentation falsely showed that customers had provided trade-in vehicles to the Big Red Dealerships as part of their purchase of the vehicle. Customers were informed that they could trade in any vehicle, regardless of whether it was operational and regardless of whether it was even owned by the customer.  All the Big Red Dealership needed was a vehicle identification number. In most cases the vehicle was never inspected or actually even brought into the dealerships.  The Big Red Dealership employees would prepare documentation indicating that the vehicle had been traded in and assigning it a value, often well in excess of any legitimate value and again not coincidentally in the exact amount

17

required by the lender as a down payment or trade in.  However, the Big Red Dealership employees also prepared a corresponding invoice showing the customer had repurchased the vehicle for $1, which was not provided to the Lenders.

O.     Between on or about January 6, 2014, and on or about March 27, 2019, the Big Red Dealerships, controlled by MAYES, GOOCH, and WELLS, sold approximately 636 vehicles to customers and secured loan proceeds from Lenders by sending information by wire to the Lenders for the loans to be approved based on fictitious trade-ins.  At the direction of MAYES, GOOCH, and WELLS, Big Red Dealership employees sent false information to the Lenders that showed trade-in values for vehicles that were never transferred to the Big Red Dealerships. Specifically, the Big Red Dealerships secured financing based on fictitious trade-ins from the following Lenders:   American Credit Acceptance, Americredit Financial, BBVA Compass, Consumer Portfolio Services, Credit Acceptance, Crescent Bank & Trust, Foursight Capital, LLC, Global Lending Services, LLC, Peak Acceptance, LLC, Santander Consumer USA, Skopos Financial LLC, and Tinker Federal Credit Union.

P.     The Big Red Dealerships never informed the Lenders that a corresponding invoice was generated to return the purported trade-in vehicle back to the customer for $1.  MAYES, GOOCH, and WELLS knew that the lenders would not have agreed to provide or purchase such loans if the true nature of the sale was described to the lenders.

## EXAMPLES OF DOLLAR BUYBACKS AND FAKE PAWN TRANSACTIONS

Q.     On or about January 18, 2016, T.G. went to Big Red Sports/Imports to purchase a vehicle for her daughter.  T.G. advised the salesperson that she had only $500 for a down payment.  The Big Red Sports/Imports salesperson asked if she had a vehicle to trade in, and she advised that she only had a 1998 Honda Accord that was not in working condition.  The salesperson told T.G. that she could trade in the Accord and repurchase it for $1 without even bringing it to the dealership.  The salesperson prepared a sales contract for a 2015 Kia Soul that showed a $500 cash payment and a trade-in allowance of $1,000 for the 1998 Honda

Accord, with $18,486.00 total financed, with $14,456.00 in finance charges, and a total amount of payments of $32,942.00 over 72 months.  GOOCH, as Compliance Officer, approved the terms of the sale.  Big Red Dealership employees transmitted the contract terms over the Internet to Global Lending Services, who agreed to fund the loan and subsequently disbursed funds to Big Red Sports/Imports.  On or about January 18, 2016, a Big Red Dealership employee generated a wholesale bill of sale showing T.G. purchased a 1998 Honda Accord for $1 from Big Red Sports/Imports. T.G. could not make payments on the Kia Soul, and Global Lending Services repossessed the car and recognized a loss on the loan.

R.     On or about February 22, 2016, T.C. went to Big Red Sports/Imports to purchase a vehicle.  The Big Red Sports/Imports salesperson told T.C. that he was required to make a $1,000 down payment to purchase a 2015 Kia Forte.  T.C. did not have $1,000 in cash, so the salesperson told T.C. that there was a loophole available to cover the down payment if he had anything electronic.  T.C. said he had a broken Xbox 360, and the salesperson said the broken Xbox 360 could be used to cover the $1,000 down payment.   The salesperson prepared a sales contract for a 2015 Kia Forte that showed a $1,000 cash payment, with $22,367.00 total financed with a 21% annual percentage rate, $17,492.00 in finance charges, and a total amount of payments of $43,050.00 over 72 months.  The salesperson also generated a pawn ticket showing an Xbox 360 was to be provided as collateral on or about January 22, 2016.  GOOCH, as Compliance Officer, approved the terms of the sale.  Big Red Dealership employees transmitted the contract terms over the Internet to Global Lending Services, who agreed to fund the loan and subsequently disbursed funds to Big Red Sports/Imports.  GOOCH, WELLS, or someone acting at their direction in the finance or accounting office generated a Norman Pawn & Gun check to T.C. dated January 22, 2016, then forged the signature of T.C., endorsed the check over to BRSI LLC, and deposited it into BRSI LLC's bank account on or about May 2, 2016.   T.C. did not make all the payments on the loan, and Global Lending Services repossessed the Kia Forte and recognized a loss on the loan.

S.      On or about August 15, 2016, S.O. went to Big Red Sports/Imports to purchase a vehicle.  The salesperson told S.O. that she could provide electronics for a down payment, and she agreed to provide a used iPhone 5C and a used Amazon tablet.  The salesperson provided S.O. with a pawn ticket that showed $3,700 in appraised value for the two items.  The salesperson prepared a sales contract for the 2008 Honda Accord that showed a $3,700 cash payment.  GOOCH, as Compliance Officer, approved the terms of the sale.  Big Red Dealership employees transmitted the contract terms over the Internet to American Credit Acceptance, who agreed to fund the loan and subsequently disbursed funds to Big Red Sports/Imports.  GOOCH, WELLS, or someone acting at their direction in the finance or accounting office generated a Norman Pawn & Gun check to S.O. dated August 15, 2016, then forged the signature of S.O., endorsed the check over to BRSI LLC, and deposited it into BRSI LLC's bank account on or about October 6, 2016.  S.O. did not make all payments on the loan, and American Credit Acceptance repossessed the Honda Accord and recognized a loss on the loan.

T.      On or about August 20, 2016, J.D. went to Big Red Sports/Imports to buy a vehicle after hearing an advertisement that Big Red Sports/Imports could provide financing to individuals with no credit.  J.D. was 18, had no credit, and had never financed the purchase of a vehicle before.  J.D. agreed to provide a $200 cash payment and to trade in a 1994 Chevrolet truck and a 2005 Ninja motorcycle, neither of which was in working condition, which he advised the salesperson.  J.D. believed the truck and motorcycle were not worth $1,200 together.  The salesperson prepared a sales contract for a 2011 Ford truck that showed a $200 cash payment and $4,800 trade-in allowance.  GOOCH, as Compliance Officer, approved the terms of the sale.  Big Red Dealership employees transmitted the contract terms over the Internet to American Credit Acceptance, who agreed to fund the loan and subsequently disbursed funds to Big Red Sports/Imports.  On or about August 20, 2016, a Big Red Dealership employee generated a wholesale bill of sale showing J.D. purchased a 1994 Chevrolet truck for $1 from Big Red Sports/Imports.  J.D. subsequently called Big Red Sports/Imports about picking up the Chevrolet truck and motorcycle and was advised that Big Red Sports/Imports

did not want the truck or motorcycle.  J.D. lost his job and was unable to make the monthly payment, and American Credit Acceptance repossessed the 2011 Ford truck and recognized a loss on the loan.

U.      On or about September 21, 2016, C.M. went to Mayes Kia to purchase a vehicle he had identified on an Internet advertisement.  Once at Mayes Kia, he was advised the vehicle was no longer available, and he agreed to purchase a 2010 Ford F-150.  C.M. advised the salesperson that he did not have any cash for a down payment.  The salesperson suggested that C.M. could trade in a 2000 Hyundai C.M. owned that was not in working condition and was in Ohio, without actually trading it in.  C.M. believed the Hyundai was worth approximately $1,000.  The salesperson prepared a sales contract for a 2010 Ford F-150 that showed a $6,800 trade-in allowance, with $19,158.00 total financed with a 21% annual percentage rate, $14,962.00 in finance charges, and a total amount of payments of $34,120.00 over 72 months.  GOOCH, as Compliance Officer, approved the terms of the sale.  Big Red Dealership employees transmitted the contract terms over the Internet to American Credit Acceptance, who agreed to fund the loan and subsequently disbursed funds to Big Red Sports/Imports.  A Big Red Dealership employee enclosed the title to the Hyundai in the file for C.M.'s deal, along with a slip of paper with a handwritten note that said "In & Out."  C.M. was unable to make payments on the Ford F-150 and American Credit Acceptance repossessed the truck and recognized a loss on the loan.

V.      On or about November 11, 2016, M.C. went to Big Red Sports/Imports to purchase a vehicle.  She advised the Big Red Dealership salesperson that she did not have money for a down payment.  The salesperson offered that M.C. could instead pawn an item with Norman Pawn & Gun.  The salesperson generated a pawn slip showing M.C. had pawned an Apple iPad 2 to Norman Pawn & Gun.  M.C. never provided an Apple iPad 2 to Norman Pawn & Gun or the Big Red Dealerships. The Big Red Dealership salesperson prepared a retail installment sale contract showing M.C. made a $500 cash down payment to purchase a 2012 Dodge Journey. GOOCH approved the terms of the sale.  The sales contract was transmitted over the Internet to Santander Consumer USA, who approved a loan to M.C. and

disbursed the proceeds to BRSI LLC.  GOOCH, WELLS, or someone acting at their direction in the finance or accounting office generated a Norman Pawn & Gun check to M.C. that was dated with September 22, 2016, then forged the signature of M.C., endorsed the check over to BRSI LLC, and deposited it into BRSI LLC's bank account on or about November 23, 2016.  M.C. could not make the payments, and Santander Consumer USA repossessed the vehicle and recognized a loss on the loan.

W.      On or about January 5, 2017, F.A. went to Mayes Kia to purchase a vehicle.  F.A. had a nonworking Buick LeSabre for a trade-in, as well as $500 for a cash down payment.  The salesperson suggested that F.A. could also trade in electronics—his PlayStation 4—to help with the down payment.  The salesperson provided F.A. with a pawn ticket that showed $2,300 in appraised value for the PlayStation 4 Pro video game console.  The salesperson prepared a sales contract for the 2010 Chevrolet Malibu that showed a $5,500 trade-in allowance for the 1997 Buick and a $2,800 cash payment, with $15,017.00 total financed.  GOOCH, as Compliance Officer, approved the terms of the sale.  Big Red Dealership employees transmitted the contract terms over the Internet to American Credit Acceptance, who agreed to fund the loan and subsequently disbursed funds to Big Red Sports/Imports.  GOOCH, WELLS, or someone acting at their direction in the finance or accounting office generated a Norman Pawn & Gun check to F.A. dated January 5, 2017, then forged the signature of F.A., endorsed the check over to DKR LLC, and deposited it into DKR LLC's bank account on or about January 23, 2017. F.A. was unable to make payments and American Credit Acceptance repossessed the Malibu and recognized a loss on F.A.'s loan.

X.      On or about February 10, 2017, Mr. B.C. went to Big Red Sports/Imports to purchase a 2013 Hyundai Accent.  After taking the vehicle home, he received a call on February 14, 2017, from a Big Red Dealership finance employee that the lender had rejected the loan and that a new lender required a $1,000 down payment.  The finance employee told Mr. B.C. that he could sell something to Norman Pawn & Gun to cover the down payment. Mr. B.C. offered to provide a wifi hot spot he had purchased for about $60, and the Big Red Dealership

employee said that was sufficient and prepared a pawn ticket for the ZTE Internet wifi hotspot for $1,000.  A Big Red Dealership employee prepared a sales contract showing a $1,000 cash down payment.  GOOCH, as Compliance Officer, approved the terms of the sale.  Big Red Dealership employees transmitted the contract terms over the Internet to Global Lending Services, who agreed to fund the loan and subsequently disbursed funds to Big Red Sports/Imports.  GOOCH, WELLS, or someone acting at their direction in the finance or accounting office generated a Norman Pawn & Gun check to B.C. dated February 10, 2017, then forged the signature of Mr. B.C, endorsed the check over to BRSI LLC, and deposited it into BRSI LLC's bank account on or about March 31, 2017.  Mr. B.C. stopped making payments, and the Hyundai was repossessed by Global Lending Services, which recognized a loss on Mr. B.C.'s loan.

Y.    On or about April 15, 2017, Ms. B.C. went to Big Red Sports/Imports to purchase a vehicle.  The salesperson told Ms. B.C. that she could trade in a television to cover the down payment for the purchase of a 2014 Mitsubishi Outlander.  She agreed to trade in her father's 32" Vizio television, which had been purchased for $200 new.  The salesperson prepared a pawn ticket for the television, showing an appraisal value of $1,500.  GOOCH signed the pawn ticket.  The salesperson prepared a sales contract showing a $1,500 cash down payment.  Big Red Dealership employees transmitted the contract terms over the Internet to Santander Consumer USA, who agreed to fund the loan and subsequently disbursed funds to Big Red Sports/Imports.  GOOCH, WELLS, or someone acting at their direction in the finance or accounting office generated a Norman Pawn & Gun check to Ms. B.C. dated April 15, 2017, then forged the signature of Ms. B.C, endorsed the check over to BRSI LLC, and deposited it into BRSI LLC's bank account on or about June 7, 2017.  Ms. B.C. could not make timely payments or keep up with late fees, and Santander repossessed the vehicle and recognized a loss on the loan.

Z.    On or about May 8, 2017, D.D. went to Big Red Sports/Imports to purchase a used Ford Mustang he saw advertised on the Internet.  A salesperson told D.D. that his fast food service income did not qualify him to purchase the used

Mustang.  However, the salesperson told D.D. that he could qualify for financing for a new Kia if he would put down on the sales contract that he traded in his 2002 Nissan truck, which D.D. explained was not in working condition.  The salesperson said that did not matter and that the trade in could satisfy D.D.'s down payment with the lender.  The salesperson prepared a retail sales contract showing D.D was given a trade-in allowance of $3,000 for a Nissan truck, with $20,459.00 financed at a 21% APR, with $15,994.60 in finance charges, and a total of $36,453.60 in payments over 72 months.  GOOCH, as Compliance Officer, approved the terms of the sale.  Big Red Dealership employees transmitted the contract terms over the Internet to Santander Consumer USA, who agreed to fund the loan and subsequently disbursed funds to BRSI.  On or about May 13, 2017, a Big Red Dealership employee generated a wholesale bill of sale showing D.D. purchased a 2002 Nissan for $1 from Big Red Sports/Imports.  D.D. never provided the Nissan truck to the dealership.  D.D. lost his fast food job, and the Kia Forte was repossessed, with Santander Consumer USA recognizing a loss on D.D.'s loan.

AA.    On or about May 10, 2017, B.W. went to Norman Mitsubishi to purchase a vehicle.  He told the salesperson that he did not have cash for a down payment and did not have a vehicle to trade in to purchase a 2015 Dodge Ram truck.  The salesperson prepared a sales contract that showed a $500 trade-in allowance for a 2003 Mercury Grand Marquis, with $26,904.00 financed, $16,438.56 in finance charges, and a total amount of payments of $43,342.56 over 72 months. GOOCH, as Compliance Officer, approved the terms of the sale.  Big Red Dealership employees transmitted the contract terms over the Internet to Global Lending Services LLC, who agreed to fund the loan and subsequently disbursed funds to Norman Mitsubishi.  On or about May 10, 2017, a Norman Mitsubishi or Big Red Dealership employee generated a wholesale bill of sale showing B.W. purchased a 2003 Mercury Grand Marquis for $1 from Big Red Sports/Imports.  B.W. did not trade in any vehicle and did not own a Mercury Grand Marquis.

BB.    On or about June 1, 2017, A.B. went to Big Red Sports/Imports with her son for her son and his fiancé to purchase a vehicle.  A.B., her son, and his fiancé met with a Big Red Dealership finance department employee.  A.B.'s future

daughter-in-law had a 2002 Dodge Intrepid to trade-in, although it was not in working condition.  A.B. said she could not purchase the vehicle because she was unemployed.  The finance employee told her that it would be in A.B.'s name for a short period and would then transfer to her son and his fiancé, and A.B. believed she was a co-signer.  A.B. is partially blind and could not read the paperwork generated by the Big Red Dealership employee.  The Big Red Dealership employee prepared a retail sales contract that showed a $3,000 trade-in allowance for a Dodge Intrepid, with total payments under the financing package of $34,200.72 over 72 months.  GOOCH, as Compliance Officer, approved the terms of the sale.  Big Red Dealership employees transmitted the contract terms over the Internet to Santander Consumer USA, who agreed to fund the loan and subsequently disbursed funds to BRSI.  On or about June 1, 2017, a Big Red Dealership employee generated a wholesale bill of sale showing A.B. purchased a Dodge Intrepid for $1 from Big Red Sports/Imports.  A.B.'s son and his fiancé only made one payment, and A.B. started receiving calls from Santander Consumer USA, which is when she realized she was the sole purchaser and borrower; the car was repossessed, and Santander Consumer USA recognized a loss on the loan to A.B.

## REIMBURSEMENTS OF NORMAN PAWN & GUN

CC.   When Norman Pawn & Gun was first started in February 2015, Norman Pawn & Gun did not have funds to draw upon for the checks written to Big Red Dealership customers who were pawning items.  On or about March 11, 2015, MAYES provided $7,000 in funds to GOOCH by personal check, to be deposited into Norman Pawn & Gun's bank account to begin covering checks to Big Red Dealership customers.

DD.   Between in or around March 2015 until in or around July 2015, at the direction of MAYES, GOOCH, and WELLS, the Big Red Dealerships each regularly consolidated the amounts of Norman Pawn & Gun checks that had been endorsed to them and paid Norman Pawn & Gun back by check.

EE.   Beginning in or around July 2015, MAYES, GOOCH, WELLS, and others operating under their direction and control began issuing checks from the Big Red Dealerships to Trident for the amounts received from Norman Pawn & Gun.

MAYES and WELLS then issued reimbursement checks from Trident to Norman Pawn & Gun for the amounts that had been used for purported pawns in connection with Big Red Dealership sales.

FF.    For example, in or around July 2017, checks from Norman Pawn and Gun that were endorsed to BRSI totaled $12,000, to NMD totaled $500, and to Mayes Kia totaled $13,300.  On or about July 28, 2017, BRSI transferred $12,000 to Trident, NMD transferred $500, and Mayes Kia transferred $13,300 to Trident.  The transfers to Trident were described as "commissions."  WELLS, MAYES, and GOOCH prepared a check from Trident to Norman Pawn & Gun for $25,800.00, dated July 3, 2017, and it was signed by MAYES and deposited into the Norman Pawn & Gun bank account.

GG.    In or around July 2017, checks from Norman Pawn and Gun that were endorsed to Mayes Kia totaled $41,850.00, to NMD totaled $3,000, and to BRSI totaled $7,700.  On or about August 15, 2017, Mayes Kia transferred $41,850.00, BRSI transferred $7,700, and NMD transferred $3,000 to Trident.  The transfers to Trident were described as "commissions."  WELLS prepared a check from Trident to Norman Pawn & Gun for $52,550.00, dated August 3, 2017, and it was signed by MAYES and deposited into the Norman Pawn & Gun bank account with GOOCH's endorsement.

HH.    In or around August 2017, checks from Norman Pawn and Gun that were endorsed to BRSI totaled $7,000, to NMD totaled $1,000, and to Mayes Kia totaled $55,600. On or about September 5, 2017, BRSI transferred $7,000 to Trident, and on September 7, 2017, NMD transferred $1,000, and Mayes Kia transferred $55,600 to Trident.  The transfers to Trident were described as "commissions." WELLS prepared a check from Trident to Norman Pawn & Gun for $63,600, dated September 5, 2017, and it was deposited into the Norman Pawn & Gun bank account by GOOCH.

II.    The Federal Grand Jury hereby alleges and incorporates by reference all of the allegations and statements contained in Counts 2 through 19 of this Indictment as acts in furtherance of the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2–13
### (Wire Fraud)

35.     The Federal Grand Jury incorporates paragraphs 1–34 by reference.

36.     On or about the dates listed below, in the Western District of Oklahoma and elsewhere,

---------------------------------------- BOBBY CHRIS MAYES,
                                          CHARLES GOOCH, and
                                          COURTNEY WELLS, -------------------------------------

aided and abetted by each other and by others known and unknown to the Federal Grand Jury, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations and promises, did knowingly transmit and cause to be transmitted, in interstate commerce, by means of wire communication, certain writings, signs, and signals described below:

| COUNT | DATE | DESCRIPTION OF WIRE |
|---|---|---|
| 2 | January 18, 2016 | Retail sales contract and terms of sale between BRSI and T.G. transmitted over the Internet to Global Lending Services for loan funding premised on fake trade-in and undisclosed $1 repurchase |
| 3 | February 23, 2016 | Retail sales contract and terms of sale between BRSI and T.C. transmitted over the Internet to Global Lending Services for loan funding premised on fictitious cash down payment and undisclosed pawn of an Xbox 360 |
| 4 | August 15, 2016 | Retail sales contract and terms of sale between BRSI and S.O. transmitted over the Internet to American Credit Acceptance for loan funding premised on fictitious cash down payment and undisclosed pawn of an iPhone 5C and an Amazon tablet |
| 5 | August 20, 2016 | Retail sales contract and terms of sale between BRSI and J.D. transmitted over the Internet to American Credit Acceptance for loan funding premised on fake trade-in and undisclosed $1 repurchase |

| COUNT | DATE | DESCRIPTION OF WIRE |
|---|---|---|
| 6 | September 21, 2016 | Retail sales contract and terms of sale between Mayes Kia and C.M. transmitted over the Internet to American Credit Acceptance for loan funding premised on fake trade-in |
| 7 | November 11, 2016 | Retail sales contract and terms of sale between BRSI and M.C. transmitted over the Internet to Santander Consumer USA for loan funding premised on fictitious cash down payment and undisclosed pawn of an Apple iPad 2 that was never provided |
| 8 | January 5, 2017 | Retail sales contract and terms of sale between Mayes Kia and F.A. transmitted over the Internet to American Credit Acceptance for loan funding premised on fake $2,700 cash down payment, when $2,300 was the undisclosed pawn of a PlayStation 4 |
| 9 | February 10, 2017 | Retail sales contract and terms of sale between BRSI and Mr. B.C. transmitted over the Internet to Global Lending Services for loan funding premised on fictitious $1,000 cash down payment and undisclosed pawn of ZTE Internet wifi hotspot |
| 10 | April 15, 2017 | Retail sales contract and terms of sale between BRSI and Ms. B.C. transmitted over the Internet to Santander Consumer USA for loan funding premised on fictitious $1,500 cash down payment and undisclosed pawn of television that was never provided |
| 11 | May 8, 2017 | Retail sales contract and terms of sale between BRSI and D.D. transmitted over the Internet to Santander Consumer USA for loan funding premised on fake trade-in and undisclosed $1 repurchase |
| 12 | May 10, 2017 | Retail sales contract and terms of sale between Norman Mitsubishi and B.W. transmitted over Internet to Global Lending Services premised on a fake trade-in and undisclosed $1 repurchase |
| 13 | June 1, 2017 | Retail sales contract and terms of sale between BRSI and A.B. transmitted over Internet to Santander Consumer USA premised on a fake trade-in and undisclosed $1 repurchase |

All in violation of Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 2.

**COUNTS 14–19**
**(Uttering Forged Security)**

37.     The Federal Grand Jury incorporates paragraphs 1–34 by reference.

38.     On or about the following dates, in the Western District of Oklahoma,

---------------------------------------- **BOBBY CHRIS MAYES,**
                                **CHARLES GOOCH, and**
                                **COURTNEY WELLS,** ------------------------------------

aided and abetted by each other and by others known and unknown to the Federal Grand Jury, knowingly and intentionally made, uttered, and possessed securities of Norman Pawn & Gun, an organization which operates in interstate commerce, with forged endorsements of the payees, with the intent to deceive Republic Bank and Trust in Norman, Oklahoma, another organization which operates in interstate commerce, in particular the following checks payable to individuals, which purported to bear the true signatures of such individuals as endorsements, but which signatures were forged by or at the direction of MAYES, GOOCH, and WELLS:

| Count | Date of Check (On or About) | Payee | Amount | Check No. | Date of Deposit (On or About) |
|-------|-----------------------------|-------|--------|-----------|-------------------------------|
| 14 | 1/22/2016 | T.C. | $1,000.00 | 1211 | 5/2/2016 |
| 15 | 8/15/2016 | S.O. | $3,700.00 | 1299 | 10/6/2016 |
| 16 | 9/22/2016 | M.C. | $500.00 | 1333 | 11/23/2016 |
| 17 | 1/5/2017 | F.A. | $2,300.00 | 1377 | 1/23/2017 |
| 18 | 2/10/2017 | Mr. B.C. | $1,000.00 | 1439 | 3/31/2017 |
| 19 | 4/15/2017 | Ms. B.C. | $1,500.00 | 1487 | 6/7/2017 |

All in violation of Title 18, United States Code, Section 513(a), and Title 18, United States Code, Section 2.

**COUNTS 20–25**
**(Aggravated Identity Theft)**

39.     The Federal Grand Jury incorporates paragraphs 1–34 and 38 by reference.



40.    On or about the following dates, in the Western District of Oklahoma,

---------------------------------------- **BOBBY CHRIS MAYES,**
                                      **CHARLES GOOCH, and**
                                      **COURTNEY WELLS,** ------------------------------------

aided and abetted by each other and by others known and unknown to the Federal Grand Jury, knowingly transferred, possessed and used, without lawful authority, a means of identification of another person, that is, they knowingly possessed and used the name and signature of the individuals identified below, during and in relation to the federal felony of wire fraud, enumerated in Title 18, United States Code, Section 1343, as charged in Counts 3, 4, 7, 8, 9, and 10, and uttering forged securities, in violation of Title 18, United States Code, Section 513(a), as charged in Counts 14-19.  In particular, MAYES, GOOCH, WELLS, and others acting under their direction and control fraudulently forged the signatures of the following individuals in endorsing checks from Norman Pawn & Gun over to the Big Red Dealerships and depositing such checks in dealership accounts:

| Count | Date of Check (On or About) | Payee | Amount | Check No. | Date of Deposit (On or About) |
|---|---|---|---|---|---|
| 20 | 1/22/2016 | T.C. | $1,000.00 | 1211 | 5/2/2016 |
| 21 | 8/15/2016 | S.O. | $3,700.00 | 1299 | 10/6/2016 |
| 22 | 9/22/2016 | M.C. | $500.00 | 1333 | 11/23/2016 |
| 23 | 1/5/2017 | F.A. | $2,300.00 | 1377 | 1/23/2017 |
| 24 | 2/10/2017 | Mr. B.C. | $1,000.00 | 1439 | 3/31/2017 |
| 25 | 4/15/2017 | Ms. B.C. | $1,500.00 | 1487 | 6/7/2017 |

All in violation of Title 18, United States Code, Section 1028A(a)(1) and Title 18, United States Code, Section 2.

**INSTRUCTION NO. 7**

**PLEA AND PRESUMPTION OF INNOCENCE**

As to the indictment, the defendants have entered pleas of not guilty, which casts upon the government the burden of proving the essential allegations beyond a reasonable doubt before you would be justified in returning a verdict of guilty on any crime charged.

As previously stated, the defendants are presumed to be innocent of the crimes charged against them, and of each and every essential element of those crimes.

The presumption of innocence with which a defendant enters a trial continues until such time, if ever, as guilt is shown beyond a reasonable doubt, and if, upon a consideration of all the evidence, facts and circumstances in the case, you entertain a reasonable doubt of the guilt of a defendant as to any one of the crimes charged against that defendant, then you must give that defendant the benefit of that doubt and return a verdict of not guilty with respect to that crime.

**INSTRUCTION NO. 8**

**<u>BURDEN OF PROOF</u>**

The government has the burden of proving a defendant guilty beyond a reasonable doubt.  The burden of proving a defendant guilty beyond a reasonable doubt that rests upon the government never shifts throughout the trial.  The law does not require a defendant to prove innocence or produce any evidence at all.  A defendant may rely on evidence brought out on cross-examination of witnesses for the government, or on the presumption of innocence, or on the weakness of the government's case, or on favorable inferences casting doubt on guilt, or on any of these.

**INSTRUCTION NO. 9**

**<u>REASONABLE DOUBT</u>**

It is not required that the government prove guilt beyond all possible doubt. The test is one of reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense – the kind of doubt with a basis that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in important and weighty affairs, or hesitate to accept the weighty consequences.

The jury will remember that a defendant is never to be convicted on mere suspicion or conjecture.

**INSTRUCTION NO. 10**
**<u>EVIDENCE — DEFINED</u>**


  The evidence in the case consists of the sworn testimony of the witnesses and all exhibits that have been received in evidence, and any facts which have been agreed upon.  Statements and arguments of counsel are not evidence in the case.

  You are to consider only the evidence in the case; but, in your evaluation of the evidence, you are not limited to the bald statements of the witnesses.  In considering the evidence and in determining the issues in this case, you should bring to your aid the general knowledge which you possess, your understanding of the ways of the world, and your common sense.

**INSTRUCTION NO.  11**

**EVIDENCE — DIRECT AND CIRCUMSTANTIAL — INFERENCES**

There are, generally speaking, two types of evidence from which a jury may properly determine the facts of a case.  One is direct evidence, such as the testimony of an eyewitness.  The other is indirect or circumstantial evidence, that is, the proof of a chain of facts which point to the existence or non-existence of certain other facts.

As a general rule, the law makes no distinction between direct and circumstantial evidence.  The law simply requires that you find the facts in accord with all the evidence in the case, both direct and circumstantial.

While you must consider only the evidence in this case, you are permitted to draw reasonable inferences from the testimony and exhibits, inferences you feel are justified in the light of common experience.  An inference is a conclusion that reason and common sense may lead you to draw from facts which have been proved.

By permitting such reasonable inferences, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts which have been established by the testimony and evidence in this case.

# INSTRUCTION NO. 12
## <u>CREDIBILITY OF WITNESSES</u>

You are the sole judges of the credibility or believability of each witness and the weight to be given to the witness's testimony.  In weighing the testimony of a witness, you should consider the witness's relationship to the government or to the defendants; and interest, if any, in the outcome of the case; manner of testifying; opportunity to observe or acquire knowledge concerning the facts about which the witness testified; candor, fairness and intelligence; and the extent to which the witness has been supported or contradicted by other credible evidence. You may, in short, accept or reject the testimony of any witness in whole or in part.

Also, the weight of the evidence is not necessarily determined by the number of witnesses testifying as to the existence or non-existence of any fact.  You may find that the testimony of a smaller number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

The testimony of a defendant should be weighed and his or her credibility evaluated in the same way as that of any other witness.

**INSTRUCTION NO. 13**

**<u>IMPEACHMENT</u>**

You are instructed that a witness may be discredited or impeached by contradictory evidence, or by evidence that at other times the witness has made statements that are inconsistent with the witness's present testimony.

If you believe that any witness has been impeached and thus discredited, it is your exclusive province to give the testimony of that witness such credibility, if any, as you may think that it deserves.

If any witness is shown to have knowingly testified falsely concerning any material matter, you have the right to distrust such witness's testimony in other particulars, and you may reject all of the testimony of that witness, or give it only such credibility as you may think that it deserves.

You may also consider any demonstrated bias, prejudice, or hostility of a witness toward one party or the other in determining the weight to be accorded to the witness's testimony.

**INSTRUCTION NO. 14**

**NON-TESTIFYING DEFENDANT**

Defendant Charles Gooch did not testify.  I remind you that you cannot consider a defendant's decision not to testify as evidence of guilt.  You must understand that the Constitution of the United States grants to a defendant the right to remain silent.  That means the right not to testify.  That is a constitutional right in this country, it is very carefully guarded, and you must not presume or infer guilt from the fact that a defendant does not take the witness stand and testify.

**INSTRUCTION NO. 15**

**LAW ENFORCEMENT WITNESSES**

You have heard the testimony of certain current or former employees of the Federal Bureau of Investigation.  The fact that a witness is or was employed by the federal government as a law enforcement official does not mean that the official's testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of an ordinary witness.

It is your decision, after reviewing all the evidence, whether to accept the testimony of the law enforcement witness, and it is your province to give that testimony whatever weight, if any, you find it deserves.

## INSTRUCTION NO. 16
## <u>IMMUNITY</u>

A person may testify under a grant of immunity, that is, an agreement with the government that the person will not be charged with criminal conduct.  The person's testimony alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt even though it is not corroborated or supported by other evidence. You should consider testimony given under such circumstances with greater care and caution than the testimony of an ordinary witness.  You should consider whether testimony under a grant of immunity has been affected by the witness's own interest, the government's agreement, the witness's interest in the outcome of the case, or by prejudice against a defendant.

On the other hand, you should also consider that an immunized witness can be prosecuted for perjury for making a false statement.  After considering these things, you may give testimony given under a grant of immunity such weight as you feel it deserves.

You should not convict a defendant based on the unsupported testimony of an immunized witness unless you believe the unsupported testimony beyond a reasonable doubt.

## INSTRUCTION NO. 17
## <u>VOLUNTARINESS OF STATEMENT BY DEFENDANT</u>

Evidence has been presented about a statement attributed to a defendant alleged to have been made after the commission of the crimes charged in this case but not made in court.  Such evidence should always be considered by you with caution and weighed with care.  You should give any such statement the weight you think it deserves, after considering all the circumstances under which the statement was made.

In determining whether any such statement is reliable and credible, consider factors bearing on the voluntariness of the statement.  For example, consider the age, gender, training, education, occupation, and physical and mental condition of the defendant, and any evidence concerning the defendant's treatment while under interrogation if the statement was made in response to questioning by government officials, and all the other circumstances in evidence surrounding the making of the statement.

After considering all this evidence, you may give such weight to the statement as you feel it deserves under all the circumstances.  If you determine that the statement is unreliable or not credible, you may disregard the statement entirely.

**INSTRUCTION NO. 18**

**EVIDENCE OF GOOD CHARACTER OR HONESTY AND INTEGRITY**

One or more of the defendants have offered evidence of the defendant's reputation for good character or the defendant's reputation for honesty and integrity or both.

Evidence in the form of reputation for good character or in the form of reputation for honesty and integrity may be sufficient to raise a reasonable doubt whether the defendant is guilty, because you may think it improbable that a person of good character or a person of honesty and integrity would commit such a crime. Evidence in the form of reputation for good character or in the form of reputation for honesty and integrity may be inconsistent with those traits of character ordinarily involved in the commission of the crime charged, and may give rise to a reasonable doubt.

You should also consider any evidence offered to rebut the evidence of good character or honesty and integrity offered by the defendant.

You will always bear in mind, however, that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

**INSTRUCTION NO. 19**

**DATE OF ALLEGED OFFENSES**

You will note that the indictment charges that the alleged offenses were committed "on or about" or between certain dates. The government need not establish with certainty the exact date of an alleged offense. It is sufficient if the evidence in the case establishes beyond a reasonable doubt that an alleged offense was committed on a date reasonably near the date alleged.

**INSTRUCTION NO. 20**

**INVESTIGATIVE TECHNIQUES**

You have heard testimony as to the manner in which the government conducted its investigation in this case, including certain investigative methods or techniques that were used and certain investigative methods or techniques that were not used.  In attempting to prove its case, the government is under no obligation to use all of the investigative methods that are available to it or to use any particular method.  The failure to utilize some particular technique or techniques does not tend to show that a defendant is not guilty of a crime with which he or she has been charged.  The question is whether the evidence presented is sufficient to convince you beyond a reasonable doubt of the defendant's guilt.

## INSTRUCTION NO. 21
## CHARTS AND SUMMARIES

Certain charts and summaries have been admitted into evidence in this case. These charts and summaries should be treated just as any other evidence and given such weight as you determine they deserve.

Other charts and summaries have been shown to you but not admitted into evidence. These charts and summaries have been shown to you in an attempt by one party or another to help explain facts disclosed by books, records, and other documents that are in evidence in the case. These charts or summaries are not themselves evidence or proof of any facts. If these charts or summaries do not correctly reflect the facts shown by the evidence in the case, you should disregard them. In other words, these charts or summaries are used only as a matter of convenience. To the extent that you find they are not truthful summaries of facts shown by the evidence in the case, you are to disregard them entirely.

**INSTRUCTION NO. 22**

**RECORDED CONVERSATION**

During the trial you have heard and seen sound and video recordings of certain conversations.  These conversations were legally recorded.  The recordings are a proper form of evidence and may be considered by you as you would any other evidence.

You were also shown a transcript of one of the recordings.  Keep in mind that the transcript is not evidence.  It was shown to you only as a guide to help you follow what was being said.  The recording itself is the evidence.  If you noticed any differences between what you heard on the recording and what you read in the transcript, you must rely on what you heard, not what you read.  If you could not hear or understand certain parts of the recording, you may not treat the transcript as evidence of what was said in those parts.

**INSTRUCTION NO. 23**

**CAUTION — CONSIDER ONLY CRIMES CHARGED**

You are here to decide whether the government has proven beyond a reasonable doubt that a defendant is guilty of one or more of the crimes charged in the indictment.  The defendants are not on trial for any act, conduct, or crime not charged in the indictment.

It is not up to you to decide whether anyone who is not on trial in this case should be prosecuted for any of the crimes charged.  The fact that another person also may be guilty is no defense to a criminal charge.

The question of the possible guilt of others should not enter your thinking as you decide whether a defendant has been proven guilty of a crime charged against the defendant in the indictment.

**INSTRUCTION NO. 24**

**MULTIPLE DEFENDANTS – MULTIPLE COUNTS**

A separate crime is charged against the defendants in each count of the indictment.  You must separately consider the evidence against each defendant on each count and return a separate verdict for each defendant on each count, unless otherwise instructed.

Your verdict as to any one defendant, whether it is guilty or not guilty, should not influence your verdict as to any other defendant.

With one exception, your verdict as to any one count, whether it is guilty or not guilty, should not influence your verdict as to any other count.  The exception, as you will see later in these instructions, relates to counts 20 through 25, the aggravated identity theft counts.  On this point, see instruction no. 31 for additional guidance.

**INSTRUCTION NO. 25**

**PROOF OF INTENT**

With respect to proof of intent, you are instructed as follows.

Intent ordinarily may not be proved directly, because there is no way of fathoming or scrutinizing the operations of the human mind. You may infer a defendant's intent from the surrounding circumstances. Intent may be, and usually is, proved by circumstantial evidence if it is proved at all. You may consider any statements made and any acts done or omitted by a defendant, and all other facts and circumstances in evidence that indicate the defendant's state of mind.

You may consider it reasonable to draw an inference and thus find that a person intends the natural and probable consequences of acts knowingly done. As I have said, it is entirely up to you to decide what facts to find from the evidence.

**INSTRUCTION NO. 26**

**KNOWINGLY — DELIBERATE IGNORANCE**

When the word "knowingly" is used in these instructions, it means that the act was done voluntarily and intentionally, and not because of mistake or accident. Although knowledge on the part of a defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself or herself to the existence of a fact. Knowledge can be inferred if the defendant was aware of a high probability of the existence of the fact in question, unless the defendant did not actually believe the fact in question.

**INSTRUCTION NO. 27**

**COUNT 1 — CONSPIRACY TO COMMIT WIRE FRAUD — 18 U.S.C. § 1349**

**ESSENTIAL ELEMENTS**

The defendants are charged in count 1 of the indictment with a violation of Title 18, United States Code, Section 1349.

This law makes it a crime for anyone to conspire with someone else to commit wire fraud, as described later in these instructions.  To find a defendant guilty of this crime, you must be convinced that the government has proven each of the following essential elements beyond a reasonable doubt:

**FIRST**:     The defendant agreed with one or more persons to violate the law, as alleged in the indictment;

**SECOND**:   The defendant knew the essential objective of the conspiracy;

**THIRD**:     The defendant knowingly and voluntarily participated in the conspiracy; and

**FOURTH**:   There was an interdependence among the members of the conspiracy.

## INSTRUCTION NO. 28
## <u>CONSPIRACY AND INTERDEPENDENCE—DEFINED</u>

A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose.  It is a kind of "partnership in criminal purposes" in which each member becomes the agent or partner of every other member.  The evidence may show that some of the persons involved in the alleged conspiracy are not on trial.  This does not matter.  There is no requirement that all members of a conspiracy be charged or tried together in one proceeding.

The evidence need not show that the members entered into an express or formal agreement.  Nor does the law require proof that the members agreed on all the details. But the evidence must show that the members of the alleged conspiracy came to a mutual understanding to try to accomplish a common and unlawful plan.

If you are convinced that the charged conspiracy existed, then you must next determine whether the defendant was a member of that conspiracy, that is, whether the defendant knew at least the essential goal or objective of the conspiracy and voluntarily chose to be part of it. The law does not require proof that the defendant knew all the other members of the conspiracy or knew all the details about how activities were to be carried out. A person may belong to a conspiracy for a brief period of time or play a minor role. On the other hand, proof is not sufficient if it merely shows that the defendant knew about the existence of the conspiracy or was associated with members of the conspiracy. Rather, the evidence must show the defendant knowingly joined the conspiracy with the intent to advance its purposes.

You are also required to find that interdependence existed among the members of the conspiracy. This means that the members intended to act for their shared mutual benefit. To satisfy the interdependence element, you must conclude that the defendant participated in a shared criminal purpose and that the defendant's actions constituted an essential and integral step toward the realization of that purpose.

**INSTRUCTION NO. 29**

**COUNTS 2-13 — WIRE FRAUD – 18 U.S.C. § 1343**

**ESSENTIAL ELEMENTS**

The defendants are charged in counts 2 through 13 of the indictment with a violation of Title 18, United States Code, Section 1343.

This law makes it a crime to use interstate wire communication facilities in carrying out a scheme to defraud.

To find a defendant guilty of this crime, you must be convinced that the government has proven each of the following essential elements beyond a reasonable doubt:

FIRST:     The defendant devised or intended to devise a scheme to defraud, as alleged in the indictment;

SECOND:   The defendant acted with specific intent to defraud;

THIRD:     The defendant used, or caused another person to use, interstate wire communication facilities for the purpose of carrying out the scheme; and

FOURTH:   The scheme employed false or fraudulent pretenses, representations, or promises that were material.

A "scheme to defraud" is conduct intended to or reasonably calculated to deceive persons of ordinary prudence or comprehension. It includes a scheme to deprive another person or business of money or property by means of false or fraudulent pretenses, representations, or promises.

An "intent to defraud" means an intent to deceive or cheat someone, ordinarily for the purpose of causing financial loss to another or bringing about financial gain to one's self.

A representation is "false" if it is known to be untrue or is made with reckless indifference as to its truth or falsity. A representation would also be "false" when it constitutes a half truth, or effectively omits or conceals a material fact, provided it is made with intent to defraud.

A false statement is "material" if it has a natural tendency to influence, or is capable of influencing, the decision of the person or entity to which it is addressed. This is an objective standard, not a subjective standard.  The question is whether the false statement objectively has a tendency to influence, or is capable of influencing, a lender to approve a loan.  The government does not have to prove that the lender relied on the false statement or that the lender was damaged by the false statement.

A lender's negligence or lack of due diligence in considering and approving a loan is not a defense to a scheme to defraud the lender.

"Interstate wire communications facilities" include any wire, radio, or television communications that cross state lines.  A person uses "interstate wire communications facilities" by using the Internet to transmit a document from one state to another state.

To "cause" interstate wire communication facilities to be used is to do an act with knowledge that the use of the wire facilities will follow in the ordinary course of business or where such use can reasonably be foreseen.

You are instructed that each separate use of interstate wire communication facilities in furtherance of a scheme to defraud constitutes a separate offense.

Accordingly, counts 2 through 13 of the indictment each charge a separate offense of wire fraud.  Counts 2 through 13 charge that the defendants, for the purpose of executing or attempting to execute the alleged scheme to defraud, transmitted or caused to be transmitted over the Internet the following allegedly false retail sales contracts and terms of sale between dealerships and customers to lenders premised on fake cash down payments, fake trade-ins of vehicles, undisclosed pawns or $1 repurchases.

| COUNT | DATE | DESCRIPTION OF WIRE |
|---|---|---|
| 2 | **January 18, 2016** | **Retail sales contract and terms of sale between BRSI and T.G. transmitted over the Internet to Global Lending Services for loan funding premised on fake trade-in and undisclosed $1 repurchase** |
| 3 | **February 23, 2016** | **Retail sales contract and terms of sale between BRSI and T.C. transmitted over the Internet to Global Lending Services for loan funding premised on fictitious cash down payment and undisclosed pawn of an Xbox 360** |
| 4 | **August 15, 2016** | **Retail sales contract and terms of sale between BRSI and S.O. transmitted over the Internet to American Credit Acceptance for loan funding premised on fictitious cash down payment and undisclosed pawn of an iPhone 5C and an Amazon tablet** |
| 5 | **August 20, 2016** | **Retail sales contract and terms of sale between BRSI and J.D. transmitted over the Internet to American Credit Acceptance for loan funding premised on fake trade-in and undisclosed $1 repurchase** |
| 6 | **September 21, 2016** | **Retail sales contract and terms of sale between Mayes Kia and C.M. transmitted over the Internet to American Credit Acceptance for loan funding premised on fake trade-in** |
| 7 | **November 11, 2016** | **Retail sales contract and terms of sale between BRSI and M.C. transmitted over the Internet to Santander Consumer USA for loan funding premised on fictitious cash down payment and undisclosed pawn of an Apple iPad 2 that was never provided** |
| 8 | **January 5, 2017** | **Retail sales contract and terms of sale between Mayes Kia and F.A. transmitted over the Internet to American Credit Acceptance for loan funding premised on fake $2,700 cash down payment, when $2,300 was the undisclosed pawn of a PlayStation 4** |
| 9 | **February 10, 2017** | **Retail sales contract and terms of sale between BRSI and Mr. B.C. transmitted over the Internet to Global Lending Services for loan funding premised on fictitious $1,000 cash down payment and undisclosed pawn of ZTE Internet wifi hotspot** |

| 10 | April 15, 2017 | Retail sales contract and terms of sale between BRSI and Ms. B.C. transmitted over the Internet to Santander Consumer USA for loan funding premised on fictitious $1,500 cash down payment and undisclosed pawn of television that was never provided |
|---|---|---|
| 11 | May 8, 2017 | Retail sales contract and terms of sale between BRSI and D.D. transmitted over the Internet to Santander Consumer USA for loan funding premised on fake trade-in and undisclosed $1 repurchase |
| 12 | May 10, 2017 | Retail sales contract and terms of sale between Norman Mitsubishi and B.W. transmitted over Internet to Global Lending Services premised on a fake trade-in and undisclosed $1 repurchase |
| 13 | June 1, 2017 | Retail sales contract and terms of sale between BRSI and A.B. transmitted over Internet to Santander Consumer USA premised on a fake trade-in and undisclosed $1 repurchase |

**INSTRUCTION NO. 30**

<u>**COUNTS 14-19 — UTTERING FORGED SECURITY – 18 U.S.C. § 513(a)**</u>
<u>**ESSENTIAL ELEMENTS**</u>

The defendants are charged in counts 14 through 19 of the indictment with a violation of Title 18, United States Code, Section 513(a).

This law makes it a crime for anyone to make, utter, or possess a forged security of an organization, with the intent to deceive another organization.

To find a defendant guilty of this crime, you must be convinced that the government has proven each of the following essential elements beyond a reasonable doubt:

<u>FIRST</u>:        The defendant made, uttered, or possessed a security;

<u>SECOND</u>:    The defendant knew that the security was forged;

<u>THIRD</u>:        The forged security was of an organization; and

<u>FOURTH</u>:    The defendant did so with the intent to deceive another organization.

A check is a "security" within the meaning of the law.

The term "utter" means putting a check in circulation by means of an assertion or misrepresentation that the instrument is genuine.  It is not necessary that the check be cashed to complete the offense of uttering.

The term "forged" means a document that purports to be genuine but is not because it has been falsely altered, completed, signed, or endorsed.

The term "organization" means a legal entity, other than a government, established or organized for any purpose, and includes a corporation, company, association, firm, partnership, joint stock company, foundation, institution, society, union, or any other association of persons which operates in interstate commerce.

For purposes of the fourth element, set forth above, you are instructed that a federally insured bank is an "organization."

The phrase "intent to deceive" means to act with intent to cheat or defraud. It does not matter, however, whether anyone was in fact cheated or defrauded or whether money was actually obtained.

Counts 14 through 19 of the indictment each charge a separate offense of uttering forged security.  Counts 14 through 19 charge that the defendants made, uttered, and possessed the following securities of Norman Pawn & Gun, payable to individuals, identified below, which purported to bear the true signatures of such individuals as endorsements, but which signatures were forged by or at the direction of the defendants, with the intent to deceive Republic Bank and Trust in Norman, Oklahoma.

| Count | Date of Check (On or About) | Payee | Amount | Check No. | Date of Deposit (On or About) |
|---|---|---|---|---|---|
| 14 | 1/22/2016 | T.C. | $1,000.00 | 1211 | 5/2/2016 |
| 15 | 8/15/2016 | S.O. | $3,700.00 | 1299 | 10/6/2016 |
| 16 | 9/22/2016 | M.C. | $500.00 | 1333 | 11/23/2016 |
| 17 | 1/5/2017 | F.A. | $2,300.00 | 1377 | 1/23/2017 |
| 18 | 2/10/2017 | Mr. B.C. | $1,000.00 | 1439 | 3/31/2017 |
| 19 | 4/15/2017 | Ms. B.C. | $1,500.00 | 1487 | 6/7/2017 |

INSTRUCTION NO. 31

**COUNTS 20-25 — AGGRAVATED IDENTITY THEFT – 18 U.S.C. § 1028A(a)(1)**
**ESSENTIAL ELEMENTS**

The defendants are charged in counts 20 through 25 of the indictment with a violation of Title 18, United States Code, Section 1028A(a)(1).

This law makes it a crime for anyone to knowingly use, without lawful authority, a means of identification of another person during and in relation to certain offenses, including the offense of wire fraud in violation of Title 18, United States Code, Section 1343 and the offense of uttering forged security in violation of Title 18, United States Code, Section 513(a).

To find a defendant guilty of this crime, you must be convinced that the government has proven each of the following essential elements beyond a reasonable doubt:

**FIRST**: The defendant committed the offense of wire fraud as charged in counts 3, 4, 7, 8, 9, or 10 of the indictment, or the offense of uttering forged security as charged in counts 14, 15, 16, 17, 18, or 19 of the indictment;

**SECOND**: During and in relation to the offense of wire fraud or the offense of uttering forged security, the defendant knowingly used a means of identification;

**THIRD**: The defendant did so without lawful authority; and

**FOURTH**: The defendant knew that the means of identification belonged to another real person.

The phrase "means of identification" means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual.

A person's signature is a "means of identification."

The phrase "without lawful authority" means the defendant used another's means of identification either without that person's permission, or having obtained that person's permission illegally.

A person uses a means of identification "in relation to" the offense of wire fraud or the offense of the uttering forged security if it had a purpose, role, or effect with respect to the offense of wire fraud (and was more than merely incidental to the offense of wire fraud) or the offense of uttering forged security. It also means that the use of the means of identification had a connection to or a relationship with the offense of wire fraud or the offense of uttering forged security.

For purposes of the first element, above, you are instructed that count 20 of the indictment requires proof of the offense of wire fraud as charged in count 3 of the indictment or proof of the offense of uttering forged security as charged in count 14 of the indictment. Therefore, if you find a defendant not guilty with respect to both count 3 and count 14 of the indictment, then you must completely disregard count 20 of the indictment and return no verdict at all with respect to that count.

Similarly, for purposes of the first element, above, you are instructed that count 21 of the indictment requires proof of the offense of wire fraud as charged in count 4 of the indictment or proof of the offense of uttering forged security as charged in count 15 of the indictment. Therefore, if you find a defendant not guilty with respect to both count 4 and count 15 of the indictment, then you must completely disregard count 21 of the indictment and return no verdict at all with respect to that count.

In addition, for purposes of the first element, above, you are instructed that count 22 of the indictment requires proof of the offense of wire fraud as charged in count 7 of the indictment or proof of the offense of uttering forged security as charged in count 16 of the indictment. Therefore, if you find a defendant not guilty with respect to both count 7 and count 16 of the indictment, then you must completely disregard count 22 of the indictment and return no verdict at all with respect to that count.

Also, for purposes of the first element, above, you are instructed that count 23 of the indictment requires proof of the offense of wire fraud as charged in count 8 of the indictment or proof of the offense of uttering forged security as charged in count 17 of the indictment. Therefore, if you find a defendant not guilty with respect

to both count 8 and count 17 of the indictment, then you must completely disregard count 23 of the indictment and return no verdict at all with respect to that count.

Further, for purposes of the first element, above, you are instructed that count 24 of the indictment requires proof of the offense of wire fraud as charged in count 9 of the indictment or proof of the offense of uttering forged security as charged in count 18 of the indictment.  Therefore, if you find a defendant not guilty with respect to both count 9 and count 18 of the indictment, then you must completely disregard count 24 of the indictment and return no verdict at all with respect to that count.

Finally, for purposes of the first element, above, you are instructed that count 25 of the indictment requires proof of the offense of wire fraud as charged in count 10 of the indictment or proof of the offense of uttering forged security as charged in count 19 of the indictment.  Therefore, if you find a defendant not guilty with respect to both count 10 and count 19 of the indictment, then you must completely disregarded count 25 of the indictment and return no verdict at all with respect to that count.

You are instructed that each use, without lawful authority, of a means of identification of another person during and in relation to the offense of wire fraud or the offense of uttering forged security, constitutes a separate offense.

Accordingly, counts 20 through 25 of the indictment each charge a separate offense of aggravated identify theft.  Counts 20 through 25 charge that the defendants used without lawful authority the name and signature of the individuals identified below during and in relation to the offense of wire fraud and the offense of uttering forged security.  In particular, counts 20 through 25 charge that defendants and others acting under their direction and control fraudulently forged the signatures of the individuals identified below in endorsing checks from Norman Pawn & Gun over to the Big Red Dealerships and depositing such checks in dealership accounts.

| Count | Date of Check (On or About) | Payee | Amount | Check No. | Date of Deposit (On or About) |
|---|---|---|---|---|---|
| 20 | 1/22/2016 | T.C. | $1,000.00 | 1211 | 5/2/2016 |
| 21 | 8/15/2016 | S.O. | $3,700.00 | 1299 | 10/6/2016 |
| 22 | 9/22/2016 | M.C. | $500.00 | 1333 | 11/23/2016 |
| 23 | 1/5/2017 | F.A. | $2,300.00 | 1377 | 1/23/2017 |
| 24 | 2/10/2017 | Mr. B.C. | $1,000.00 | 1439 | 3/31/2017 |
| 25 | 4/15/2017 | Ms. B.C. | $1,500.00 | 1487 | 6/7/2017 |

**INSTRUCTION NO. 32**

**COUNTS 2-25 — AIDING AND ABETTING – 18 U.S.C. § 2**

**ESSENTIAL ELEMENTS**

The defendants are also charged in counts 2 through 25 in the indictment with a violation of Title 18, United States Code, Section 2.

Section 2 provides that: "Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

This law makes it a crime to intentionally help someone else commit a crime.

To find a defendant guilty of this crime, you must be convinced that the government has proven each of the following essential elements beyond a reasonable doubt:

<u>FIRST</u>:    Every element of a charged crime was committed by someone other than the defendant; and

<u>SECOND</u>:    The defendant intentionally associated himself or herself in some way with the crime and intentionally participated in it as he or she would in something he or she wished to bring about. This means that the government must prove that the defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help him or her.

The defendant need not perform the underlying criminal act, be present when it is performed, or be aware of the details of its commission to be guilty of aiding and abetting. But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.

The crime of aiding and abetting is different from the crime of conspiracy because it is not contingent upon a prior agreement by two or more persons to violate the law. Intentionally aiding, counseling, or assisting another in the commission of a crime is all that is required.

**INSTRUCTION NO. 33**

**CAUTION — PUNISHMENT**

If you find a defendant guilty of any crime charged in the indictment, it will be my duty to decide what the punishment will be.  You should not discuss or consider the possible punishment in any way while deciding your verdict.

## INSTRUCTION NO. 34
### <u>TRANSCRIPT</u>

During the trial, you undoubtedly noted some instances in which I quickly reviewed the preliminary transcript as it appeared on the computer screen. That was only a preliminary transcript. Any transcript which could be made available to other persons for any other purpose would have to be a certified transcript. The preparation of a certified transcript involves a number of steps, including the reporter listening to the tape to verify the transcript, proofreading, the making of any necessary corrections, and so forth. It is highly unlikely that a certified transcript of the testimony of any witness could be completed without substantial delay. Moreover, if a transcript of the testimony of any particular witness were provided, it might be necessary, in fairness, to provide additional transcripts of the testimony of other witnesses. That would take additional time, resulting in further delay. For that reason, it is simply not practicable to prepare a transcript of testimony for use in your deliberations. It will be necessary for you to make your decision based on what you remember about the evidence. You must do your very best to recall the testimony as it was presented at trial. You should also listen very carefully to your fellow jurors' recollections as to the testimony which was given during the trial.

**INSTRUCTION NO. 35**

**<u>VERDICT</u>**


If you unanimously find beyond a reasonable doubt from the evidence in this case and under these instructions that a defendant is guilty of a crime charged against him or her, then you should find the defendant guilty with respect to that crime.

On the other hand, if you do not so find, or if you entertain a reasonable doubt as to the guilt of a defendant with respect to a crime charged, then you should return a verdict of not guilty with respect to that crime.

## INSTRUCTION NO. 36
## <u>CLOSING</u>

From all the facts and circumstances appearing in evidence and coming to your observation during the trial, and aided by the knowledge that you each possess in common with other persons, you will reach your conclusions.  You should not let sympathy, sentiment or prejudice enter into your deliberations, but you should discharge your duties as jurors in an impartial, conscientious and faithful manner under your oaths and return such verdicts as the evidence warrants when measured by these instructions.  These instructions contain all the law, whether statutory or otherwise, that may be applied by you in this case and the rules by which you should weigh the evidence and determine the facts in issue. You must consider the instructions as a whole and not a part to the exclusion of the rest.  You will not use any method of chance in arriving at your verdicts but base them on the judgment of each juror concurring in them.

After the closing arguments have been completed, the bailiff will lead you to the jury deliberation room to begin your deliberations.  If any of you have cellphones or similar devices with you, you are instructed to turn them off and give them to the bailiff as you enter the jury deliberation room.  They will be held by the bailiff for you and returned to you after your deliberations are completed and during any lunch break or similar period when you are not deliberating.  The purpose of this requirement is to avoid any interruption or distraction during your deliberations and to eliminate even the possibility of any question of outside contact with the jury during your deliberations.

After you have retired to consider your verdicts, select one of your number as the foreperson and enter upon your deliberations.  The exhibits will be available for your examination.

If it becomes necessary during your deliberations to communicate with the court, you may send a note by the bailiff, signed by your foreperson, or by one or more members of the jury.  No member of the jury should ever attempt to communicate with the court by any means other than a signed writing, and the

court will never communicate with any member of the jury on any subject touching the merits of the case otherwise than in writing or orally here in open court.

The bailiff, too, as well as other persons, is forbidden to communicate in any way or manner with any member of the jury on any subject touching the merits of the case.

Bear in mind also that you are never to reveal to any person—not even to the court—how the jury stands, numerically or otherwise, on the question of the guilt or innocence of the defendants, until after you have reached unanimous verdicts.

If you fail to reach verdicts, the parties may be put to the expense of another trial and may once again have to endure the mental and emotional strain of a trial. If the case is retried, a future jury must be selected in the same manner and from the same source as you have been chosen, and there is no reason to believe that the case would ever be submitted to a jury more competent to decide this case than those of you who compose the present jury.  There is no reason to believe that there will be more or clearer evidence produced at a future trial.

When you have agreed on the verdicts, notify the court of that fact by sending a note through the bailiff.  The foreperson alone will sign the verdict forms and you will as a body return them into open court, where the court will read the verdicts.  Verdict forms will be furnished for your use.

In this connection you are advised that the verdict forms include a blank space after the words "not guilty" and "guilty" for each crime charged against the defendants, so that if you find the defendants not guilty or guilty, simply place a mark in the appropriate space.

The verdicts of the jury in this case must be unanimous which means that each juror must agree and concur in the verdicts.  In this connection, the court advises each of you that as jurors you have a duty to consult with one another and to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment; each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. In the course of deliberations, a juror should not hesitate to re-examine his or her own views and change that opinion if convinced it is erroneous, but no juror should

surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of his or her fellow jurors or for the mere purpose of returning the verdicts.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

**DATE:  November 18, 2021**