1 IN THE UNITED STATES DISTRICT COURT

2 FOR THE WESTERN DISTRICT OF OKLAHOMA

3

4 UNITED STATES OF AMERICA,

5   Plaintiff,

6 vs.      Case No. CR-20-240-F

7 BOBBY CHRIS MAYES,
 CHARLES GOOCH, and
8 COURTNEY WELLS,

9   Defendants.
 ------------------------------

10

11

12

13    * * * * * * * * *

14  TRANSCRIPT OF JURY TRIAL PROCEEDINGS

15  BEFORE THE HONORABLE STEPHEN P. FRIOT

16   UNITED STATES DISTRICT JUDGE

17    NOVEMBER 4, 2021

18     8:00 A.M.

19    VOLUME II OF XII

20    * * * * * * * * *

21

22

23

24

25 Proceedings reported by mechanical stenography; transcript
 produced by computer-aided transcription.

*Tracy Thompson, RDR, CRR*
United States Court Reporter
U.S. Courthouse, 200 N.W. 4th St.
Oklahoma City, OK 73102 * 405.609.5505

```
 1                    A P P E A R A N C E S:

 2   FOR THE GOVERNMENT:
     Ms. K. McKenzie Anderson and Mr. Thomas B. Snyder, Assistant
 3   United States Attorneys, United States Attorney's Office, 210
     W. Park Ave., Suite 400, Oklahoma City, OK 73102
 4
     FOR MR. BOBBY CHRIS MAYES:
 5   Ms. Vicki Z. Behenna and Mr. W. Brett Behenna, Behenna Goerke
     Krahl & Meyer, 210 W. Park Ave., Suite 3030, Oklahoma City, OK
 6   73102

 7   Mr. William H. Bock and Ms. Michelle L. Greene, Attorneys at
     Law, 6402 N. Santa Fe Ave., Suite A, Oklahoma City, OK 73116
 8
     Ms. Rachel N. Jordan, Mulinix Goerke & Meyer, PLLC, 210 W. Park
 9   Ave., Suite 3030, Oklahoma City, OK 73102

10
     FOR MR. CHARLES GOOCH:
11   Mr. Joseph G. Shannonhouse, IV, Shannonhouse Law Office, PLLC,
     500 N. Walker Ave., Suite C-100, Oklahoma City, OK 73102
12
13   FOR MS. COURTNEY WELLS:
     Mr. Robert D. Gifford, II, Gifford Law, PLLC, P.O. Box 2682,
14   Oklahoma City, OK 73101

15   Mr. S. Thomas Adler, II, Atkins & Markoff, 9211 N. Lake Hefner
     Parkway, Suite 104, Oklahoma City, OK 73120
16

17

18

19

20

21

22

23

24

25
```

```
1                          EXAMINATION INDEX

2

3    GOVERNMENT'S WITNESSES:

4    JUSTIN LOWRANCE
          CONTINUED DIRECT BY MR. SNYDER            165
5         CROSS BY MR. BEHENNA                      169
          CROSS BY MR. GIFFORD                      193
6         REDIRECT BY MR. SNYDER                    195
          RECROSS BY MR. BEHENNA                    197
7
     ANDY ELLIOTT
8         DIRECT BY MS. ANDERSON                    200

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (PROCEEDINGS HAD ON NOVEMBER 4, 2021, IN OPEN COURT, WITH

2     ALL PARTIES AND THEIR COUNSEL PRESENT, OUTSIDE THE PRESENCE OR

3     HEARING OF THE JURY.)

4          THE COURT:  Good morning.  We're resuming in Criminal

5     20-240, United States of America vs. Mayes, Gooch, and Wells,

6     without the jury to address the recorded conversation that we

7     were discussing at the end of the day yesterday.  And my

8     recollection is that the government planned to play some

9     portions of it and there was an objection to proceeding without

10    other portions being played.  And my approach at 5:00 yesterday

11    was to have counsel collaborate on what portions need to be

12    played from the perspective of both sides, so where do we stand

13    on that?

14         MR. SNYDER:  Thank you, Your Honor, so the good news

15    is, with respect to Justin Lowrance and the clips that we were

16    going to play through him, I think that issue has been

17    resolved.  We received faster notification than you even

18    required from defense counsel that they were okay with the

19    clips that we were going to play, and they didn't require

20    additional ones, so the immediate issue has been resolved.

21         We think this is going to be a recurrent issue, as

22    Mr. Gifford indicated with his client, so I don't know if now

23    is the time for us to address sort of our view on what the rule

24    of completeness requires on how it really probably ought to be

25    handled going forward, or whether we want to table that for

1   another time.

2           THE COURT:  Without any promises from me that I can

3   do my part, I'll hear what you have to say, and I'll hear what

4   defense counsel have to say, and maybe we can make some headway

5   on it.

6       Let me give you a starting point.  And maybe I'm relying

7   too much on conventional wisdom, we'll see, but it has always

8   been my understanding that if one part of -- we can talk about

9   a document or a recording, whatever -- if one part of a

10  recording is played of an interview with Joe Dokes and then Joe

11  Dokes' lawyer says, well, there's another part of it that's

12  relevant that I want to be heard, then Joe Dokes' counsel has

13  virtually free rein in presenting the other parts to the jury.

14      Now, if the law is otherwise, I have gone about 49 years

15  about learning that.  So I'll invite you to continue my legal

16  education.

17          MR. SNYDER:  Sure.  And before -- I'm going to read

18  some excerpts from a Tenth Circuit opinion that are directly on

19  point I think that lay this out.  Before I do, I will assure

20  the Court that the message you gave to us yesterday was loud

21  and clear, that we are not going to be a "stickler" may be the

22  wrong word, but we are going to have an open mind to any

23  portions that the defense wants to play in response.  Because I

24  understand the Court does not want to get bogged down in this

25  overtly.  But I think the framework indicates where this

1  process needs to start and it's not with carte blanche for them

2  to play the entire video.

3          THE COURT:  Let me interrupt there.  That's also

4  true.  You know, there have been cases tried in this

5  courthouse, and I'm happy to say it has not been me, in which

6  almost seemingly for vindictive reasons one side says, well, if

7  they're going to hear their snippets then we want to hear the

8  whole two-hour recording.  That ain't gonna happen, unless

9  every second of that two-hour recording is clearly relevant.

10 So there's something for both sides to think about.

11         MR. SNYDER:  I was responding to Mr. Gifford's

12 comment that all of it gets played or none of it gets played.

13         THE COURT:  All or none is a nonstarter.

14         MR. SNYDER:  So Rule 106 -- and I'm going to quote

15 mostly from the opinion just because they do a better job

16 explaining it than I could -- so they say United States v.

17 Williston, 862 F.3d 1023, which is 2017 case, says Rule 106 --

18         THE COURT:  862 F.3d what?

19         MR. SNYDER:  1023.

20     Rule 106 does not give a interview declarant a general

21 right to introduce selected statements to try to counter the

22 statements in the proponent's offered segment.  It goes on to

23 say that only the portions of the statement that are, one,

24 relevant to an issue in the case and, two, necessary to explain

25 or clarify the already admitted portions need be admitted.

1      Then the Tenth Circuit sets forth a four-factor test that

2  the Court should consider, that all four factors have to be

3  present before a responsive clip is admitted, and then

4  concludes with a statement, hearsay statements that do not meet

5  this test remain inadmissible.

6      So I don't want to get bogged down in it, but I think what

7  has to happen is the rule of completeness allows responsive

8  clips to be offered, when necessary, to put the offered clip

9  into context or clarify or made some context that would

10 otherwise make the clip that we propose misleading.  So what

11 should happen, what the law requires, is that if they want to

12 play additional clips, those clips need to be tailored to

13 responding to the clips that we have chosen in some way.  And

14 they need to identify what they want to play.  Once they do

15 that, we can evaluate whether those clips meet this four-factor

16 test.  And as I said to the Court, if they propose us ten

17 different clips, we are going to be liberal in our view towards

18 whether they meet this test because we understand what you said

19 and what you're saying.  But they need to identify the clips

20 that they want to play and it can't just be "play the whole

21 video."

22     Now, if it was a five-minute video, it might be a

23 different thing, but we're talking long recordings.  And so we

24 flagged for defense counsel that we tend to play parts of

25 Exhibits 9 and 10, which are interviews -- the recordings

 1   between Donna Mullins and Andy Elliott.  There may be other
 2   objections, but we haven't been told what clips -- additional
 3   clips if any -- they want to play on that.
 4          THE COURT:  Wait, wait, wait, wait, wait.  Maybe I
 5   was thinking too much about the substance of what you're saying
 6   and not enough about the details.  The pending offer, is that
 7   the one where you say you have not been told what --
 8          MR. SNYDER:  The Exhibit 8, which Justin Lowrance is
 9   going to testify to, that issue has been resolved.
10       One of our witnesses we expect later today is Andy
11   Elliott, and through him we intend to offer the recordings
12   between Mr. Elliott and Ms. Mullins that you've heard reference
13   in the testimony yesterday.  We have prepared clips from those.
14   At the end of the day yesterday, we alerted defense counsel to
15   the fact that we were going to be playing clips from those, and
16   we basically need the same response from them on our clips and
17   proposed responsive clips for Exhibits 9 and 10.  And then, of
18   course, the issue is going to repeat itself again with the
19   Courtney Wells interview, which is further down the road.  So
20   we think we need to know what clips they want to play in
21   response and maybe we have no problem and there's no issue to
22   be resolved.  We just don't know that until we know what they
23   want to play.  All we know right now is that, I guess,
24   theoretically, they want to play the entire thing.
25       The logistic issue I want to flag, real briefly, is if

1   they identify clips they want us to play, our paralegal can on

2   the fly just with the time stamps of the video play those clips

3   for the Court.

4           THE COURT:  You say can or can't?

5           MR. SNYDER:  Can.  She can do that.  She's capable of

6   doing that.  The problem with that is the only versions of the

7   recordings we have are our clips and the complete video.  So if

8   we are going to have certain clips that they want played, we

9   don't have those clips in any form that can go into the JERS

10  system and be sent back to the jury.  So they need, at some

11  point, provide the actual clips, because we have not prepared

12  their clips for them.  And if we send the entire video back

13  then the jury will have the entire video.

14          THE COURT:  Well, that's significant because

15  especially in a case like this I think the JERS system is

16  pretty important.  Obviously, that's not a problem that needs

17  to be solved right when that exhibit is presented but it

18  certainly is a problem that needs to be solved.  And there's

19  especially, obviously, a need to make sure that everybody is on

20  the same page in terms of exactly what was designated and needs

21  played so that the JERS system receives only that which was

22  designated and played.

23       And just to give me a little bit of a birds-eye view of

24  the scope of this practical problem, how many recordings are we

25  going to be addressing, roughly, altogether during this trial?

1           MR. SNYDER:  I believe there are four.

2           MS. ANDERSON:  The one we resolved.

3           MR. SNYDER:  So the Justin Lowrance one we've

4    resolved.

5           THE COURT:  Okay.

6           MR. SNYDER:  There are two recordings between Donna

7    Mullins and Andy Elliott.  And I think there's just, then, the

8    Courtney Wells' interviews, there's those four.

9           THE COURT:  And the last one was what?

10          MR. SNYDER:  The interview of Defendant Courtney

11   Wells.

12          THE COURT:  Okay.

13          MR. SNYDER:  And the first is resolved.  The second

14   two are likely to come up later today or tomorrow, and the last

15   one is not likely to come up until next week.

16          THE COURT:  Okay.  But you're thinking today you may

17   get to the point of offering the two Mullins/Elliott

18   recordings?

19          MR. SNYDER:  That would be our thought and our plan,

20   although I've been wrong about our schedule the entire time.

21          THE COURT:  Okay.  Let me hear from the defense

22   counsel, then, as to their proposed approach to -- and please

23   work from the lectern -- their proposed approach to, number

24   one, effectively representing your client, number two, not

25   subjecting the jury to listening to or viewing an entire

 1  recording if that's not necessary.

 2       MR. BEHENNA:  Thank you, Your Honor.  So if I could

 3  address your point directly first and then there's another

 4  issue I would like to circle back to when we have time.

 5     We did speak with the government.  I sent an e-mail last

 6  night to the government saying that the selected clips of Chris

 7  Mayes, so Exhibit 8, we do not object to those clips being used

 8  and not the whole video, because part of the video we had

 9  problems with as being hearsay, and it's also being prejudicial

10  and not relevant to the case.  And it appears that the

11  government cut those clips out, so that's fine.

12     Exhibits 9 and 10 are audio recordings between Donna

13  Mullins and Andy Elliott.  The entire recording is discussing

14  bribery, right?  It's those two, it's Donna trying to solicit

15  statements from Andy, it's Andy coaching Donna what to say.

16  The government told us that they intended to introduce clips

17  back in October of -- October 27th.  We responded with an

18  e-mail on October 28th that we are thinking through any

19  objection we may have to this audio being admitted at trial,

20  but at a minimum, under the rule of completeness, we would ask

21  that the entire recording being be played and transcribed --

22       THE COURT:  Please slow down.

23       MR. BEHENNA:  Oh, sorry.

24     -- be played and transcribed and the transcription

25  entered, if at all.  So if we want to have, I guess, an

1  intelligent conversation about whether or not that clip is

2  relevant, I think it's really important for the Court to listen

3  to that entire recording and then listen to the proposed cuts

4  that the government is seeking to make to this bribery scheme

5  that both Andy and Donna were discussing on a recorded tape.

6  We think every bit of it is relevant, and it should all come in

7  its full -- in its entirety.

8          THE COURT:  Then what would be wrong with playing the

9  unplayed portion of it during your case?

10         MR. BEHENNA:  Yeah, it's just, one, we never heard

11  from the government in response to my e-mail, okay?  So the

12  first time we are hearing that, one, here are the clips --

13  first, we were given those yesterday, I think for the first

14  time, I'll check on that to be sure.  We were given the clips

15  yesterday for the first time, so we hadn't heard from them

16  since October 28th until yesterday.  And then last night we're

17  preparing for cross and then we're preparing to create videos

18  to fill in the gaps that the government left, it's an

19  inconvenience, it's unnecessary, when the government could just

20  hit play and the entire thing could run.

21         THE COURT:  Roughly how long is Exhibit 9 in its

22  entirety?

23         MR. BEHENNA:  In its entirety, I think, is -- there's

24  a note -- I don't want to misspeak.  If I can look.  Your

25  Honor, I'm being told one is 26 minutes and one is 17.

1          THE COURT:  And do I understand you to be saying that

2   from the perspective of your client, they are relevant in their

3   entirety?

4          MR. BEHENNA:  In their entirety, yes, Your Honor.

5          THE COURT:  Okay.  And so I take it the Defendant

6   Mayes would not object to those exhibits, assuming they are

7   played in their entirety.

8          MR. BEHENNA:  That's -- no, we would object that

9   they're hearsay.  Our first objection is they're hearsay and

10  they shouldn't come in, Your Honor.  But if they are to be

11  admitted, the entire video or audio is relevant.

12         THE COURT:  Okay.  Now, if you would, explain your

13  hearsay objection just a little more.

14         MR. BEHENNA:  The recording is between Donna Mullins

15  and Andy Elliott.  It is out of court statements made by those

16  two, and they're being asserted by the government for the truth

17  of the matter therein.

18         THE COURT:  Okay.  Well, where does Rule 801(d)(2)(E)

19  fit into this?

20         MR. BEHENNA:  Forgive me on that.  I don't have that

21  off the top of my head memorized, but I can look it up.

22  801(d)(2)(E), Your Honor.

23         THE COURT:  Co-conspirator statements.

24         MR. BEHENNA:  Well, we never had a James hearing,

25  Your Honor.  If they wanted to allege that Andy Elliott was a

 1   co-conspirator of Chris Mayes, we should have had a James

 2   hearing.

 3            THE COURT:  Well, you've got a point there.

 4            MR. BEHENNA:  And we never did.

 5            THE COURT:  Anything further on this point?

 6            MR. BEHENNA:  Circling back, we also object to

 7   Exhibit 8.  And let me just talk about what you're going to see

 8   in Exhibit 8, Your Honor.  Exhibit 8 is Justin Lowrance going

 9   to talk with Chris Mayes about Tinker's buying guidelines, that

10   whole discussion we had yesterday about buying guidelines,

11   changing the pricing index.  There's nothing on that video

12   about bribery, about paying Donna Mullins, about Chris Mayes

13   knowing Donna Mullins had been bribed, that whole video is

14   irrelevant.  Chris is not charged with submitting loans to

15   Tinker that affected their buying guidelines.  In fact, the

16   government, in their grand jury testimony, Agent Schmitz says

17   that we didn't think there was enough -- there was anything

18   there to charge that.  That's not charged in this case.

19            THE COURT:  Okay.  Well, I need you to answer this:

20   My impression is, and the government can set me straight if I'm

21   wrong, is that one or more of the defendants focused on this

22   sale price criterion that Tinker Federal Credit Union used as

23   opposed to MRSP as kind of one of the building blocks of their

24   scheme to submit these dummied-up invoices showing sale price

25   far in excess of MRSP as part of the plan to get very shaky

 1   loans approved.  That's my perception.  I'm not asking you to

 2   agree that that's factually true, but it's my perception that

 3   is perhaps, in broad strokes, part of the government's theory

 4   in this case.  If that's true then why should the government

 5   not be permitted to have the jury view or hear this recording?

 6          MR. BEHENNA:  Your Honor, because I think there's a

 7   very fine line and propensity comes into play here, okay.  What

 8   Donna Mullins told you from the stand yesterday is she didn't

 9   change her buying guidelines because of the money.  She admits

10   Andy Elliott was giving me money, he was relentless about it,

11   but I didn't change my buying guidelines.  I understand the

12   government's theory, but that's different, but that's the

13   witness that they sponsored.  Okay.  If Tinker thought that

14   there was something wrong with their buying guidelines and

15   Chris Mayes and his dealership, people at his dealership, in

16   submitting loans were a problem, there's civil action that

17   could have been taken, never taken.  The government could have

18   charged that conduct if they thought something was going on,

19   never charged.

20          THE COURT:  This sounds like material for closing

21   argument.

22          MS. BEHENNA:  But here is the point, Your Honor, what

23   we're going to put in front of the jury, what we spent, really,

24   all day yesterday and a good part of today, the only statement

25   that they seek to take from Chris Mayes is about buying

1    guidelines with Tinker, okay?  We're putting that in front of

2    the jury and the jury is then going to sit and think, well, did

3    he mislead Tinker on buying guidelines and, if so, if he did

4    that, did he also do things with these other lenders in the

5    pawn shop?  Does he -- is that his character?  If he's done it

6    in the past, will he do it again?  That's propensity evidence.

7            THE COURT:  Well, but it doesn't matter if it is

8    otherwise propensity evidence if it also goes directly to and

9    intrinsically to one of the counts of the indictment.

10           MR. BEHENNA:  And I guess -- I would end with that,

11   the intrinsic part of this indictment is bribery, Your Honor.

12   It was -- that they allege that between April '16 dealership

13   operating, Mayes routinely met with the loan officer -- or

14   direction and control of Mayes routinely met with a loan

15   officer at a financial institution, approximately $30,000 in

16   payments.  Big Red Dealership manager sometimes would call on

17   the loan officer and give notice of questionable applications

18   was being sent over.

19           THE COURT:  Please slow down.

20           MR. BEHENNA:  Forgive me, Your Honor.

21           THE COURT:  Well, it's a no kidding proposition.

22   You've been on your feet in enough courtrooms to know that you

23   just can't read at a pace like that.

24           MR. BEHENNA:  Forgive me.

25         To the attention of the loan officer.  Some of these loans

1   were for vehicles which an employee at Big Red Dealership had

2   generated their own invoices to support prices above the

3   manufacturer's suggested retail price.

4      Your Honor, we've heard evidence of the bribery.  Evidence

5   related to a bribery taking place is fine, but to admit

6   statements of Chris Mayes about a discussion with Tinker and

7   their buying guidelines isn't relevant, for me, in the argument

8   that I'm making to the Court that -- to the charges that he's

9   facing in this case.  And so we would say that they're not

10  relevant, they're prejudicial, and they should be excluded.

11       THE COURT:  Okay.  Thank you.

12     The pending offer is Exhibit 8, that's the exhibit number,

13  right?  Okay, I haven't heard anything that would require it to

14  be excluded, but I do want to address, since we may get to this

15  today, I do want to address these Mullins/Elliott recordings,

16  because the Court was informed that out-of-court co-conspirator

17  statements would not be offered.  I need to hear more on that.

18       MS. ANDERSON:  Yes, Your Honor.  The government isn't

19  offering the Andy Elliott and Donna Mullins recordings under

20  801(d)(2)(E).  Our argument is that it's unnecessary to prove

21  the conspiracy and the James hearing process because here we

22  have a formal agency relationship, so we are offering them

23  under 801(d)(2)(D), which is statements made by a party's agent

24  or employee on a matter within the scope of that relationship

25  and while it existed.

1     And we will lay the foundation during Mr. Elliott's

2  testimony that these recordings, which happened on June 21st of

3  2017 and July 17th of 2017, were when he was an employee of

4  Chris Mayes and Courtney Wells and Chuck Gooch, they were all

5  officers and directors of the Big Red Dealership group of

6  companies.  They actually oversaw all the different

7  dealerships.  He was a general manager at one of those, and he

8  was speaking to Donna Mullins about something within the scope

9  of his employment relationship and that he had knowledge on as

10  part of his relationship.

11     So there's a three-part test in the Tenth Circuit for

12  statements made by the party's agent or employee on the matter

13  within the scope of that relationship and while it existed,

14  it's United States v. Ballou, 59 F. Supp. 3rd 1038, which is

15  District of New Mexico in 2014.  And it's citing Fischer v.

16  Forestwood Company, Inc., which is a Tenth Circuit case from

17  2008, found at 525 F.3d 972.

18     And the government needs to establish by at least a

19  preponderance that, number one, an agency employment servant

20  and/or partnership relationship existed between the defendants

21  and the other co-defendants and others -- he would be an other

22  here, in which relationship defendant was the principal

23  employer, master and/or partner, and in which the declarants

24  were the agents, employees, servants and/or partners of

25  defendants.

1      Number two, that the statements were made during the

2 relevant relationship.

3      And number three, that the statements related to a matter

4 within the scope of the relationship.

5           THE COURT:  Okay.

6           MS. ANDERSON:  And so the Tenth Circuit has held that

7 in a criminal trial, the existence of an employment

8 relationship includes statements made by an employee against a

9 corporate officer, not just the corporation itself, that's

10 United States v. Young, 736 F.2d. 565.

11           THE COURT:  To what extent do these recordings

12 implicate Defendants Gooch or Wells?

13           MS. ANDERSON:  They do in that Gooch and Wells were

14 other corporate officers, so Mr. Gooch was the vice president

15 over all of the -- over the Big Red Sports & Imports, he was

16 the compliance officer for every one of the dealerships in that

17 group.  Courtney Wells was the controller over all of the

18 dealerships.  They were all part of the upper management

19 structure of these dealerships overseeing the operations of all

20 of them.  And you'll hear from Andy Elliott that when he was

21 giving cash bribes to Donna Mullins, it was at Chris Mayes'

22 direction.  Chris Mayes directed Courtney Wells, who was the

23 controller, to provide him with cash for him to give that cash

24 to Donna Mullins.  And once Donna Mullins was fired from Tinker

25 and hired at the dealerships, Chris Mayes directed Andy Elliott

1   to shut up Donna Mullins.

2       And what's happening in these recordings is him trying to

3   shut up Donna Mullins about the bribery that he and Chris Mayes

4   and Courtney Wells had engaged in, in order to push loans

5   through the Tinker systems that were questionable, bypass some

6   of the scrutiny that was required, and to take advantage of the

7   loophole that Mr. Mayes, in his interview, talks about,

8   identifying in the Tinker guidelines.

9       And, additionally, the statements that Andy Elliott makes

10  would be admissible, and I believe there will be a foundation

11  for it as not hearsay, under 801(d)(2)(C), in that he was a

12  person whom Chris Mayes authorized to make a statement on the

13  subject.  And throughout that recording, Andy Elliott says that

14  Chris Mayes told him to say this, Chris Mayes told him to tell

15  Donna X, Y, or Z, that this other version of the story is what

16  she should go with, she better say that and other things like

17  that.  So that's our argument on hearsay.

18      There are additional cases I could provide to the Court,

19  but the gist of it is that it was statements made by Andy, and

20  we'll establish this as a foundation, while he was an employee,

21  while he was talking about matters within his knowledge because

22  of his employment, and let's see, and what was the third one?

23  Sorry.  So he was an agent, it was during that relevant

24  relationship, and the statements related to a matter within the

25  scope of that relationship.

1          THE COURT:  Thank you.  Do defense counsel care to

2    respond as to the application of 801(d)(2)(C) and/or (D)?

3          MR. BEHENNA:  Both, Your Honor.  But it would be my

4    request that -- the government cited two cases that I would

5    like to read if it would be permissible to the Court.  My

6    initial response is simply this:  Big Red Sports & Imports is

7    not an employer -- or not a party in this case.  Andy's

8    relationship is with Big Red Sports & Imports, not Chris Mayes.

9    I don't think Andy has an agency relationship with Chris Mayes.

10       The second point is, bribing a bank official is not within

11   the scope of someone's employment.  And I don't think that he

12   qualifies as an agent of Chris Mayes to make hearsay statements

13   or to allow hearsay statements be made in court when he could

14   testify about them in court all day long.

15       I would like to read the two cases before I respond if

16   that's okay to the Court.  Otherwise, I'm at a disadvantage in

17   that I haven't read them, and I don't have the ability to make

18   a full argument on to the Court on.

19          THE COURT:  Well, is it going to be this afternoon

20   before we get to that?  You'll have that opportunity then.

21   Very well.  Anything else -- so anyway, I haven't heard

22   anything that would keep Exhibit 8 out.  And I don't know if

23   anyone cares to be heard any further on it but, subject to

24   that, it will be received and played.  And I do applaud counsel

25   for cooperating on ironing those issues out.  And then we'll

 1   just cross the bridge of Government Exhibits 9 and 10 when we

 2   get there.

 3       Obviously, the foundation that Ms. Anderson has alluded to

 4   is going to be essential.  And, as a matter of fact, and as you

 5   all know, this is how it so often works out, once we get to

 6   that point, and I hear the foundational testimony, and

 7   everybody at either table hears the foundational testimony,

 8   sometimes these things do just kind of magically simplify

 9   themselves.  And so we'll take that one step at a time.

10       Ms. Anderson.

11           MS. ANDERSON:  Yes.  One more thing as to the

12   logistics on the clips of those -- Donna Mullins and Andy

13   Elliott.  For the first one, we have the clips and we have the

14   full version that can be played, although not separate files

15   that are prepared as clips.  For the second one, it is very,

16   very difficult to hear what is being said because the radio is

17   on, so our clips have been prepared, painstakingly, with a

18   running transcript.  And the transcript was provided in our

19   second batch of discovery back in October of 2020.  And so we

20   have it because otherwise it's nearly impossible to hear and

21   the transcript really helps to understand it.  So if we need to

22   play the entire one, we have not undertaken the painstaking

23   process of putting the transcript to the entire video.  And I

24   just want to flag that for the Court.  And that is what I

25   flagged for defense counsel a while back.

 1          THE COURT:  Okay.  Now, that's with respect to

 2   Government's Exhibit 10?

 3          MS. ANDERSON:  Correct, Your Honor.

 4          THE COURT:  And what's the length of the unedited

 5   recording?

 6          MS. ANDERSON:  I don't know off the top of my head.

 7          THE COURT:  Earlier this morning I heard some

 8   references to one of them was maybe 17 minutes, one of them was

 9   26 minutes.  Is that the general range we're talking about?

10          MS. ANDERSON: I'm taking it from defense counsel,

11   yes.

12          THE COURT:  Okay.  And, again, focusing on Government

13   Exhibit 10, what is -- what's the length of those portions the

14   government does plan to present with the scrolling transcript?

15          MS. ANDERSON:  Possibly ten minutes.  We have

16   provided in the books the transcript of the ten clips that

17   we've chosen as in the book.  So you can review those and see

18   the content and the length of those clips, at least in terms of

19   the words that are spoken.

20          THE COURT:  Okay.  Of course, we're all well aware,

21   the transcript is, to put it mildly, secondary to the recording

22   itself.  The actual evidence is the recording itself, and I'm

23   even obligated to so inform the jury.  So as a legal

24   proposition, the fact that there may be some segments for which

25   there is not a scrolling transcript is probably not an

1  insuperable problem, as a practical matter it may be a problem,

2  just from the standpoint of intelligibility.  But from a legal

3  standpoint, the transcript is kind of the tail on the dog

4  anyway, the dog being the recording itself.

5      So I don't know that we have an insuperable problem at

6  this point, as long as the foundation is laid, as I have

7  mentioned.  It may be that at another point in the trial it

8  would be the defendants' prerogative to play the rest of it

9  and, if so, we can cross that bridge when we come to it.

10          MS. ANDERSON:  Thank you, Your Honor.

11          THE COURT:  Very well.  Anything else we need to

12  address before we bring the jury back?

13          MR. GIFFORD:  Yes, Your Honor.  Your Honor, I haven't

14  had an opportunity to say anything.  Obviously, we'll address

15  the video with Ms. Wells later and, you know, the argument on

16  that.  But I do have some concerns with the video with

17  Ms. Mullins.  I want to point out the obvious.  Number one,

18  there was no motion in limine that was filed.  Motions in

19  limine keep out evidence, also assist the Court on the

20  admissibility of evidence.  This was not put in the trial

21  brief, this all could have been addressed prior to court.  We

22  learn of it as we get the books dropped off the other morning.

23  We're here for trial, we're not here to start preparing for

24  trial.  This is becoming trial by ambush.  That leads me to an

25  issue that popped up yesterday and we didn't bring it up

1  yesterday because I wanted to --

2          THE COURT:  Please slow down.

3          MR. GIFFORD:  My apologies.  I wanted to confirm this

4  last night.  Donna Mullins testified yesterday, which she could

5  have testified about this video yesterday as well, and why she

6  did not I don't know why the government didn't present it.  But

7  Donna Mullins testified yesterday, and I listened for this, and

8  I heard this, and I conferred with counsel.  And I went last

9  night to check with the statements, and I spoke with my

10 co-counsel, and we spoke with -- I believe that my

11 co-counsel -- and I don't want to speak for him, I believe that

12 he spoke with her attorney, Mr. Aldridge.  Ms. Mullins

13 testified that she had a -- had an intimate relationship with

14 Mr. Mayes.  Her prior statements, 302s to the FBI, denies that.

15 According to her testimony yesterday, she said the opposite.

16 What's troubling, she testified she informed the government

17 that she had lied.  She informed them that she -- that when she

18 said -- she denied it the first time, she later came forward

19 and says, remember when I told you I didn't have an intimate

20 relationship?  I lied.  Yes, I did.  That's Giglio.  There's no

21 FBI 302 showing that, that she came in and said I'm having -- I

22 had an intimate relationship with, you know, with this

23 gentleman.  I lied to you.

24    I'm seeing throughout this entire case we show up and it's

25 always something new.  And this morning we're going into these

 1  evidentiary issues that we're not prepared to answer when this

 2  could have been addressed a long time ago.

 3          THE COURT:  So what specific action are you asking

 4  the Court to take now?

 5          MR. GIFFORD:  I'm not really sure what to do.  The

 6  thing is, you know, what else -- what other statements have

 7  been given to the government that have not been turned over to

 8  us, where the FBI just chose to not make a 302 because it hurt

 9  their case?

10          THE COURT:  Well, I hear what you're saying.  My job

11  is to make rulings.  And you're not giving me anything to make

12  a ruling on.  And so I think we're ready to bring the jury

13  back.

14      Court will be in recess.

15      (RECESS HAD.)

16      (THE FOLLOWING TOOK PLACE IN OPEN COURT, WITH ALL PARTIES

17  AND COUNSEL PRESENT AND WITHIN THE PRESENCE AND HEARING OF THE

18  JURY.)

19          THE COURT:  And welcome back, members of the jury.

20  I'm not going to say this every morning, but let me say this

21  morning, I do appreciate your punctuality.  Obviously, a lot of

22  people have to be here at the same time before anything can

23  happen and I do sincerely appreciate your punctuality,

24  especially for those of you who probably have not been

25  accustomed to getting through downtown traffic at this hour.

1        So we are resuming in United States of America v. Bobby

2    Chris Mayes, Charles Gooch, and Courtney Wells, with the agent

3    on the stand.

4        And the government may continue.

5                          JUSTIN LOWRANCE,

6        (PREVIOUSLY SWORN.)

7                    CONTINUED DIRECT EXAMINATION

8    BY MR. SNYDER:

9    Q.   Good morning, Agent Lowrance.

10   A.   Good morning.

11   Q.   So I think we left off yesterday, we were discussing a

12   recording you had made of an interview you had with Mr. Mayes;

13   is that right?

14   A.   Yes.

15   Q.   And is Exhibit 8 in the binder in front of you a recording

16   of that exhibit?

17   A.   It is.

18           MR. SNYDER:  Your Honor, at this point, I would move

19   to admit Government's Exhibit 8.

20           THE COURT:  I've previously ruled on it.  Is there

21   anything more that either side has for me to address?

22           MR. BEHENNA:  No, Your Honor.

23           MR. GIFFORD:  No, Your Honor.

24           MR. SHANNONHOUSE:  No, Your Honor.

25           THE COURT:  Very well.  It will be received.

 1            MR. SNYDER:  Can you begin Clip Number 1, please.

 2       (VIDEO CLIP NUMBER 1 PLAYED FOR THE COURT AND JURY.)

 3       (VIDEO PAUSED.)

 4  Q.   (BY MR. SNYDER) Before we go on, Agent Lowrance, I'd just

 5  like you to identify the person who is sitting at the desk

 6  there with the baseball hat on.

 7  A.   It's Mr. Mayes.

 8  Q.   And where are you sitting in relation to Mr. Mayes?

 9  A.   Across his desk.

10  Q.   And who all is in the room with you at this time?

11  A.   So it was me and Mr. Mayes for a little bit.  I believe he

12  was waiting on an attorney; I don't recall that person's name.

13       So for the first few minutes before that attorney got

14  there, we just chatted.  And then we got into the substance of

15  the interview after that person entered the room.

16  Q.   Okay.

17            MR. SNYDER:  Go ahead.

18       (VIDEO CONTINUED.)

19       (VIDEO COMPLETED.)

20  Q.   (BY MR. SNYDER) Now, the time stamp on this interview is

21  July 17, 2017; do you see that?

22  A.   I do.

23  Q.   Is that the date the interview took place?

24  A.   I believe so, yeah.

25  Q.   Okay.  Do you have any reason to think that time stamp is

1    not accurate?

2    A.    No.

3    Q.    Okay.

4          MR. SNYDER:  Can you play Clip Number 2.

5    (VIDEO CLIP NUMBER 2 PLAYED FOR THE COURT AND JURY.)

6    (VIDEO COMPLETED.)

7          MR. SNYDER:  Go ahead and play Clip Number 4.

8    (VIDEO CLIP NUMBER 4 PLAYED FOR THE COURT AND JURY.)

9    (VIDEO COMPLETED.)

10          MR. SNYDER:  Go ahead and play the third clip.

11    (VIDEO CLIP NUMBER 3 PLAYED FOR THE COURT AND JURY.)

12    (VIDEO COMPLETED.)

13          MR. SNYDER:  And, finally, let's play Clip Number 5.

14    (VIDEO CLIP NUMBER 5 PLAYED FOR THE COURT AND JURY.)

15    (VIDEO COMPLETED.)

16    Q.    (BY MR. SNYDER) Now, Agent Lowrance, what was the focus of

17    your investigation at that point of time, as of July of 2017?

18    A.    Sure.

19          At this point, it was a simple bank fraud investigation.

20    I was still just trying to figure out whether or not anything

21    criminal had occurred regarding these loans and specifically

22    these invoices that were submitted to Tinker.

23    Q.    Was there any broader investigation into other practices

24    at Big Red going on at that time?

25    A.    No.

1  Q.   Following this interview in July of 2017, what was the
2  next thing you did?
3  A.   I asked for some subpoenas for the -- for Yamaha and
4  another entity, maybe the insurance company that provided some
5  gap insurance, if I remember correctly.  I could be mistaken on
6  that.
7       And then after that, shortly, I received transfer orders
8  to transfer to a different FBI office, so my involvement in the
9  case kind of dwindled.
10 Q.   When did you actually transfer to the other office?
11 A.   I received my transfer orders in September of that year
12 and then there's a series of things that you've got to do and I
13 reported to the new office in early December of 2017.
14 Q.   So when did your sort of official involvement in this
15 investigation end?
16 A.   In September -- the way the FBI works is, when you get
17 transfer orders, that's kind of your primary goal is to wind
18 things down at your current office and make sure that you
19 report to your new office within 90 days.
20 Q.   So have you had any involvement -- let me ask it this way:
21 What involvement have you had in the investigation since you
22 left the Oklahoma City office?
23 A.   Until a couple weeks ago, when you guys told me this was
24 going to trial, none.
25           MR. SNYDER:  I'll pass the witness, Your Honor.

```
 1              THE COURT:  Cross-examination.
 2                          CROSS-EXAMINATION
 3   BY MR. BEHENNA:
 4   Q.   Good morning, sir.
 5   A.   Good morning.
 6   Q.   Being an FBI agent comes with a lot of training, correct?
 7   A.   Yeah.
 8   Q.   There are classes you have to go to?
 9   A.   Yes.
10   Q.   Where are those classes?
11   A.   The initial academy is in Quantico, Virginia, and then
12   there's various trainings you can attend afterwards in
13   locations all over the country.
14   Q.   And there is a test you have to take?
15   A.   There are some, yeah.
16   Q.   And, then, is there field training you have to go through
17   afterwards?
18   A.   Yeah, you're assigned a field training agent when you
19   report to your office.
20   Q.   Are there continuing education courses you have to take?
21   A.   There are.
22   Q.   Can you tell the jury about those?
23   A.   They're called virtual academies.  They're various
24   training courses that you take on the computer.
25   Q.   And this is to make sure that agents are well-trained,
```

1   correct?

2   A.    Yes.

3   Q.    Because that's important, right?

4   A.    Yes.

5   Q.    Because investigators play a key role in our criminal

6   justice system, right?

7   A.    Yes.

8   Q.    Investigators gather the facts, correct?

9   A.    That's correct.

10  Q.    All the facts, right?

11  A.    Yeah.

12  Q.    And that's important because you never know where a case

13  is going to lead you?

14  A.    True.

15  Q.    And you can't have tunnel vision in an investigation?

16  A.    True.

17  Q.    How would you describe "tunnel vision"?

18  A.    Focusing on one thing.

19  Q.    And maybe missing another part that's a key part?

20  A.    Sure.

21  Q.    And that's a big no-no?

22  A.    Yeah.

23  Q.    Do you agree that people who accuse other of crimes can

24  have ulterior motives?

25  A.    Yeah, sometimes.

1   Q.   Do you agree that people can be dishonest?

2   A.   Yeah.

3   Q.   Do you agree people can be motivated by a desire to stay

4   out of trouble themselves?

5   A.   Yeah.

6   Q.   Do you agree it's important to look for corroborating

7   evidence?

8   A.   Yeah.

9   Q.   Because the key is to search for the truth, right?

10  A.   Right.

11  Q.   No matter where it leads?

12  A.   Right.

13  Q.   So when you started your investigation, you were looking

14  into bribery at Tinker Federal Credit Union, correct?

15  A.   Bribery and, yeah, overall bank fraud.

16  Q.   But you knew a piece of it specifically was that a loan

17  analyst was being paid money --

18  A.   Yes.

19  Q.   -- by a dealership employee?

20  A.   Yes, those were the allegations that I received from

21  Tinker.

22  Q.   And you knew that Donna Mullins had admitted to taking

23  money from specifically Andy Elliott?

24  A.   That's correct.

25  Q.   And that interview with Donna Mullins, between Donna and

```
1   Tinker Federal Credit Union, took place in August of 2016?
2   A.   I'm sure you're correct.  I don't remember the exact date.
3   Q.   And after that, you reach out to Donna in February of
4   2017, correct?
5   A.   Again, I'm sure you're correct.  I don't remember the
6   exact date of when I interviewed her, but if that's what's on
7   the 302, I'm sure it's correct.
8   Q.   And maybe we can get into that later.
9   A.   Sure.
10  Q.   Okay.  But you wanted to know what she had to say about
11  the issue?
12  A.   Right.
13  Q.   Because that's an important tactic in a criminal
14  investigation, right?
15  A.   Interviewing people?
16  Q.   Yes.
17  A.   Yeah.
18  Q.   And, in particular, potentially interviewing suspects --
19  A.   Right.
20  Q.   -- right?
21       And Donna Mullins was a suspect for you at that time?
22  A.   Yeah.
23  Q.   And when you interview a suspect, you can learn valuable
24  information?
25  A.   Correct.
```

1   Q.   And that's part of what we talked about earlier, avoiding

2   tunnel vision --

3   A.   Right.

4   Q.   -- right?

5        Because, in truth, there might be an honest explanation

6   for what happened, too?

7   A.   In this case or generally?

8   Q.   In general.

9   A.   Yes, that's correct.

10  Q.   And you can learn that when you talk to someone?

11  A.   Right.

12  Q.   It might look one way but then you talk to them and you

13  realize it's not?

14  A.   I'll agree with that, yeah.

15  Q.   So before you left the case, you interviewed Donna on June

16  16th of 2021; is that true?

17  A.   Probably, yes.

18  Q.   And Donna told you she took money from Andy Elliott?

19  A.   Yes.

20  Q.   And she told you that Andy took advantage of her?

21  A.   Yes.

22  Q.   She told you only someone in the tower could have created

23  the invoices you were investigating?

24  A.   I'm sure she did.

25  Q.   Okay.  And she gave you three names of people who were in

JUSTIN LOWRANCE - CROSS BY MR. BEHENNA                    174

```
1   the tower?

2   A.    Possibly.  I don't remember this.

3   Q.    At this point, I'm going to grab your 302 and maybe that

4   will help refresh your memory.

5   A.    Sounds good.  Thank you.

6         MR. BEHENNA:  May I approach the witness, Your Honor?

7         THE COURT:  You may.

8   Q.    (BY MR. BEHENNA) Agent Lowrance, I'm going to tell you

9   where I'm looking --

10  A.    Sure.

11  Q.    -- but feel free to read anything.

12  A.    Okay.

13  Q.    I'm going to be looking here and that first paragraph.

14  A.    Got it.  Thanks.

15        Okay.

16  Q.    Very good.

17        So I think the last question I posed to you is she told

18  you there were three people in the tower, correct?

19  A.    That's correct.

20  Q.    And that's Nick Peterson, correct?

21  A.    Yes.

22  Q.    Bentley Redburn?

23  A.    Yes.

24  Q.    And Andy Elliott?

25  A.    That's correct.
```

1  Q.   And then she told you that Andy Elliott was the general

2  manager?

3  A.   Yes, she did.

4  Q.   And she told you that the only person in the tower during

5  the entire time the loans with Tinker Federal Credit Union were

6  done was Andy Elliott?

7  A.   Yes.

8  Q.   And she told you that Andy Elliott played at her

9  heartstrings?

10 A.   Yes.

11 Q.   And she told you that Andy told her, "Donna, no one will

12 find out, no one will know."

13 A.   Yes.

14 Q.   And Andy would call her about loans that he was sending

15 her way?

16 A.   Yes.

17 Q.   He would put "Attention Donna" on it, right?

18 A.   Uh-huh, yes.

19 Q.   And he would tell Donna, "You don't get what you deserve

20 and I can help you out"?

21 A.   Yes.

22 Q.   And Andy paid Donna between 10,000 and $15,000?

23 A.   That's correct.

24 Q.   And he paid her when they ate breakfast together at a

25 Bible study?

1   A.    After -- yeah, that's correct.

2   Q.    Just those two?

3   A.    I guess.  I don't specifically remember that.

4   Q.    Okay.  Well, maybe we'll come back to that.

5   A.    Sure.

6   Q.    And Donna also told you that she deleted all of her text

7   messages?

8   A.    Yes.

9   Q.    She -- and you asked -- because you were asking her.  You

10  have some text messaging of what was going on at the time,

11  right?

12  A.    Probably.  I mean, I'd have to listen to the recording but

13  I'm sure you're not making this up.

14  Q.    I'm not.

15       And she -- and she told you that she, as a routine,

16  deletes all of her text messages, right?

17  A.    Yes.

18  Q.    But in truth, even if someone deletes their text messages,

19  you could get stuff from the hard drive of a phone?

20  A.    That's partially correct.  Depends on how they were

21  deleted.

22       I'm not a tech person but I've personally been involved in

23  cases before where phones have been deleted and they're truly

24  deleted, you cannot recover.

25       So, again, it just -- it depends.

```
 1   Q.   And that's fair.

 2        But did you look with Donna?

 3   A.   No, I don't think so.

 4   Q.   Like, did you ask her for her phone and say, Hey --

 5   A.   Not that I remember.

 6   Q.   -- let me go see it?

 7        And she told you that she had turned Andy Elliott down two

 8   or three times but he was persistent?

 9   A.   Yes.

10   Q.   And she told you he was relentless?

11   A.   Yes.

12   Q.   And she told you that he broke her?

13   A.   Yes.

14   Q.   And she told you that she called Elliott right after she

15   was fired?

16   A.   Yes.

17   Q.   And she told Andy that he got her fired?

18   A.   Yes.

19   Q.   And Andy told Donna that he didn't do anything wrong?

20   A.   That's correct.

21   Q.   And she told him "don't lie"?

22   A.   Yes.

23   Q.   And Andy laughed and denied knowing anything about

24   anything?

25   A.   Yes.
```

1  Q.    Donna does not mention Chris Mayes ever contacting her

2  about money?

3  A.    Say that again.

4  Q.    Donna does not mention Chris Mayes ever contacting her

5  about money?

6  A.    About money, no.

7  Q.    She doesn't mention Chris Mayes contacting her about

8  loans?

9  A.    No.

10 Q.    She never mentions getting money from Chris Mayes?

11 A.    No.

12 Q.    She never mentioned Chris was giving money to Andy to give

13 to her?

14 A.    No, she didn't, no, that's correct.

15 Q.    She never mentioned Chris wanting this to happen?

16 A.    No.

17 Q.    She never mentioned Chris knowing that this was happening?

18 A.    No, I don't believe so.

19 Q.    The only thing she mentioned about Chris is that after she

20 quit she couldn't find a job, right?

21 A.    Correct.

22 Q.    And Chris offered her a job stating that, "You can work

23 until you find something else"?

24 A.    Okay.

25 Q.    Right?

```
1    A.    I believe so, yes.
2    Q.    All she ever told you about the interaction with money was
3    between her and Andy?
4    A.    Yes.
5    Q.    And you -- and I know we're looking at just one 302 here
6    but you had multiple interactions with Donna, right?
7    A.    Yeah.
8    Q.    She never says Chris gave her money?
9    A.    I believe you.  Again, I haven't reviewed all of these
10   302s.
11   Q.    I don't want you to just take me at my word so I'm going
12   to hand them all to you.
13   A.    Okay.
14   Q.    And I want you to look through them and see, in any of
15   your reports, do you see anything about Donna mentioning
16   anything about Chris Mullins -- or Chris Mayes?
17   A.    Sure.
18   Q.    Like, 21 maybe through -- you'll see your last one.
19   A.    Okay.
20         (WITNESS REVIEWS EXHIBIT BOOK.)
21   Q.    And, Agent, just so I'm clear about the rules, I'm only
22   allowed to show you your 302s.
23   A.    Sure.
24   Q.    You're looking at your name at the bottom, right?
25   A.    And your question again is if she ever talked to Chris
```

1   about money?

2   Q.   Yeah.

3   A.   Okay.

4   Q.   I'm asking you if you ever wrote in any of your -- yeah,

5   if Donna ever said that Chris gave her money, Chris Mayes.

6   A.   Oh, no, I don't think so.

7   Q.   Right.  In any 302, right?

8   A.   Yeah, I don't think so.  I mean, I'm still going through

9   the last one, but --

10  Q.   Go ahead.

11  A.   No, I don't think she ever alleged that Chris was the one

12  that gave her money.

13  Q.   Right.  Or was involved in?

14  A.   Yeah, I don't think so.

15  Q.   But I'm making this point for a reason --

16  A.   Sure.

17  Q.   -- because yesterday I think the jury heard you say or I

18  heard you say, because I wrote it down --

19  A.   Uh-huh.

20  Q.   -- that Donna alluded Chris Mayes being involved.

21  A.   I did say that.  I remember saying that.

22  Q.   That's not in any 302 that you've come up with?

23  A.   Yeah, this happened a long time ago.  If I said that and

24  that's not true, I apologize.

25  Q.   Right.  To this jury?

```
 1   A.   Yes.

 2   Q.   Okay.  Thank you for your honesty.

 3   A.   Yeah.

 4   Q.   You agree that accepting a bribe as a bank official is a

 5   serious crime?

 6   A.   Yes.

 7   Q.   It's a federal crime, correct?

 8   A.   Yes.

 9   Q.   It can come with a stiff prison sentence?

10   A.   Yes.  I don't know the penalties for that particular

11   statute, but --

12   Q.   It --

13   A.   A prison sentence would be stiff to me, yeah.

14   Q.   I agree with you.

15        And that is a case that's frequently charged, isn't it?

16   A.   I don't know if I can comment on that.  I don't know how

17   frequent -- I don't know what you mean by "frequent."

18   Q.   That's fair.

19        Have you ever investigated cases like that?

20   A.   Yes, I have.

21   Q.   Have you ever seen those cases brought by the U.S.

22   Attorney's Office?

23   A.   Yes.

24   Q.   Okay.  Because that's a deterrent, right?

25   A.   It is.
```

1   Q.   All right.   It helps protect our banking system?

2   A.   Yes.

3   Q.   You don't want someone who is accepting bribes working for

4   banks?

5   A.   No.

6   Q.   Donna was not charged for accepting bribes, correct?

7   A.   I don't know.

8   Q.   Okay.  Do you know if she still works for a bank today?

9   A.   I have no idea.

10  Q.   So you haven't heard that she is currently working for

11  Arvest Bank?

12  A.   No.

13  Q.   Would that surprise you?

14  A.   A little bit, yes.

15  Q.   Are you aware she's faced no criminal penalties at all for

16  her actions with Andy?

17  A.   I am not.

18  Q.   Are you aware that Donna Mullins might have lied to the

19  FBI?

20  A.   Generally, I'm aware of that, yes.

21  Q.   Are you talking about the -- having -- or a sexual

22  relationship with Chris Mayes, versus not?

23  A.   Yes, I was unaware of all of that until the past couple of

24  days.

25  Q.   And you would agree with me that that is a federal

1  offense, correct?

2  A.   To lie to the FBI, yes, it is.

3  Q.   And you've seen that charge before?

4  A.   I have.

5  Q.   And Donna hasn't been charged with that either?

6  A.   I don't know.

7  Q.   Okay.  All right.  So this video we saw, you go to Big Red

8  Sports & Imports in July of 2017, right?

9  A.   That's correct.

10 Q.   To interview Chris?

11 A.   Yes.

12 Q.   Okay.  And you have a hidden recorder on you?

13 A.   Yes.

14 Q.   Is it in a bag?  Or I notice that it's off to the side.

15 A.   Yeah, it was in a device, a mug, like a Yeti mug.

16 Q.   Okay.  Okay.  And you at that point, you know that Andy

17 has bribed Donna?

18 A.   Yes.

19 Q.   Because that's what Donna has told you?

20 A.   Yes.

21 Q.   And did you say yesterday you saw Andy when you walked

22 into the dealership?

23 A.   I believe I did.  I've reviewed this recording a couple

24 weeks ago when I was contacted by the prosecution, and, again,

25 it had been so long ago, I don't remember all of the details

1  about it.  But I believe when I first came to the dealership, I

2  had a very, very brief interaction with him, like, outside of

3  one of the doors, yes.

4  Q.   But you didn't try to talk to him about anything?

5  A.   No, not at that point.

6  Q.   You just go straight to talk to Chris?

7  A.   Yes.

8  Q.   And what we heard in the clips, the majority of your

9  conversation is about Tinker lending guidelines?

10 A.   That's correct.

11 Q.   All right.  You talk about their pricing grid?

12 A.   Say it again.

13 Q.   Yeah, their pricing grid.  That sheet, the August

14 guideline or the April guidelines --

15 A.   Yeah.

16 Q.   -- that changed from March, like their pricing?

17 A.   That's correct.

18 Q.   You guys talk a lot about that?

19 A.   We do.

20 Q.   You mentioned that when you were first sent this case from

21 Tinker, they didn't tell you that they had changed their

22 pricing grid?

23 A.   Yes.  Which very well -- that could be true.  I don't

24 remember that as I sit here today.  But I don't think they

25 shared with me exactly what he had said, that they had changed

1    their pricing grid.

2    Q.   Right.  And Chris had showed you those documents

3    demonstrating that to you, right?

4    A.   Yes, yeah.

5    Q.   And at that time, Chris explained to you what he knew

6    about the issue with Tinker?

7    A.   Yes.

8    Q.   You never asked Chris about his relationship with Donna

9    Mullins?

10   A.   About -- not really.  I mean, short of what you could see

11   that we spoke about in the interview, her involvement, yeah,

12   but as far as his relationship with her, at that point, I don't

13   think I suspected or had any idea that they had a relationship.

14   Q.   Right.  Well -- and I don't mean physical relationship,

15   I'm talking about his interaction -- like, you didn't say,

16   "Chris, were you bribing Donna Mullins?"

17   A.   No.  No.

18   Q.   Or "Did you give money to Donna Mullins?"

19   A.   I did not.

20   Q.   "Did you know other people were giving money to Donna

21   Mullins?"

22   A.   I did not ask that, no.

23   Q.   You don't ask about how she came to be employed at Big Red

24   Sports & Imports after she left Tinker Federal Credit Union?

25   A.   I do not.

1  Q.   All right.  You didn't ask about his thought process

2  behind that, why she was hired there or anything like that?

3  A.   Yeah, you're -- again, this is so long ago, I don't know

4  if I knew at that point that she was employed there, maybe I

5  did.  I'm just not remembering it.  But, no, I did not ask

6  about that, either way.

7  Q.   Right.  You had talked to Donna Mullins multiple times

8  before this, right?

9  A.   Yes.

10 Q.   Okay.  And the timeline, just so we're clear, the pricing

11 grid that you were asking Chris about occurs in April of 2016,

12 right?

13 A.   Yes.

14 Q.   Donna Mullins leaves Tinker in August of 2016?

15 A.   Yes.

16 Q.   You're doing an interview with Chris in July of 2017?

17 A.   Yes.

18 Q.   Just to orient the jury to this timeline, right?

19 A.   Sure.

20 Q.   Are you aware that Tinker and legal counsel for Chris

21 Mayes had had dialogue through 2016 about those loans and

22 invoices?

23 A.   Say it again.

24 Q.   Are you aware that counsel for Chris Mayes and Tinker had

25 had dialogue throughout 2016 about those either invoices, their

1   pricing grid, things like that?

2   A.   If you're talking about the civil suit --

3   Q.   Yeah.

4   A.   -- I don't know if I was aware of that or not.  I had a

5   meeting with Tinker when this case -- when they first brought

6   this case to us, and I can't specifically remember if this

7   civil suit was brought up or not.

8   Q.   And that's fair.  But in this video, it was -- Chris

9   mentions --

10  A.   Yeah, that's correct.

11  Q.   -- we were having a civil dispute about what was going on

12  with these pricing guidelines, right?

13  A.   Yeah.

14  Q.   So, effectively, by the time you talked to Chris, this

15  issue -- this is an issue he's been dealing a with for over a

16  year --

17  A.   Yeah.

18  Q.   -- fair?

19  A.   Yeah.

20  Q.   All right.  And at that time, in 2017, Chris is explaining

21  to you his thoughts at that time --

22  A.   Yes.

23  Q.   -- right?

24       You didn't ask Chris when he became aware of the Tinker

25  pricing grid change?

1    A.   No.

2    Q.   Or, like, when he became aware invoices were being sent?

3    A.   No.

4    Q.   Right?

5         You were just asking, as of July of '15, what do you know

6    now?

7    A.   July of 2017.

8    Q.   Sorry, forgive me, July of '17 --

9    A.   Yes.

10   Q.   -- right?

11        So when he learned that information, how he learned that

12   information, you never explored with him?

13   A.   No.

14   Q.   Another important point, this is just for context,

15   corporations can be charged with a crime, correct?

16   A.   That's correct.

17   Q.   An entity can commit a criminal act --

18   A.   Yes.

19   Q.   -- right?

20        No corporation has been charged in this case, correct?

21   A.   I don't know.

22   Q.   Okay.  Do you know if Chris Mayes has been charged

23   individually in this case?

24   A.   I believe so; he's sitting at the defendant --

25   Q.   Right.

 1        So the government is alleging that Chris is personally

 2   involved with these things, right?

 3   A.   That's how I would surmise it, yes.

 4   Q.   We're not dealing with did an entity like Big Red do bad

 5   practices?

 6   A.   I don't believe so, but, again, I don't know.

 7   Q.   Got it.

 8        Do you agree that a witness's credibility is important?

 9   A.   Yes.

10   Q.   It's important for determining whether a witness is

11   believable?

12   A.   Yes.

13   Q.   Is this something that an investigator should look into?

14   A.   Yes.

15   Q.   Like, how believable a witness is?

16   A.   Yes.

17   Q.   Had you ever looked into a witness's background to

18   determine whether they're believable?

19   A.   Yes.

20   Q.   Is that something you're trained to do?

21   A.   Yes.

22   Q.   Is that an important investigative step?

23   A.   It can be.

24   Q.   Because you don't want to sponsor a liar as a witness,

25   right?

```
 1   A.    Yes.  I mean, there -- yeah, in some types of cases, you
 2   know, I worked violent crime after this and it's tough to get
 3   -- in some of those cases, your witnesses can be not very
 4   trustworthy.
 5   Q.    And I know that to be true.
 6   A.    Sure.
 7   Q.    But I just want you to know -- I mean, agree that it is
 8   still important to look?
 9   A.    I agree with you, that's correct.
10   Q.    And you left this investigation, I think, September of
11   2017, right?
12   A.    Yeah, right around there.
13   Q.    So you weren't really involved with what took place after
14   that?
15   A.    Not at all.
16   Q.    And at the time you were involved in the case, Andy
17   Elliott was a suspect?
18   A.    Yes.
19   Q.    He wasn't a government witness at the time?
20   A.    He was not.
21   Q.    So you didn't have an opportunity to look into Andy
22   Elliott's credibility?
23   A.    No, at that point, no.
24   Q.    Is that something you would have expected agents to do
25   down the road?
```

 1   A.    I mean, it kind of depends on how the case evolved.   If

 2   he's a -- you know, every case is unique, and like I said, I

 3   don't know what happened after I left, so depending on his

 4   involvement in the case, yes, that could have been an important

 5   step.

 6   Q.    Important step.

 7   A.    But, again, I don't know.

 8   Q.    Right.

 9         If a witness made a lot of videos, either teaching or

10   trying to explain how to lie to people, would that be important

11   to know?

12   A.    It could be.

13   Q.    Yeah?

14   A.    Depending on the context of what they're talking about.

15   Q.    No -- well, how about sales, selling, how to be a

16   salesman?

17   A.    A car salesman?

18   Q.    Uh-huh.

19   A.    Teaching people how to lie?

20   Q.    Uh-huh.

21   A.    I guess that could be important.

22   Q.    Right.

23         Would you want to obtain text messages from a cooperating

24   witness -- we haven't talked about that earlier -- to see if

25   their story makes sense?

```
 1  A.   Yeah.  Yeah, I mean, if it would corroborate what they're
 2  talking about and they're readily available, yeah, that could
 3  be an important step.
 4  Q.   Thank you.
 5       Now, the last thing, I think you mentioned that you were
 6  involved in is issuing subpoenas?
 7  A.   That's correct, yeah.
 8  Q.   Do you want to say something else?
 9  A.   I had to go back to the -- this was so long ago and I've
10  worked so many cases since then, but I had to go back in the
11  file and look to see what I had done after this and that's when
12  I found the -- I think there were two subpoenas that I sent
13  out.
14  Q.   And that was to further your investigation?
15  A.   Yes.
16  Q.   To see if there was anything to the allegations you were
17  looking into?
18  A.   Yeah.
19  Q.   And Chris Mayes complied with those requests?
20  A.   Oh, yeah, I'm sorry, that maybe would have been a third
21  subpoena, but, yes, he did provide all the documents that we
22  had asked for.
23  Q.   He gave you everything you requested?
24  A.   As far as I know, yes.
25  Q.   He didn't push back or fight any of your requests?
```

1    A.    No.

2    Q.    No lawyer fought you in court, saying "We're not going to

3    show you that stuff"?

4    A.    No.

5              MR. BEHENNA:  May I just have one moment, Your Honor?

6              THE COURT:  Surely.

7              MR. BEHENNA:  Nothing further, Your Honor.

8              THE COURT:  Cross-examination on behalf of Defendant

9    Gooch.

10             MR. SHANNONHOUSE:  No questions of this witness, Your

11   Honor.

12             THE COURT:  Cross on behalf of Defendant Wells?

13             MR. GIFFORD:  Yes, Your Honor.

14                       CROSS-EXAMINATION

15   BY MR. GIFFORD:

16   Q.    Agent Lowrance, as part of your duties, does that include

17   to testify?

18   A.    Yes.

19   Q.    And if I counted it right, between yesterday and today, I

20   think I'm around 12 times you said you didn't remember, don't

21   recall and don't know about things that you put in your report;

22   is that correct?

23   A.    Could be.

24   Q.    Did you know you were testifying in this trial?

25   A.    I did.

1    Q.    Did you know you were testifying today?

2    A.    Yes.

3    Q.    Do you have any reports that you could have prepared for

4    testimony?

5    A.    That I could have reviewed?

6    Q.    Yes.

7    A.    Yes.

8    Q.    Yesterday you talked about -- you mentioned something

9    about an FBI policy on recording, I'm going to ask you about

10   another FBI policy.

11        What's the FBI's policy on making reports, 302s, on

12   witnesses who give statements that hurt the government's case?

13   A.    The policy -- just you have to make the report, I mean,

14   just as you would any report of anybody that you interviewed.

15   Q.    Okay.  So if Donna Mullins told the FBI one thing and then

16   later told the FBI, Yeah, I lied to you about that previously,

17   why isn't there -- why is there not a 302 on that?

18             MR. SNYDER:  Objection, Your Honor.

19             THE COURT:  Sustained.

20   Q.    (BY MR. GIFFORD) Now, during that video you talked about

21   Tinker said something about the goals they want to meet.  What

22   were you referring to?

23   A.    Like loan goals.  Like a dollar amount that they want to

24   loan out every month or every quarter.

25   Q.    Okay.  So -- so this case and Tinker -- this is about

1  money -- they're not meeting their goals, and you mentioned

2  just a second ago that Tinker didn't share with you their

3  pricing grid where they changed it; is that correct?

4  A.   Yes.

5  Q.   Is that important?

6  A.   That they didn't share it with me?

7  Q.   Yes.

8  A.   It could be.

9  Q.   I believe that Mr. Behenna already -- I think he already

10 asked you about if you used the phrase "orchestrated" earlier

11 and I think you withdrew that statement, but one last question:

12 In regards to your investigation -- I know that you rotated out

13 in September of 2017, but where was Courtney Wells in your

14 investigation?

15 A.   I don't know who that is.

16         MR. GIFFORD:  Thank you.  No further questions.

17         THE COURT:  Any redirect?

18         MR. SNYDER:  Yes, Your Honor.

19                      REDIRECT EXAMINATION

20 BY MR. SNYDER:

21 Q.   Agent Lowrance, your interview with Mr. Mayes was on July

22 17, 2017, correct?

23 A.   Yes.

24 Q.   When were the two recordings done by Donna Mullins of Andy

25 Elliott?

1   A.    Prior to that.

2   Q.    So was one done the same day?

3   A.    Yes.

4   Q.    And was the other one done prior to that?

5   A.    Yeah, so one would have been done right after that, right

6   after the interview with Mr. Mayes.

7   Q.    When the one that was done prior to July 17th was done,

8   did you review it right after it was made?

9   A.    Yes.

10  Q.    In that recording, was there anything that indicated

11  Mr. Mayes was involved in the bribes paid to Donna Mullins?

12          MR. BEHENNA:  Objection, Your Honor; that's hearsay.

13          THE COURT:  Well, the question is whether there was a

14  recording and that in and of itself is not hearsay.  We'll hear

15  the answer to that.  We'll take it one step at a time.

16      Overruled.

17          THE WITNESS:  Say that again.

18  Q.    (BY MR. SNYDER) So there was a recording made between Andy

19  Elliott and Donna Mullins prior to July 17, 2017, correct?

20  A.    Yes.

21  Q.    Was there anything in that interview that caused you to go

22  visit Mr. Mayes personally?

23          MR. BEHENNA:  Objection, Your Honor.  That calls for

24  hearsay of a self-serving statement from Andy Elliott.

25          THE COURT:  Overruled.

1           THE WITNESS:  So say it again.  You're asking me if

2  there was anything in the recording -- ask it again.

3           MR. SNYDER:  Sure.

4  Q.  (BY MR. SNYDER) Was there anything about the first

5  recording between Donna Mullins and Andy Elliott that led you

6  to label Mr. Mayes as a suspect, which you testified to

7  yesterday?

8  A.   Yes.  I mean, Chris was brought up.  But I think the

9  defense was asking if she had ever alleged that Chris was the

10  one that personally paid Donna, and that was not mentioned, but

11  Chris was mentioned in the recording, yes.

12  Q.   And what -- was that part of your motivation in going to

13  interview Chris Mayes personally?

14  A.   Yeah, I mean, at this point it was still fairly early in

15  the investigation, I was just trying to figure out what was

16  going on with these loans.  You know, it was still kind of a

17  bank fraud investigation involving a bribed bank employee.  I

18  was just talking to people trying to figure out what was going

19  on.

20           MR. SNYDER:  Your Honor, no further questions.

21           THE COURT:  Any recross limited to redirect?

22           MR. BEHENNA:  May I have one moment, Your Honor?

23           THE COURT:  Surely.

24                     RECROSS-EXAMINATION

25  BY MR. BEHENNA:

1   Q.   Just one question, Agent.

2       Have you ever investigated Andy Elliott to determine

3   whether he has previously bribed a bank official?

4   A.   Previously investigated him?  No, not that I recall.

5           MR. BEHENNA:  No further questions, Your Honor.

6           THE COURT:  Redirect on behalf of Defendant Gooch --

7   I'm sorry -- recross.

8           MR. SHANNONHOUSE:  No, Your Honor.

9           THE COURT:  And Defendant Wells.

10          MR. GIFFORD:  No, Your Honor.

11          THE COURT:  Very well.  You may step down.

12      And we'll have the government's next witness.

13      Members of the jury, as I mentioned yesterday, we'll

14  typically be taking our mid-morning break in the neighborhood

15  of 10:15, but, as always, if anybody needs a break and you

16  don't sense we're coming up on a break, all you've got to do is

17  let me know and we'll take a break.

18      We'll have the government's next witness.

19          MS. ANDERSON:  Yes, Your Honor.

20      The United States calls Andy Elliott.

21          THE COURT:  Very well.

22          MR. BEHENNA:  Your Honor, before Mr. Elliott is

23  called, can we have a bench conference?

24          THE COURT:  Very well.

25      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND OUT

```
 1  OF THE HEARING OF THE JURY.)

 2          THE COURT:  Okay.  Can government counsel hear me?

 3          MS. ANDERSON:  Uh-huh.

 4          THE COURT:  And can defense counsel hear me?

 5          MR. BEHENNA:  I can, Your Honor.

 6          THE COURT:  Okay.  Very well.

 7      I'll hear you.

 8          MR. BEHENNA:  I just wanted to make a point.  I'm

 9  going to hand the government what exhibits or videos we intend

10  to use to impeach Andy Elliott.  They have not been previously

11  produced.  We don't believe there's an obligation to produce

12  them, but in order to produce judicial efficiency, we want to

13  do them ahead of time before cross-examination when we seek to

14  introduce them as exhibits.

15          THE COURT:  Well, all you're doing is being

16  informative, which there may be a follow-on to that that would

17  result in additional conversation, but I take that as simply

18  being an informative advisory and I don't know that that calls

19  for me to do anything more at this point.

20      What says the government?

21          MS. ANDERSON:  Your Honor, it sounds like this is

22  information that has never previously been disclosed to the

23  government, was not produced as discovery at any point, and is,

24  in our view, part of defense's case in chief, if they're

25  planning to use it to impeach a government witness.  I just
```

```
 1   want to note that we don't know what's on that drive.
 2          THE COURT:  Well, we'll cross that bridge when we
 3   come to it.
 4       You may proceed with the witness.
 5       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITH
 6   ALL PARTIES AND COUNSEL PRESENT AND WITHIN THE PRESENCE AND
 7   HEARING OF THE JURY.)
 8          THE COURT:  And we'll proceed with the witness.
 9                      ANDREW ELLIOTT,
10       (WITNESS SWORN.)
11          THE WITNESS:  Can I remove this or keep it off?
12          THE COURT:  As you testify, please remove your mask
13   and just -- you can just leave it on the table in front of you.
14          THE WITNESS:  Okay.  Thank you, sir.
15                      DIRECT EXAMINATION
16   BY MS. ANDERSON:
17   Q.   Could you please state your full name and spell it.
18   A.   Andrew Jeffrey Elliott, A-N-D-R-E-W, J-E-F-F-R-E-Y,
19   Elliott, E-L-L-I-O-T-T.
20   Q.   Where are you from, Mr. Elliott?
21   A.   Norman, Oklahoma, but I live in Scottsdale, Arizona, right
22   now.
23   Q.   And where do you work right now?
24   A.   For the Elliott Group; for myself.
25   Q.   What do you do?
```

1    A.    I do sales training.

2    Q.    What kind of sales training?

3    A.    In the automotive.

4    Q.    So do you work for dealerships or individuals?  How does

5    it work?

6    A.    Yeah, it's mostly salespeople, we teach salespeople the

7    process of how to sell cars.

8    Q.    And so are you hired by car dealerships as a vendor to

9    train their employees?

10   A.    Yes.

11   Q.    How long have you been doing that?

12   A.    For two years now fully.

13   Q.    Are you testifying today based on an agreement?

14   A.    Yes.

15   Q.    I want to direct your attention to what's been marked as

16   Government's Exhibit 25 in the binder.

17   A.    In the binder?  Would that be the Donna Mullins or is that

18   here?  I go here.  My bad.

19            MS. ANDERSON:  Your Honor, if there are papers up

20   there, may I approach and take whatever is up there?

21            THE COURT:  You may.

22            MS. ANDERSON:  Thank you.

23   Q.    (BY MS. ANDERSON) Are you looking at Exhibit 25?

24   A.    Yes, ma'am.

25   Q.    What's been marked as Exhibit 25, do you recognize that?

1    A.    Yes, I do.

2    Q.    What is it?

3    A.    This is an agreement between my attorney, me, and the U.S.

4    Attorney's Office.

5    Q.    Okay.

6           MS. ANDERSON:  Your Honor, the United States moves to

7    admit into evidence Government's Exhibit 25 and to publish it

8    to the jury.

9           THE COURT:  Any objection?

10          MR. BEHENNA:  No objection, Your Honor.

11          MR. SHANNONHOUSE:  No objection, Your Honor.

12          THE COURT:  Any objection from the Defendant Wells?

13          MR. GIFFORD:  No objection.

14          THE COURT:  It will be received.

15          MS. ANDERSON:  All right.  And if we could zoom in on

16   the first paragraph, please.

17   Q.    (BY MS. ANDERSON) According to that first paragraph, what

18   do you get out of this agreement with the United States?

19   A.    To not be prosecuted, as long as I tell the truth.

20   Q.    All right.  And so the first paragraph, you won't be

21   prosecuted by our office for bank fraud, false statements to

22   banks, wire fraud, aggravated identity theft or any other

23   violations associated with that stuff?

24   A.    Yes, ma'am, that is correct.

25   Q.    Okay.  And according to the second paragraph, what do you

1  have to do?

2  A.   I give my testimony fully and make sure that it is

3  accurate and it is the truth and fully cooperate.

4  Q.   Okay.  And what does the last paragraph of that first page

5  say?

6  A.   That if I lie, the agreement is no good.

7  Q.   All right.  So what happens if my office thinks that

8  you've given false information or incomplete information or

9  misleading information?

10  A.   Then the agreement is void.

11  Q.   Okay.  You could be prosecuted for wire fraud, bank

12  fraud --

13  A.   Yes.

14  Q.   -- aggravated identity theft, bribery, or anything?

15  A.   Yes, exactly.

16  Q.   All right.  And if we look at the second page of this,

17  please.  At the top, could you also be prosecuted for perjury

18  and obstruction of justice?

19  A.   Yes, I can.

20  Q.   Okay.  Is that your signature on this?

21  A.   Yes, it is.

22  Q.   Do you know someone named Chris Mayes?

23  A.   Yes, I do.

24  Q.   How do you know him?

25  A.   I started working with him in, I believe, the year of 2001

```
1   at Hudiburg Chevrolet.  He hired me as a salesperson.

2   Q.   And about 20 years you've known him?

3   A.   Yes.

4   Q.   How old were you at the time?

5   A.   Probably 21 years old.

6   Q.   Had you worked in car dealerships before?

7   A.   Yes, I worked for one.  I worked at a Nissan store that

8   was down the road for about a year and a half.

9   Q.   Do you know -- what does he do now?

10  A.   He's the owner of Big Red, I believe.

11  Q.   At various points over the last 20 years, have you worked

12  for Chris Mayes?

13  A.   Yes, I have.

14  Q.   And at some point, did he own dealerships?

15  A.   Yes.  He owned Big Red and then Norman Mitsubishi and then

16  Mayes Kia down in Ardmore and we also owned a Yamaha franchise.

17            MS. ANDERSON:  Could we pull up Exhibit 29, please.

18  Q.   (BY MS. ANDERSON) Is that Big Red where you worked at some

19  point?

20  A.   Yes, it is.

21            MS. ANDERSON:  And could we pull up Exhibit 30,

22  please.

23  Q.   (BY MS. ANDERSON) Is that Norman Mitsubishi?

24  A.   Yes, it is.

25  Q.   And when you worked at those dealerships, what kind of
```

1   customers did they have?

2   A.    Mostly special-finance customers, mostly.

3   Q.    What does that mean?

4   A.    People with less-than-perfect credit, or bad credit.

5   Q.    And how did the Big Red Dealerships attract those

6   customers?

7   A.    Advertised.

8   Q.    Where did they advertise?

9   A.    Primarily radio.

10  Q.    Are you familiar with those advertisements?

11  A.    Yes, I am.

12  Q.    Let me direct to you what's been marked as Government

13  Exhibit 20.  Look through it.  Make sure you know everything

14  that's in there.

15  A.    Yes, I do.

16  Q.    Do you recognize that?

17  A.    Yes.

18  Q.    What is it?

19  A.    It looks like a bill from the radio station and roughly

20  what ad they were going to run for that month on the radio.

21  Q.    And is there a disk in there?

22  A.    Yes, there is.

23  Q.    Have you listened to that disk?

24  A.    Yes, I have listened and I initialed the disk.

25  Q.    Okay.  And you were -- when you were working at the Big

1    Red Dealerships, you were aware of the advertisements that ran

2    at the time; is that right?

3    A.    Yes, ma'am.

4    Q.    And was this one that ran while you were working there?

5    A.    Yes, it was.

6    Q.    Okay.  And --

7             MS. ANDERSON:  Your Honor, the United States moves to

8    admit Government Exhibit 20 and to publish it.

9             THE COURT:  Any objection?

10            MR. BEHENNA:  Your Honor, we would object as to

11   hearsay.  He didn't create the ad, he doesn't know the

12   requirements of dealerships that they have to go into to make

13   ads like that, disclosures that have to be made, so we would

14   object.  It's hearsay.

15            THE COURT:  Any other defendants object?

16            MR. SHANNONHOUSE:  I would make the same objection,

17   Your Honor.

18            MR. ADLER:  Objection as to foundation on behalf of

19   Ms. Wells, Your Honor.

20            THE COURT:  Well, the hearsay objection is without

21   merit.  It's not even articulated as a hearsay objection.  And

22   it's otherwise overruled.  It will be received.

23            MS. ANDERSON:  Could we play that, please?

24        (EXHIBIT NUMBER 20 PLAYED FOR THE COURT AND JURY.)

25   Q.    (BY MS. ANDERSON) All right.  I think you said you first

1  started working for Chris Mayes in about 2000; is that correct?

2  A.   Yeah, 2001.

3  Q.   And where was that?

4  A.   At Hudiburg Chevrolet.

5  Q.   Okay.  And what was his job at the time?

6  A.   Used car manager.

7  Q.   Okay.  And at some point, did Mr. Mayes leave Hudiburg?

8  A.   Yes, he purchased Big Red.

9  Q.   About when was that, if you know?

10 A.   I believe it was '05, I think.

11 Q.   Around 2005?

12 A.   Yeah, 2005, 2006, something like that, because that was

13 when he left.

14 Q.   All right.  And what did you do?

15 A.   I was a used car manager when he left.

16 Q.   Okay.  And did you stay at Hudiburg?

17 A.   Yeah, for about another year and a half.

18 Q.   And at some point, did you go work for Mr. Mayes?

19 A.   Yes, I came back December 6th of 2012.

20 Q.   Okay.  Why did you go to work for Mr. Mayes at that time?

21 A.   So I had a sales training company, I started it in 2011,

22 and I was training Big Red one day a week, and I would travel

23 down and I would train them.  After about six months of

24 training, maybe four months of training them, I was offered a

25 job to be the GM.

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                              208

1   Q.   Who offered you the job?

2   A.   Chris Mayes.

3   Q.   And at the time, how many dealerships were there?

4   A.   Just one.

5   Q.   Okay.  And that was Big Red Sports & Imports?

6   A.   Yes, ma'am.

7   Q.   Okay.  And in time, you mentioned there were others?

8   A.   Yes, there was.

9   Q.   Okay.  And who owned all of them, if you know?

10  A.   Chris owned them all.  When we bought Norman Mitsubishi,

11  there was a bunch of little 5 percent owners, that we all put

12  our money in to try to partner up and buy a store together, and

13  that was in 2014, I believe.

14  Q.   And so in 2014, you ended up with 5 percent of Norman

15  Mitsubishi?

16  A.   Yes, ma'am.

17  Q.   And did Mr. Mayes also have 5 percent?

18  A.   No, he was primary.  I didn't see the whole contract but

19  I'm guessing he was the one who owned most of it.

20  Q.   Okay.

21  A.   There was, like, five or six other people that had 5

22  percent, I believe.

23  Q.   Okay.  And when all of them were operational, who was in

24  charge of them?

25  A.   Chris Mayes.

1    Q.    And were there any employees that worked at multiple

2    dealerships or over multiple dealerships?

3    A.    What does that mean again?  Sorry.

4    Q.    So, for example, the accounting, was there a separate

5    person in charge of accounting at each of the dealerships or

6    was there anyone who was in charge of all of it?

7    A.    So we had one centralized place that handled all

8    accounting for all the entities, everything.

9    Q.    Okay.  All right.  And what about -- was there ever a

10   compliance officer?

11   A.    There was one in the beginning; it was Chuck Gooch.

12   Q.    Okay.  And which employees or which dealerships was he

13   over?

14   A.    All of them.

15   Q.    Okay.  And I think you mentioned the accounting, there was

16   a controller, who was that?

17   A.    Courtney Wells.

18   Q.    And so she was over all of the dealerships?

19   A.    Yes.

20   Q.    All right.  And when you were a general manager, you were

21   hired as general manager at Big Red Sports & Imports?

22   A.    Yes, ma'am.

23   Q.    As a general manager, did you have any control over what

24   happened at the other dealerships?

25   A.    No, not without Chris's supervision.

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    210

1  Q.   All right.  When you got to Big Red in December 2012, how
2  did it compare to what you had experienced in other dealerships
3  before you got there?
4  A.   So the easiest way to explain it was it was plug-and-play,
5  which means -- like the radio commercial you just played, we
6  brought in a lot of bad credit customers, those people came in,
7  a lot of these people have shopped around at different
8  companies, they've tried to purchase vehicles, a lot of them
9  could not all the way purchase because of something, maybe they
10 had an open trade-in, maybe they didn't make enough money,
11 maybe they didn't have a down payment, and at Big Red, we could
12 just really fill in the dots with whatever they needed to make
13 that deal happen.
14 Q.   How did you fill in the dots?
15 A.   By inflating income on customers who didn't make income,
16 you know, just basically you could change a credit app to
17 whatever you needed it to fit, as long as the bank didn't ask
18 for proof of that.  Fake down payments daily.
19      If somebody came in with a trade-in, there was something
20 called a "repo close," it was where we would kick the
21 customer's car when they came in to trade it because they would
22 owe ten grand more than it was worth, they went across the
23 street, they couldn't trade that car in because they had ten
24 grand in negative equity, but then they would come to our store
25 and then we could just put it out in the field or tell them to

1  give to it someone else or give it back to the bank and we

2  would just sell them another car.

3  Q.   You said you could inflate their income unless the bank

4  asked for documentation; is that right?

5  A.   Yes, ma'am.

6  Q.   What if the bank asked for documentation?

7  A.   We would make it in some cases.  In a lot of situations,

8  when I first got there in 2012, December, on every computer a

9  lot of the finance people would have where they could make pay

10  stubs.  I mean, it was common that first year.

11  Q.   So they were making fake pay stubs?

12  A.   Yes, ma'am.

13  Q.   What about utility bills?

14  A.   Every day, yes, ma'am.

15  Q.   "Every day" what?

16  A.   We would make utility bills because you would have two

17  people and we would need to join them together sometimes and we

18  would need to say they lived at the same address, even though

19  they didn't, so we would need to adjust the utility bill to

20  match the address or the dates.

21  Q.   Okay.  And so you lied?

22  A.   Yes, ma'am.

23  Q.   And when you got there, is that something you had ever

24  done before?

25  A.   I had done things -- I had never changed a pay stub, I had

1   never changed a utility bill.  You know, we have had somebody

2   not trade in a vehicle before, right?  Like, told them they

3   owed too much and they need to give it back to the bank.

4        But wherever I worked, it was at Hudiburg, you know,

5   before then, then David Stanley and then Carter County Dodge --

6   I mean, that wasn't something that happened very often.  This

7   was a daily event at Big Red.

8   Q.   And you participated in it?

9   A.   Yes, ma'am.

10  Q.   Did -- why?

11  A.   It was the company culture and it was easy to just fit

12  right in.  It never seemed easier to sell cars.  You know,

13  working at a lot of dealerships, it always seemed like you were

14  just one document away from a deal, you know.

15       So we're at a dealership where you're trying to put

16  everything together all the time, you have customers going home

17  looking for, you know, utility bills and everything.  This was

18  an opportunity where you could just make it in this store and

19  we could sell cars that our competition couldn't.

20  Q.   And so what part of the market did you capture?

21  A.   Bad credit or people that had good credit but maybe that

22  didn't have income or something like that and we could alter

23  that.

24  Q.   Okay.

25            THE COURT:  Let me know when you get to a convenient

1    stopping point, we'll take our mid-morning break.

2              MS. ANDERSON:  Your Honor, I think we could stop

3    here.

4              THE COURT:  Very well.  You may be seated.

5         Members of the jury, we'll take our mid-morning break at

6    this time.

7         Since you haven't heard me give it yet today, I'll give

8    you the full version of my very important usual admonition, and

9    that is not to discuss the case with anyone for any purpose

10   until it has been given to you for your deliberations and

11   verdict, not to undertake any form of independent investigation

12   of any aspect of the case, and not to reach any conclusions

13   about the case until it has been given to you for your

14   deliberations and verdict.

15        We'll resume here in the courtroom at 10:30.

16        Again, I commend the jury assembly room to you for your

17   use because that is your space.

18        All persons will please remain seated while the jury

19   departs.

20        Oh, by the way, before I forget it, one week from today is

21   Thursday, right, Lori?  She knows those things.  That's

22   Veterans Day and we won't have court one week from today for

23   your planning purposes.  I wanted to remember to tell you that.

24        So all persons will please remain seated while the jury

25   departs.

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                        214

```
 1            (JURY EXITS THE COURTROOM.)
 2            THE COURT:  Okay.  I want to see if we can get -- to
 3   the CSOs, let me tell you, I apologize.  I apparently have hit
 4   the duress alarm again.  I'm just renting this courtroom.  I'm
 5   not used to it.  And, apparently, I hit it yesterday.  As far
 6   as I'm concerned, you can disconnect it.  It's right --
 7            COURTROOM DEPUTY:  They can't do that.
 8            THE COURT:  Okay.  It's placed differently than what
 9   I've been used to for 20 years.  So, anyway, I apologize.  And
10   whatever you all can do about that -- I'll try not to hit it,
11   but I have not been under duress so far today, nor was I
12   yesterday.  But, anyway, I do apologize.
13       A couple of other things I want to touch on while I'm
14   thinking of it before we take our mid-morning break.
15       I very confidently, and I remain confident about that,
16   overruled an objection to a question to Agent Lowrance about
17   the lack of a 302 relating to Donna Mullins changing her story.
18   I don't want anyone to think that my thinking was any broader
19   than it was.
20       My thinking in overruling that objection, quite simply,
21   was that my sense was that there were not quite enough facts
22   woven into the question in terms of the factual context in
23   which that situation arose, and that was the basis upon which I
24   sustained the objection to that question.
25       One other matter, this came up yesterday.  I don't know
```

1  how likely it is to arise again, but we had -- we received in

2  evidence, I think, perhaps might have been one of the very

3  first exhibits, Exhibit 191, a pricing grid, and it -- in the

4  upper right-hand corner, it had some notations that were not

5  made in the ordinary course of business, which of course raises

6  an issue as to whether at least that part of it would come in

7  under the business records rule.

8      Those notations I easily concluded were innocuous and

9  that's the reason that I really wasn't all that worried about

10  receiving that exhibit with those notations that may not have

11  been made in the ordinary course of business.

12      But I would ask the government to take a look at any other

13  exhibits that may have any such notations.  I don't want to put

14  unnecessary burdens on anyone on either side, but that deserves

15  a look so that we can, if possible, avoid those problems as we

16  go.

17      Court will be in recess until 10:30.

18      (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING PROCEEDINGS

19  WERE HAD IN OPEN COURT AND WITHIN THE PRESENCE AND HEARING OF

20  THE JURY.)

21          THE COURT:  Welcome back, members of the jury.

22      Ms. Anderson, you may continue.

23          MS. ANDERSON:  Thank you, Your Honor.

24  Q.   (BY MS. ANDERSON) I think before our break we were talking

25  about how and why you participated in the conduct going on at

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    216

1   Big Red.

2        When you worked there in that first stretch in -- starting

3   in December 2012, what was your title?

4   A.   GM.

5   Q.   And who did you report to?

6   A.   Chris Mayes.

7   Q.   As a general manager at Big Red, how did you get

8   compensated?

9   A.   I got paid off a salary and I got paid off of commission.

10  Q.   Okay.  And how was your commission calculated?

11  A.   By how much the dealership would put up in profit.

12  Q.   And so you got a percentage of the profits of the Big Red

13  Dealership?

14  A.   Yes, ma'am.

15  Q.   And how much was your percentage?

16  A.   I honestly don't remember.  I want to say, like, 5 percent

17  but maybe 3 percent, I don't remember.  I can -- I can get that

18  answer.

19  Q.   Based on what you recall, 3 to 5 percent or somewhere in

20  that ballpark?

21  A.   Yes, ma'am.

22  Q.   Okay.  And who got the rest of the profits?

23  A.   It would go to the company.

24  Q.   And who owned the company?

25  A.   Chris Mayes.

1   Q.   Okay.  And when you were a general manager at Big Red

2   Sports & Imports, were you also the general manager at Norman

3   Mitsubishi?

4   A.   In the beginning, no, I wasn't.  It was -- there was

5   another -- there was a GM over there, there was a couple

6   different people when we first opened it.

7   Q.   Okay.  And were you ever the general manager at Mayes Kia?

8   A.   No.  There was a time where I was a platform GM, kind of

9   over all of them, I had the title, but Chris was in charge.

10   Q.   Okay.  Do you remember about when that was?

11   A.   I believe that was 2016 -- 2016.  It had to have been

12   2016.

13   Q.   Okay.  That's to the best of your recollection?

14   A.   I believe, yes, ma'am.  And it was only for, like, a

15   six-month period.

16   Q.   Were you ever a signatory on any of the bank accounts for

17   the dealerships?

18   A.   No, ma'am.

19   Q.   And I think you mentioned at one point in time you owned a

20   5 percent interest in Norman Mitsubishi?

21   A.   Yes, ma'am.

22   Q.   Did you ever have an ownership interest in any of the

23   other dealerships?

24   A.   No, ma'am.

25   Q.   When you -- and we're talking about that first period of

1  time when you worked there, starting in December 2012, about

2  how much time did you spend with Chris Mayes?

3  A.   In the beginning, I would spend a little bit of time.

4  Maybe, you know, like, one hour a week.  We wouldn't spend a

5  lot of time.  My first run there, we didn't get to spend a lot

6  of time together.  It was my second time back that we spent all

7  our time together.

8  Q.   Did you consider him a friend?

9  A.   Absolutely.

10  Q.   Did you consider him a mentor?

11  A.   Yes.

12  Q.   Earlier, you mentioned Charles Gooch as compliance

13  officer.  Who is he, generally?  How do you know him?

14  A.   Well, so Chuck worked with us back at Hudiburg a long time

15  ago and then he moved to Big Red with Chris at some point in

16  time, I don't remember, but he went and joined Chris.

17       When I got there, Chuck was kind of like a jack-of-all-

18  trades.  He handled, you know -- normally, he was in finance

19  but he would handle all kinds of stuff for Chris.

20  Q.   All right.  Was he vice president over the dealerships, if

21  you know?

22  A.   Not that I know of.  He did a lot of things behind the

23  scenes.  I was selling cars on the front, and the first time

24  there in 2014, 2012 to 2014, I really didn't know what he did,

25  he just did stuff for Chris.  When I came back, he was the

1   compliance manager and then took on different positions.

2   Q.   And when he was the compliance manager, that was over all

3   of the dealerships; is that right?

4   A.   Yes.

5   Q.   And what does that mean?

6   A.   That means that any deal that would go to the finance

7   office after it would be -- well, when it was booked, it would

8   go to accounting and Chuck would have to sign off on every deal

9   or review every deal before it could be sent to the bank.

10  Q.   And what was -- if you know, what was he looking for when

11  he was signing off on it before it went to the bank?

12  A.   Just making sure that there was nothing like -- that

13  wasn't supposed to go to the bank that was in there.  And then,

14  secondly, just to make sure that all the compliances that we

15  were supposed to have were in there, all signatures.  If there

16  was ever a signature missed, you know, he would send it back

17  down to the sales department and we'd have to get it.

18  Q.   Okay.  And so who set the standards for what Mr. Gooch was

19  looking for in all these deals?

20  A.   Chris Mayes.

21  Q.   And I think, before, you mentioned Courtney Wells?

22  A.   Yes.

23  Q.   Who is she?

24  A.   She was the controller and she basically was Chris Mayes'

25  kind of right-hand person in accounting for anything and

1  everything that had to do with money.

2  Q.   Okay.  And was she over all the dealerships?

3  A.   Yes, ma'am.

4  Q.   Okay.  And how much control did she have over the money in

5  Mr. Mayes' businesses?

6  A.   She had all control that I was aware of, because anytime

7  Chris needed something, she was the one handling it.

8  Q.   Anytime involving money?

9  A.   Yes.

10  Q.   And when did you first meet her?

11  A.   In 2012, when I started there.

12  Q.   Could you walk us through the sale of a car?

13      So a customer walks in and what happens?

14  A.   So -- at Big Red, is that what you mean?

15  Q.   Yes.

16  A.   Okay.  So at Big Red, a customer comes in, we say "hi, how

17  are you doing."  Obviously 99 -- or forget percentages -- most

18  of the business is subprime, which is less-than-perfect credit

19  people, so we could ask a question, like, "Hey, how do you rate

20  your credit, one to ten, one being the worst, ten being the

21  best."

22           THE COURT:  I'm going to ask you to slow down just a

23  bit, please.

24           THE WITNESS:  Okay.  Sorry, sir.

25      So we would ask a question to the customer, like, "How do

1  you rate your credit from one to ten, like, one being the

2  worst, you know, ten being the best, where are you."  It's a

3  very common question.  We ask it 100 percent of the time,

4  almost, because of the radio ads we ran.

5      And so we would say -- they would say, like, "I'm a five."

6  We're, like, "Okay, no problem.  Let's save you some time."

7      I would say, if ten people pulled up, probably seven or

8  eight of them went right inside, we would sit them down at a

9  table and we would do an immediate credit application.  That

10  way, we could figure out what was the next move, you know, how

11  much money did they make, how long have they been on their job,

12  how much cash down did they have, the car they pulled up in, is

13  it theirs, are they upside down, you know.  But that was -- we

14  would qualify them.

15  Q.   Okay.  And so I just want to make sure we slow down a

16  little bit.

17  A.   Yes, ma'am.  Sorry.

18  Q.   So you would sit down and do a credit application with

19  them?

20  A.   Yes, ma'am.

21  Q.   And you said you found out how much cash down they had?

22  A.   Uh-huh.

23  Q.   If they had a vehicle to trade in?

24  A.   Yes, ma'am.

25  Q.   And where they worked?

1  A.   Yes, ma'am.

2  Q.   And what they made?

3  A.   Uh-huh.

4  Q.   And did you run their credit score -- yeah, when did that

5  happen?

6  A.   Right then.

7  Q.   Right then?

8  A.   Yeah, we wanted to know what we had.

9  Q.   Okay.  And then what did you do with that information that

10 you got from them?

11 A.   We would go to the sales managers.  I was a sales manager,

12 but the salespeople would go to the sales managers, and then we

13 would look at the credit, the credit application, and sometimes

14 just submit it upfront to see what the bank would tell us that

15 we needed, so we would know what direction to go because we

16 didn't want to waste any time.

17 Q.   When you say you submit it "upfront," what does that mean?

18 A.   That means we'll basically submit it over to the bank on

19 a, like, fake vehicle, because we don't know what car they're

20 going to buy yet.  We're just plugging in, like, a 2017 Ford

21 Focus, 20,000 miles, or maybe even a brand-new car, depending

22 on how much they make, just to see what the bank would

23 collateral us back at and how much money they would loan them,

24 whether it would get approved or maybe even declined.

25 Q.   Okay.  And even simpler, how does the information get from

1  you to a bank?

2  A.   Okay.  So there's a Dealertrack screen and we will go in

3  and manually -- if that's what you're asking -- we'll manually

4  put down how much cash they have done, if they have a trade-in,

5  who the payoff is with, how much the trade-in is worth.

6       Is that the question?

7  Q.   Yes.

8       And so Dealertrack is on a computer?

9  A.   Yes, ma'am.

10  Q.   And is that over the Internet?

11  A.   Yes, it is.

12  Q.   Okay.  And when you insert information into Dealertrack,

13  where does it go?  Does it go to one bank or one lender or

14  where does it go?

15  A.   So it can go to as many lenders as you want it to.  When

16  you hit "submit," there will be a list of banks over here on

17  the side and you can just click what banks you want it to go

18  to.

19       And we had a pretty good general idea about what banks to

20  send it to and what banks not to based off the credit score and

21  then we would just shotgun it, just submit it.

22  Q.   Okay.  And when you're in that process and something comes

23  back from a lender, then what do you do next?  I mean --

24  A.   Well, so, like, let's say -- they say that you need 1,500

25  down and/or maybe they hit us with proof of income, right?

1  Like, the bank requires proof of income, it's on their

2  stipulations list, they're, like, we need POI on this customer.

3  Sometimes you can get a trade-in and we don't have one yet but

4  we need to go find one, because we can get around it because we

5  know this customer really doesn't make that kind of money that

6  we put on the application.

7       So we would try to find how much money down we really

8  needed to try to put the deal together and then we would go --

9  number one, we would start working the customer for cash down.

10  Q.   Okay.  So your first step is to work the customer for cash

11  down?

12  A.   Yes, ma'am.

13  Q.   Okay.  And did you submit -- as you're looking at the

14  screen and it has all the different inputs that you can put

15  in --

16  A.   Uh-huh.

17  Q.   -- is it a one time you put it in or can you tinker with

18  it?

19  A.   Yeah.  So one banks -- or some banks, you get one time.

20  So, like, with that bank, you would want to definitely submit

21  it with some cash down, even if they didn't, because you want

22  to get your approval.  Because some banks you can rehash, and

23  like you said, tinker with it, you can mess with it, and some

24  banks you can't.

25       There are banks that you can go in and there's a real-time

1  refresh, where you can just keep changing the numbers and the

2  approval will move around.

3       And then some banks, you have to pick up the phone and

4  call.

5  Q.   Okay.

6  A.   So your goal is to try to avoid the phone call.

7  Q.   Okay.  So your goal is to get an approval?

8  A.   Yes, ma'am.

9  Q.   And beyond getting an approval, do you have any other

10  goals in terms of what the numbers look like?

11  A.   As far as structure?

12  Q.   Yes.

13  A.   Okay.  So you're trying to figure out whatever vehicle it

14  is you're going to sell to the customer, you want to try to

15  figure out what kind of structure -- and what a "structure"

16  means is, you have a car and it's worth X amount of money, what

17  will the bank loan, compared to what it's worth, and we want to

18  find that number out so we can decide whether we sell them a

19  new one or a used one or where we're going to go.  Because you

20  have tons of cars so you're trying to land them on the one that

21  fits the collateral guidelines.

22  Q.   Okay.  And are there some deals that are -- even once you

23  get past an approval, are there some deals that are better for

24  the dealership than others?

25  A.   Absolutely.

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    226

1   Q.    And why is that?

2   A.    Well, so some deals you can, you know, just move the

3   numbers around to try to get yourself a higher advance carry

4   and that will make more profit for the dealership.

5         And sometimes if you have more cash down, you can make a

6   lot more money, especially on subprime credit, people with

7   less-than-perfect credit, cash down on a contract really makes

8   a big difference on getting those deals approved.

9   Q.    Okay.  And so does it -- is there a fee that lenders have

10  or a discount they apply to the loan proceeds for different

11  deals?

12  A.    Yeah.  So it's really common on most of your deals to have

13  a bank fee every time, if not a large bank fee as you get into

14  worse credit.

15  Q.    Okay.  And by changing things on the screen, are you able

16  to change the --

17  A.    The bank fee.

18  Q.    -- the bank fee?

19  A.    Absolutely, yeah.

20        So if a customer did not have a trade-in, let's say they

21  did not, and they drove up with their grandma, if they had had

22  a trade-in, we could have probably, number one, made a deal

23  where it wasn't a deal without one, like it just wasn't a deal

24  at all, or we could have actually made money just by placing

25  that trade-in on the contract, it changed the way the bank

1   perceives the loan, that the customer isn't walking, they have

2   a car.

3   Q.    It bumps them to a different category?

4   A.    Whole different category.

5   Q.    So after you get the approval from an indirect lender,

6   what happens next?

7   A.    At that point, we would go work the customer for how much

8   cash down we had, you know, if there was a trade-in, and then

9   we would try to go find them a vehicle to go sell them.

10        And then once we land them on that vehicle, before

11  obviously everything was finalized, we would need to make sure

12  that everything that the bank asked for we had, so that when it

13  went to the bank it would fund.

14  Q.    Okay.  And so you get an approval from the lender over

15  Dealertrack with the specifics of what --

16  A.    Yeah.

17  Q.    -- you have and the vehicle and all of those things?

18  A.    The stipulations, yeah.

19  Q.    Okay.  And then what sorts of documents are created?

20  A.    So the common thing is going to be obviously insurance,

21  that's not a big deal, but it's going to be -- proof of

22  residence is very common for special finance deals, proof of

23  income is very common, but sometimes with cash down and a

24  trade, you can really get around that, so that was important.

25  You know, obviously, most banks require a driver's license.

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                              228

```
 1  Q.   Okay.  And is there a contract signed?

 2  A.   Yes, there is.

 3  Q.   Okay.  So a retail purchase agreement --

 4  A.   Yes.

 5  Q.   -- with the customer?

 6       And then there's a retail installment sale contract; is

 7  that right?

 8  A.   Yes, ma'am.

 9  Q.   Okay.  And are there a bunch of other documents that are

10  signed at Big Red?

11  A.   Oh, yeah, tons.

12  Q.   Okay.  And then so all the documents are signed and you

13  have your package and the customer leaves with their car?

14  A.   Yeah, the customer leaves with their car after they sign

15  all their paperwork and then the loan would obviously -- it

16  would go to the -- the packet would be booked by a finance guy,

17  go to accounting, and then accounting would send it to the

18  bank, and then that deal would be put on a list where we would

19  need to now collect the money from the bank, so we would --we

20  would try to fund the loan.

21  Q.   Okay.  So all the documents are put together and signed,

22  it goes to accounting?

23  A.   Yes.

24  Q.   Mr. Gooch reviews it?

25  A.   Yes.
```

1   Q.    And signs off on it?

2   A.    Yes.

3   Q.    Is that what we talked about earlier?

4         And then that package goes to the lender?

5   A.    Yes.

6   Q.    Okay.  And then does the lender reach out to the customer

7   or have a direct contact with the customer?

8   A.    Yes.  So sometimes we -- there's -- depending on what bank

9   it is, we know which banks are going to do customer interviews

10  and which ones aren't, so if -- you know, if something is --

11  we've altered anything on a contract, we need to make the

12  customer aware of it and we need to tell them that when the

13  bank calls that, you know, they can be sure to say X, Y and Z

14  or else they'll have to bring their car back.

15  Q.    Okay.  And so you prepare the customer for the bank

16  calling and you tell them what they need to tell the bank or

17  they -- you tell them they're going to have to bring the car

18  back?

19  A.    Yes, that was a common -- in the finance office, that was

20  commonly handled before the customer left for delivery.

21  Q.    Okay.  And then after the lender gets the package of

22  documents, what happens?

23  A.    Well, if they have everything in there and it just looks

24  like it's okay and they're not a customer interview bank, then

25  they'll pay the dealership and it funds.

1           If it is a bank that needs to do a customer interview,

2    then they will reach out to the customer, they will ask them a

3    series of questions, and if they answer everything correctly,

4    then they will push the button to fund the loan.

5    Q.    Okay.  And so they fund the loan and the total amount

6    comes to the dealership?

7    A.    Uh-huh.

8    Q.    And then what if the customer doesn't make the payments?

9    A.    Then the car would get repo'd.

10   Q.    And does that -- oh, when we were talking before about the

11   contract -- I'm sorry.  Strike that.

12          When we were talking before about the contract, does it

13   also include back-end things?

14   A.    Yeah.  So whenever you're in the finance office, anything

15   that they purchase, like an after-market product, warranty or

16   gap insurance, those things would be included on the contract.

17   Q.    Okay.  And so then that amount also gets -- that's part of

18   the loan proceeds that come into the dealership?

19   A.    Yes.

20   Q.    Are you familiar with something known as "King Cash"?

21   A.    Yes, I am.

22   Q.    What is it?

23   A.    Okay.  So in 2012, when I started, December 6th, it was

24   something where -- and that's kind of how -- you asked me what

25   was the sales process like, when we ask a customer how much

1  money down they have, you know, when we would kind of figure
2  out where we're at on the deal, if that bank approval would
3  come back at, like, 1,500 down and let's say your customer did
4  not have any money down, well, we would still put $1,500 on the
5  contract.
6       And, basically, we could still sell that customer a car,
7  and then in the finance office, we would just give them a
8  receipt showing that they gave us 1,500 down, make a copy of
9  it, put it in the deal, the loan will fund.
10      We would tell the customers that if you tell the bank you
11 didn't put the money down, obviously you're not going to have a
12 car because you're going to need to bring it back, but we're
13 helping you out, so we're putting 1,500 down for you in the
14 contract because that's what the banks need, and that was
15 called King Cash, and it was fake cash down and it would allow
16 us to sell more cars when customers didn't have cash.
17      And we would put it in the back screen on every deal "King
18 Cash" and that means that it was just fake money, it didn't
19 exist, the customers never gave it to us.
20 Q.   Why was it called "King Cash"?
21 A.   I don't know.  I just know that was the name of it.
22 Q.   Is cash important to deals and to lenders?
23 A.   Extremely important, especially on subprime credit which
24 is people with less-than-perfect credit.
25      Maybe it's -- there's a saying in the car business that

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    232

1   goes "cash is king," which means cash down sells more cars, and

2   maybe that's why they called it "King Cash," but I just know

3   without it, we would have been in big trouble.

4   Q.   And did you come up with the idea?

5   A.   No.   This idea was already in place when I got there.

6   Q.   You mentioned on the back screen you would put in "king,"

7   why did you need to track King Cash?

8   A.   Because it wasn't real -- it wasn't real profit, it wasn't

9   real money.   And if -- let's say that customer didn't pass that

10  customer interview, right, like, we deliver the car, we coached

11  him, you know, we told him, hey, Mr. Customer, you put 1,500

12  down, just know that when the bank calls, you need to say you

13  did.

14       And they call and the customer is, like, oh, I didn't put

15  any money down, and, you know, just forgot about it.   Well, the

16  bank calls and they're, like, hey, we're not funding this loan.

17       So we go get the car or we call the customer and say you

18  need to bring your car back now.

19       But we needed to know, because we had a receipt in the

20  deal that said 1,500 down, we needed to know that they didn't

21  put that money down, number one.

22       Number two, we didn't want to pay the salesmen off of fake

23  money because it wasn't real commission, it wasn't real profit.

24  That 1,500 down wasn't real money that the customer put down.

25  So we needed to code it in the back screen on Reynolds &

1  Reynolds that it was fake money.

2  Q.   Okay.  And so you said if the customer doesn't pass the

3  interview and you have to go get the car, you want to know if

4  it was fake money, and that's because, if it was real money,

5  they would get that refunded to them?

6  A.   Yeah, most of the time, yeah.

7  Q.   And you didn't want to give them $1,500?

8  A.   Right.

9  Q.   I want to direct your attention to what's been marked as

10 Government's Exhibit Number 26.  If you could flip through the

11 pages and make sure you know what it is.

12 A.   Yes, I know what this is.

13 Q.   All right.  What is it?

14 A.   It's a screenshot of a Reynolds & Reynolds screen,

15 starting with purchase price, you know, how much cash they put

16 down.  Basically, the retail installment deal is on the first

17 page, showing the structure of the whole loan and what the

18 monthly payment is with the customer.

19      Second one is the customer's name, who purchased the

20 vehicle.

21      The last one is going to be the back screen, which is

22 where I was telling you we could code everything in.  We could

23 code it in on the "we owe" line, and as you can see on this

24 one, this one has a 1528 bank fee -- earlier we were talking

25 about bank fees.

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    234

```
 1   Q.   And let's -- if we can pause just a second.
 2   A.   Okay.
 3   Q.   And is this a document that came from Big Red Sports &
 4   Imports?
 5   A.   Yes, it did.
 6   Q.   All right.  And how did you get this?
 7   A.   I printed it.
 8   Q.   Okay.  And what's the date on it?
 9   A.   November 2, 2015.
10   Q.   And is this something that's created in the ordinary
11   course of working at Big Red Sports & Imports?
12   A.   Is it something that's normally printed?
13   Q.   Or is normally created, maintained, at Big Red Sports &
14   Imports?
15   A.   So this was -- sorry, ask your question one more time.
16   Q.   Is Reynolds & Reynolds a system used?
17   A.   Oh, yeah, we use Reynolds & Reynolds every single day for
18   every deal.
19   Q.   Okay.  And it's a way to document every deal?
20   A.   Yes, it is.
21        MS. ANDERSON:  Your Honor, the government moves to
22   admit Government's Exhibit 26.
23        THE COURT:  Any objection?
24        MR. BEHENNA:  No objection, Your Honor.
25        MR. SHANNONHOUSE:  No objection.
```

1              MR. ADLER:  No objection on behalf of Ms. Wells, Your

2    Honor.

3              THE COURT:  It will be received.

4    Q.  (BY MS. ANDERSON) So on the top left, what's the date of

5    this one?

6    A.   November 2, 2015.

7    Q.   And is that during a time period when you were working at

8    Big Red Sports & Imports?

9    A.   Yes, it was.

10   Q.   Okay.  And in line 2, is that -- says "deal date," what

11   does that mean?

12   A.   The deal date would be the date that the deal was done.

13   That was the date the customer contracted on this car.

14   Q.   Okay.  Now, do you recall, were you working at the

15   dealership on July 30, 2014?

16   A.   July?  I believe I was let go in June, so I was not there

17   in July.

18   Q.   Okay.  So this is a deal that happened when you were not

19   at Big Red Sports & Imports?

20   A.   Yes, ma'am.

21   Q.   Okay.  But once you were -- when you were there again,

22   it's something you printed off their system?

23   A.   Yes, ma'am.

24   Q.   Okay.  And so on this particular deal, in the middle

25   column, on line 14, what does that have?

```
 1   A.   Line 14 -- oh, cash down, a thousand dollars.

 2   Q.   Okay.  And on line 11, what is that showing?

 3   A.   That shows a trade-in.

 4   Q.   So a value of $1,000 assigned to some vehicle being traded

 5   in?

 6   A.   Yes.

 7   Q.   Okay.  On the left side in -- on line 4, what is that

 8   showing?

 9   A.   The price of the vehicle.

10   Q.   All right.  And then on the far right side, the amount

11   financed?

12   A.   13,759.

13   Q.   Okay.  And does that include some other --

14   A.   Yeah, it has a doc fee and the negative equity.

15   Q.   Okay.  So let's turn to 26.2, please.  What's on this

16   page?

17   A.   That would be all the customer information that -- who

18   purchased the vehicle.

19   Q.   And for this one, it's somebody -- Mr. White?

20   A.   Yeah, Leamon White.

21   Q.   And let's go to 26.3, please.

22        All right.  On this page, it has a price on the top left,

23   what does that mean?

24   A.   That would be the sale price, which was line 4, I believe,

25   on the front page.
```

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    237

1  Q.   Okay.  What's line 1, "Cost"?

2  A.   That's actually what the vehicle shows that they own it

3  for in the system, which is Reynolds & Reynolds.

4  Q.   And what's line 2, "Pack"?

5  A.   "Pack" is just an additional money that we put in the back

6  screen to offset the salesperson's commission.

7  Q.   It's some component of the sales price that's reserved for

8  the dealership?

9  A.   Yeah, it's just a reserve for the company.

10  Q.   Okay.  And is there -- is the cost -- is there anything

11  else that's factored into the cost line, line 1?

12  A.   Yeah, so, like, when you -- when you bought this car, it

13  may have been purchased for $7,000, it could have had $1,616 in

14  reconditioning, like a detail service, stuff like that, so that

15  could be the 616.

16       And then 2,000 could be a dealer pack, but that's not on

17  this screen and we don't put those on this screen.  So whatever

18  the pack was at this time, it could have been a thousand, it

19  could have been 2,000, it could have been 3,000, you know, I

20  don't know at this time what it was, but that would be included

21  in that cost.

22  Q.   There's a standard pack, a dollar amount that is added

23  into the cost of a vehicle on the internal documents?

24  A.   To offset salesmen compensation.

25  Q.   To exclude that from the commission calculation?

1   A.    That's right.

2   Q.    So there's two packs included, the one that's a line item

3   and then part of that cost; is that right?

4   A.    Yeah.  Yeah.

5   Q.    Okay.  And as we go down to lines 24, 26 and 28, what is

6   that?

7   A.    So 24, that was something that got put on every car.  It

8   was always in the back screen.  I'm not sure if we really put

9   etch on every car or if that was just a reserve again, another

10  way to offset profit, you know.  I didn't see the back-end of

11  where that 650 gets paid out to, but, again, that will offset

12  the salesperson's commission.  It would be line 24.

13        Line 26 would be the bank fee, which means the banks did

14  the loan but they said we need $1,528 in a bank fee for doing

15  this loan because the guy doesn't have very good credit.

16        And then on line 28, that's where we would plug in the

17  thousand dollars that was on the front end of the retail

18  installment contract, where the customer -- we know they did

19  not put any money down, so we just would put that in the back

20  screen and everybody would be aware that it was a fake down

21  payment.

22  Q.    Okay.  So it says "king" next to that $1,000?

23  A.    Yes.

24  Q.    To show that the cash down on the first screen was King

25  Cash?

1   A.   Yes.

2   Q.   And that meant it was fake?

3   A.   Yes.

4   Q.   And those amounts down there are amounts being subtracted

5   from the amount -- the amount financed or the amount that's

6   coming in from the bank so that it doesn't get factored into

7   commission?

8   A.   Yeah.  So if you look at the top right-hand corner, do you

9   see where it says "vehicle gross 348," right?

10  Q.   Uh-huh.

11  A.   If you guys can see that.

12       That salesperson, if they got paid 25 percent commission,

13  they were getting paid 25 percent of 348.

14       So when you look at the cost, the price, everything that's

15  down on line 24, 26 and 28, it's showing your vehicle gross was

16  $348.  That was what the salesmen was able to get paid off

17  of -- or, actually, my bad, gross pay, if you look down under

18  line 35, you see where it says "gross pay"?

19  Q.   Yes.

20  A.   That was actually a negative 101, so this deal we actually

21  reported it as losing money so the salesman would have not made

22  any money on this deal at all.

23  Q.   Was there a minimum commission that salesmen --

24  A.   A hundred dollars most times.  This would be a hundred

25  dollar mini.

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    240

```
1   Q.    So although it says it's a loss of $101.50 --
2   A.    It still pays.
3   Q.    -- the salesperson would get a hundred-dollar commission?
4   A.    Yes.
5   Q.    Why did you use King Cash?
6   A.    Well, if somebody didn't have money down and the bank
7   required them to have money down, it was just not a deal, we
8   would have had to let the customer leave.
9         So if we put it down on the contract that they did have
10  money down, then they bought a car.  So it was how we picked up
11  the market share, where other stores couldn't sell these
12  customers, we could.
13  Q.    Right.
14        So your market share was based on lies?
15  A.    Yeah.
16  Q.    What happened to King Cash?
17  A.    So in 2014, we had a big kind of blowup in the dealership,
18  where a bank had found out about a lot of King Cash and we
19  ended up -- it ended up getting kind of shut down, where it
20  was, like, no more King Cash whatsoever, so that went away.
21  Q.    So let's start at the beginning.
22        How did the bank get involved here?
23  A.    So in June of 2014, I was let go.  June of 2014, I was let
24  go from Big Red.  And when I was let go, it was because there
25  was a company that had kind of found out, because we had an
```

1    employee that worked for us and she knew about some of the

2    stuff that was going on in our company that we were able to

3    keep under the table for a long time.

4        Well, this company went to go work for a direct competitor

5    of ours and the guy's name was Joe Cooper and the girl's name

6    was LeAnne.  And when she went over there to work, she took a

7    bunch of documents that were upstairs that were fraudulent, and

8    there was fraudulent everything, but she took some specific

9    ones that literally caused a big problem.

10       And when it did, we felt like we were going to have, you

11   know, the FBI come in or, you know, like, we were going to get

12   shut down, you know, because it was out in the open now.

13       Like, so that was where -- that was where it ended.  And

14   that bank was called Peak Acceptance, the main bank, the main

15   bank.  There was lots of banks that it was done on, but the

16   main bank that had the problem was called Peak Acceptance, and

17   what started out as a total loss letter that they found out

18   there were some problems with ended up turning into, hey, we

19   found out that it's much bigger than a total loss letter.

20   There's fake cash down on every one of these contracts you've

21   been sending us.  And there was a lawsuit.

22   Q.   I want to step back a second.

23       So before you talked about King Cash and other fake

24   documents are created --

25   A.   Uh-huh.

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    242

```
1   Q.    -- was it just you who created those?

2   A.    No.

3   Q.    Who else did them?

4   A.    So everybody in the dealership that would be in upper

5   management was a part of it.

6   Q.    Who is in upper management at the dealership?

7   A.    At this time -- at this time?

8   Q.    Yes.

9   A.    Okay.  I mean, it would be Corey Harris, it would be Steve

10  Griffith, it would be anybody and everybody that worked in the

11  finance office.  You know, Richard Howard.

12        It -- it would really be anybody that was labeled in --

13  anybody in management from 2012 to 2014.  If an ethical person

14  came in to Big Red to work, they didn't last, they left within

15  a week, they were gone.

16  Q.    And when you say "anybody in management," is that just

17  managers or does it go above managers who knew about this

18  stuff?

19  A.    Oh, everybody knew about it.  I mean, Chris Mayes knows

20  about it, Chuck Gooch knows about it, anybody -- Courtney Wells

21  knows about it.  I mean, anybody in the company knew what was

22  going on inside of our company.  I mean, everybody was in it.

23        It started before I got there, but I know this, when I --

24  as I became involved in it that it was something that everybody

25  did.
```

1  Q.   How do you know that Mr. Mayes or Mr. Gooch or Ms. Wells

2  knew about it?  Did you talk to them about it?

3  A.   I talked to Chris about it all the time.  We talked about

4  fake income, you know, how much is too much, how much is not

5  enough, you know, like, what does a really bad deal look like

6  that we just want to stay away from, you know, what is

7  acceptable, you know.

8       If a lady doesn't have a job at all, you know, can we give

9  her a job, does it show that she has a job on her credit

10 application.

11      You know, it's, like, we had to play it smart so we didn't

12 end up getting in trouble.  So we communicated all the time

13 together.

14 Q.   Okay.  And was Mr. Gooch ever involved in that?

15 A.   Absolutely.

16 Q.   And how do you know?

17 A.   Because he was in the conversations with us.

18 Q.   All right.  What about Ms. Wells?

19 A.   Courtney wasn't so much into a lot of those conversations

20 because she was in accounting, but she's very aware of it.

21 Anytime there was trouble, she was right there with us.

22 Q.   And you said if an ethical person came in to work at the

23 dealership, they didn't last.  What happened to them?

24 A.   Well, so somebody would come in and if they started

25 questioning, like, what we do -- it's, like, when I came in, I

1  fell prey to making good money in this store, it's my fault.  I
2  went with the flow and I started doing bad fraudulent stuff.  I
3  was making more money than I ever made.  I made really bad
4  decisions.
5      Someone else comes in, and I was talking about ethical,
6  they're not going to sell their standards for money, then
7  they're, like, this is messed up, this isn't right.
8      And then we're, like, we need this person out of here
9  because we're going to get in trouble or he's going to rat us
10 out.
11 Q.   So did they get fired or what happened to them?  How did
12 they leave?
13 A.   We would either just fire them or we would just run them
14 off.
15 Q.   How did you run them off?
16 A.   Just by probably treating them bad.
17 Q.   Now, you were talking about the thing with Peak Acceptance
18 and you mentioned fraudulent total loss letters?
19 A.   Yes.
20 Q.   What's that?
21 A.   Okay.  So as you heard on the radio commercial and it
22 said, like, you know, you're approved, you're upside down on
23 your car, bring it in.
24      So all the buy-here-pay-here places, which is normally,
25 like, The Key -- The Key -- there's a dealership called The Key

1  in Oklahoma City, there's Express Credit Auto, there's a bunch

2  of Joe Cooper Easy Credit Auto, there's just a bunch of places

3  that do these buy-here-pay-here, kind of, where the owners kind

4  of do the self-funding their own.

5      Well, these people would come in and they would have a

6  $2,000 car that they owed 12 grand on, because in order for

7  these people to buy from those places, I mean, those places

8  just make up prices to sell these people cars because they

9  don't have one, so what we would do is we would just tell them,

10 well, your car is worth 2 grand and you owe 12 and it has

11 180,000 miles on it, you can give it back to the bank and then

12 we can just sell you a brand-new one, but when we submitted it

13 to the bank, the bank would want proof of an open -- open

14 auto -- there would be an open auto loan on the credit.  It

15 would say that they would owe Express Credit Auto $12,000.

16     So what we would do is that we would make a letter that

17 would say that the vehicle that they owned was totaled.  And

18 that's it.

19     And we would tell the bank that, hey, this customer, they

20 did have that car, you can see they paid it good on their

21 credit, but they totaled it out so they don't have it anymore

22 so we can sell them another one.

23     And we would put that document, which is what we called a

24 total loss letter, into the deal packet to fund the loan.

25 Q.   So is a fake document from a purported insurance company?

```
 1  A.    Yes.

 2  Q.    And I think you said it started with that, with Peak; is

 3  that right?

 4  A.    Yes.  So when the LeAnne girl left from accounting, she

 5  took a bunch of those letters with her, which means it's not

 6  now that somebody is saying that something was done in our

 7  store, it's like she -- we think she took some letters with

 8  her.  And that means she would know what customer it went to,

 9  what deal.

10       And the crazy thing is she went to work for Joe Cooper and

11  a lot of those cars that we convinced those people to repo were

12  from Joe Cooper's store.  So now that guy has got proof that,

13  like, we're like repo'ing his cars and how we're getting them

14  approved on our end.

15       And that was how it came to be with the Peak Acceptance

16  total loss letters.

17  Q.    Okay.  And so somehow Peak and the Big Red dealerships had

18  a dispute; is that what happened?

19  A.    Yeah.  So what happened is Chris attorneyed up really

20  hard.  I believe it was McAfee & Taft back then.  He says,

21  like, hey, I'm going to get you powerhouse lawyers, everything

22  is going to be okay, I'm going to handle it.

23       Next thing you know, he's, like, fire half the staff.  I

24  fired half the staff right away.  He's, like, we got to look

25  like there was some rogue bad people in here and we just got
```

1  rid of them all.  That's the plan.

2      He's my mentor, he's our boss, he's telling us what we're

3  going to do, so we just start letting people go left and right.

4  And it starts being total chaos.

5      I'm told -- if I'm going to handle this, I'm told:  Make a

6  confession, say that you're responsible for these letters and

7  I'll protect you.

8  Q.   Who told you that?

9  A.   Chris Mayes.

10  Q.   He told you to make a confession?

11  A.   Yeah, make a confession, which Jarrod Cunningham recorded.

12  I make the confession, the next day I'm fired and I get a

13  $10,000 check and they tell me to disappear for six months, and

14  when things cool off, they'll call me back.

15  Q.   And where did you go to record your confession?

16  A.   In Jarrod Cunningham's office.

17  Q.   Okay.  Where was Jarrod Cunningham's office?

18  A.   Over at the Mitsubishi store.  It was over -- it was where

19  Chris was currently at and they were having their daily

20  attorney meetings.

21  Q.   Okay.  And who was Jarrod Cunningham?

22  A.   Jarrod Cunningham was Chris's lawyer at that time.

23  Q.   And so you went over to the Mitsubishi store, you recorded

24  a confession?

25  A.   Yes, I did.

1  Q.   Why did you do that?

2  A.   Because I truly felt that -- I had never been in trouble

3  before and that, like, all this was going down but Chris said

4  he'll protect me.  He's, like, you don't have anything to worry

5  about.  Just do what I say and you'll be fine.

6       And we did exactly what he said.  And next thing you know,

7  I was let go the next day.

8  Q.   I'm going to direct your attention to what's been marked

9  as Government Exhibit Number 27.  Do you recognize that

10  document?

11  A.   Yes, this is an ATM receipt where I deposited the ten

12  grand that I was given.

13  Q.   Okay.  What's the -- and how do you know this --

14  A.   I gave you -- I gave you this receipt.  It was on 6/17 of

15  '14, which would have had to have been a couple days after I

16  was let go -- well, here on the next page, sorry, it says what

17  day the check was cut.  6/16, it looks like, I was given the

18  check.

19            MS. ANDERSON:  Your Honor, the government moves to

20  admit Government Exhibit 27 and to publish.

21            MR. BEHENNA:  No objection, Your Honor.

22            MR. SHANNONHOUSE:  No objection, Your Honor.

23            MR. ADLER:  No objection.

24            THE COURT:  It will be received.

25  Q.   (BY MS. ANDERSON) It's a little hard to read but is that

```
 1   your name on this, on the right side?
 2   A.   Yes, it is.
 3   Q.   Okay.  So this is a deposit ticket.  Where did you do your
 4   banking?
 5   A.   Tinker Credit Union.
 6   Q.   Okay.  And the date on this deposit is, with an arrow, can
 7   you read that?
 8   A.   Yes, 6/17.
 9   Q.   2014?
10   A.   2014, sorry.
11   Q.   And at the bottom, you're depositing -- an arrow -- is
12   that your handwriting?
13   A.   Yes, that is my handwriting.
14   Q.   Okay.  And so you drew that arrow at the bottom that says
15   "check received" and what's the amount?
16   A.   $10,000.
17   Q.   And let's go to 27.2.
18        All right.  And this is showing the backup for that Check
19   Number 1201 -- is that what that is?
20   A.   Yes.
21   Q.   Okay.  And who created it?
22   A.   Courtney Wells.
23   Q.   And the date on that is -- on the top right?
24   A.   6/16 of 2014.
25   Q.   Okay.  And total is $10,000?
```

1   A.   $10,000.

2   Q.   So you said the next day you got this $10,000 check, who

3   gave that to you?

4   A.   Jarrod Cunningham.

5   Q.   And then what did he say?

6   A.   He said:  I know you don't want to hear this, but we are

7   letting you go and Chris doesn't want to do this but he has to

8   do this and you need to lay low for six months, keep your mouth

9   shut, if anybody contacts you, you contact me, and if you say

10  something, you have enemies, and if you don't, then we'll talk

11  to you, we'll reach out.

12  Q.   All right.  Did they reach out?

13  A.   Yeah, they reached out.

14  Q.   And when was that?

15  A.   Jarrod called me multiple times and it was -- it was

16  pretty crazy.  I mean, we were getting threatened constantly by

17  Jarrod, you know, that -- because we were getting calls from

18  banks to my phone and Jarrod would say, you know, you better

19  not answer that call, you need to tell me what's going on.  You

20  know, we can burn you, we have a recording of you, don't you

21  forget that.  And --

22  Q.   Did you go meet with a bank?

23  A.   Yes, I did.

24  Q.   Who did you meet with?

25  A.   I met with Bob, who was my buyer at Peak Acceptance.  When

1  this all happened, I sat home for two months, literally -- or a

2  month, didn't know -- just didn't know what the hell to do, you

3  know.  I heard through all the banks that Chris and Richard

4  Howard had went to all the banks --

5          MR. ADLER:  Objection to hearsay.

6          THE COURT:  Overruled.

7      You may continue.

8          THE WITNESS:  That Chris and Richard Howard had went

9  to every bank and told them it was my fault, I did everything,

10  I was a rogue employee, they just found out about it.  They

11  apologized, they tried to make it right with them on that end.

12          THE COURT:  It's better now at this point to go by

13  Q-and-A, rather than narrative.

14          THE WITNESS:  So I drove down --

15          THE COURT:  Okay.  Next question.  Wait for the next

16  question, please.

17  Q.   (BY MS. ANDERSON) You drove down and you met with somebody

18  named Bob?

19  A.   Yeah, I drove down to Dallas and met with Bob at Peak.

20  Q.   And what did do you there?

21  A.   And I started talking to Bob about I apologized for being

22  a part of all of this because, you know, it just was awful.

23      And he said, "No problem."  He started asking about the

24  down payments.  He said we're investigating all these down

25  payments.  And we started talking about fake cash down.

1      And at that point, he was, like, I don't have a problem

2   with you, go back home.

3   Q.   Okay.

4   A.   And that was it.

5   Q.   And what did you tell him about fake down payments?

6   A.   I told him that there was King Cash.

7   Q.   And you told him how King Cash worked?

8   A.   Yeah.

9   Q.   And six months after you were fired -- so you were fired

10  in June 2015?

11  A.   Yes -- 2014.

12  Q.   Sorry, June 2014?

13  A.   Yes, ma'am.

14  Q.   Thank you.

15       Did you go back to Big Red in January 2015?

16  A.   I went back to Big Red January 2015.

17  Q.   And why did you go back?

18  A.   I needed to make sure my date is right, but there was -- I

19  believe I gave you some documentation on what happened before.

20  Can I see that or is that in here?

21  Q.   Let me ask a different question.

22  A.   Okay.

23  Q.   So earlier you said they asked -- they told you to wait

24  six months --

25  A.   Yes.

```
 1   Q.    -- for the smoke to clear?
 2         And so six months later, you went back to work for them?
 3   A.    Yes.  Chris had called me on the phone, and he had said:
 4   Hey, we've reached a settlement or an agreement and, you know,
 5   we may be able to slowly start working you back into the store.
 6   And I think I started back, like, training.
 7   Q.    And what did he say?  Did he explain anything that had
 8   happened?
 9   A.    He said that they settled over King Cash, over cash down.
10   Q.    Did he reprimand you for what had happened?
11   A.    No.  He just -- well, yes, he said that -- that the
12   business has been massively hurt because of the King Cash deal,
13   like, they had to buy a bunch of loans back or they had to
14   stand behind the loans of these ones that had been done and
15   that was it.  So I got to come back in and I just started
16   training.
17   Q.    Did he apologize to you --
18   A.    No.
19   Q.    -- for having forced you out?
20   A.    No.  He did tell me, though, he said, "We will always
21   stick together after this.  I'm sorry," he goes, "My attorneys
22   told me to leave your side and I listened to them."  He goes,
23   "I should have stayed by your side.  Sorry I fired you."
24   Q.    All right.  And so you went back to work there?
25   A.    Yes, I did.
```

1   Q.   And let me direct your attention to what's been marked as

2   Government Exhibit 243.  Do you recognize that document?

3   A.   243?

4   Q.   Maybe in the other binder?

5   A.   Okay.  Sorry, I'm coming here.

6        243.  Yes, I do recognize -- or recommend this -- or

7   recognize this, I'm sorry.

8   Q.   And what is it?

9   A.   It is a -- it is a pay -- it's a check to me, paid out of

10  Big Red.

11  Q.   And this is a check that you got and provided to the

12  government?

13  A.   Yes.

14  Q.   All right.

15           MS. ANDERSON:  Your Honor, the government moves to

16  admit into evidence Government's Exhibit 243.

17           MR. BEHENNA:  No objection, Your Honor.

18           MR. SHANNONHOUSE:  No objection, Your Honor.

19           MR. ADLER:  No objection.

20           THE COURT:  It will be received.

21  Q.   (BY MS. ANDERSON) All right.  I think you just testified

22  that you came back to work for Big Red Sports & Imports in

23  January 2015; is that right?

24  A.   That is correct.

25  Q.   Okay.  And is this a check that you got once you had

1  started back up again?

2  A.    Yes.

3  Q.    Okay.  So once you started back in January 2015, how long

4  did you stay?

5  A.    I stayed until sometime during October.  I believe I left

6  at the end of October of that year, 2015 of October.

7  Q.    And why did you leave?

8  A.    Chris's dad was in the hospital and he was just really

9  angry and everybody was working open-to-close all day long, all

10 night long.  I mean, if a finance guy didn't have his deal

11 booked, he had to come in on Sunday.

12      I mean, it was just crazy, everybody was exhausted, we

13 were tired and we were getting mother-F'd every single day.

14 And when you work for Chris, you work for Chris because of the

15 relationship you have with him.  It's -- it's -- it's -- at

16 that point, he got cold, felt like he hated everybody.  We all

17 just wanted to leave, so I quit, and about four or five other

18 people quit with me.

19 Q.    And did you go work at another dealership?

20 A.    Yes, I did.

21 Q.    How long did you stay at another dealership?

22 A.    I only stayed there for two months and I returned back to

23 Mitsubishi.

24 Q.    I'm going to direct your attention to what's been marked

25 as Government Exhibit 28.  Do you recognize that document?

1   A.   Yeah, this was a hand-delivered letter that I got.

2   Q.   Okay.  And it's a letter that you got from Big Red Sports

3   & Imports' attorneys?

4   A.   Yes.  Well, it was from McAfee -- yeah, McAfee & Taft,

5   yeah.

6   Q.   And it was from November 25th of 2015; is that right?

7   A.   Yes.

8   Q.   And it's in this time period when you weren't at the

9   dealership?

10  A.   Right.

11        MS. ANDERSON:  Your Honor, government moves to admit

12  and publish Government Exhibit 28.

13        MR. BEHENNA:  No objection, Your Honor.

14        MR. SHANNONHOUSE:  No objection, Your Honor.

15        MR. ADLER:  No objection.

16        THE COURT:  It will be received.

17  Q.   (BY MS. ANDERSON) When you quit Big Red Sports & Imports

18  in October, what happened Big Red Sports & Imports?

19  A.   Whenever I quit, I went to work at Bob Howard and there

20  was a bunch of demand letters that were sent out to everybody

21  who quit.  The people who walked out and quit, they --

22  everybody -- like --

23        MR. BEHENNA:  Objection, Your Honor; that would be

24  pure hearsay.

25        THE COURT:  Well, I haven't heard enough to be able

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                          257

1  to rule one way or the other.

2      Why don't you reask the question, we'll take it one step

3  at a time.

4  Q.   (BY MS. ANDERSON) All right.  So after you left in October

5  and you were working at Bob Howard, what happened?

6  A.   Demand letters were mailed to me and the other people that

7  quit.

8          MR. BEHENNA:  Your Honor, I object him saying what

9  anybody else got.

10          THE WITNESS:  Okay.  Demand letters --

11          THE COURT:  Wait, wait, wait.

12      We have to have enough of a question and then I have to

13  hear enough of the answer to know whether your objection would

14  be good or not.  So please have a seat.

15      Reask the question, we'll take it one step at a time.

16  Q.   (BY MS. ANDERSON) When you left, went to Bob Howard, what

17  happened?

18  A.   I received a demand letter.  My little niece that quit

19  with me, she received a demand letter.

20          MR. BEHENNA:  Objection.  The only way he would know

21  that would be someone telling him, Your Honor.  It's hearsay.

22          THE COURT:  Let's skip that part.  That will be

23  sustained.  The jury is admonished to disregard the part about

24  the niece.

25      Next question.

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    258

1  Q.   (BY MS. ANDERSON) Is this a demand letter that you

2  received?

3  A.   Yeah, this was a demand letter that I received that said

4  that I owe the dealership $750,000 for the damages of what

5  happened with Peak Acceptance and --

6  Q.   Okay.  Let's take it step by step.

7       At the first paragraph, what does that say?

8  A.   "As a former employee, you are" --

9  Q.   You're required to indemnify the company for losses you

10 caused it to suffer --

11 A.   Yes.

12 Q.   -- is that right?

13      And it says the losses include amounts paid by the company

14 to settle claims that arose because of your conduct --

15 A.   Yes.

16 Q.   -- is that right?

17 A.   Yes.

18 Q.   And let's get to paragraph 2.  And in the middle of that,

19 what does it say?

20 A.   It says, "You admitted your involvement in the lead role

21 in several situations that caused Peak to file a lawsuit

22 against Big Red and when you returned to Big Red you agreed to

23 work for a lower salary to assist Big Red in saving money it

24 necessarily spent on settlement because of your conduct."

25 Q.   Okay.  And when it says "you admitted your role," why do

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    259

1    you think it says that?

2    A.   Because that's the recording that I made with Jarrod that

3    I spoke previously of.

4    Q.   Okay.  And then the third paragraph?

5    A.   It says it could make a full claim for the full amount of

6    the settlement but they're willing to release liability.

7    Q.   Okay.  And what did you have to do for them to release

8    liability?

9    A.   Pay $750,000.

10   Q.   Did you have $750,000?

11   A.   No.

12   Q.   Okay.  And the next paragraph, towards the bottom of that,

13   it said they were going to initiate a lawsuit with a claim to

14   the indemnification, plus -- what's that last part about -- as

15   well as claims --

16   A.   -- to which the company is entitled, as well as claims

17   seeking redress for losses occasioned by the recent departure

18   of.

19   Q.   And then the next page, if we could?

20   A.   You and other employees from Big Red of which you're

21   advised Chris Mayes via text message while he was in the

22   hospital with his father.

23   Q.   Okay.  So you understood that you needed to pay them

24   $750,000 or they would sue you for the larger settlement amount

25   plus they would sue you for leaving the dealership and other

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    260

1    employees leaving the dealership --

2    A.    Yes.

3    Q.    -- is that right?

4          Okay.  And you said you didn't have $750,000; is that

5    right?

6    A.    That's right.

7    Q.    Did you make good money as a car salesman?

8    A.    Yeah.

9    Q.    Yeah?

10         Did you make that kind of money?

11   A.    In 2014, I made 700 grand.

12   Q.    When you were at --

13   A.    Big Red -- or, wait, 2013, I believe, or 2014, I'm sorry.

14   One of those dates.

15   Q.    Okay.

16   A.    Maybe it was 2013 because I was there all year.

17   Q.    Okay.  Did you have -- but you didn't have $750,000 to pay

18   them?

19   A.    No.

20   Q.    And did you see any other letters that were sent by the

21   Big Red dealerships?

22   A.    Yes, I saw my niece's letter, and that's my sister's

23   daughter, and she was bawling every day.  And we got her an

24   attorney, and I had an attorney, and I made -- well, I'm

25   sorry -- Jeremy Silva was another person who quit with me, he

1  got a letter.  Marty Peterson was another person who quit with

2  me, he got a letter.  I saw those letters.

3  Q.   And what did you do?

4  A.   Nothing.  It seemed like everybody was just getting

5  threatened, so I made a deal to go back and work for Chris at

6  Mitsubishi and he dropped everything with everybody.

7  Q.   How did that come to be, you made a deal with Chris?

8  A.   Yes.

9  Q.   Did you talk to him about it?

10  A.   Yes.

11  Q.   What did he say?

12  A.   He said, if you come back to work, nobody gets messed

13  with, you don't owe me the money, just -- let's go make some

14  money.

15  Q.   Why did he want you to come back and work with him?

16  A.   Maybe because I helped him make a lot of money.  I was a

17  really hard worker and I did whatever he asked.

18  Q.   And so you went back to the dealerships?

19  A.   Yes.

20  Q.   Do you recall about when that was?

21  A.   Yeah, it was in January of 2016, I went back and worked

22  for him.

23  Q.   And which dealership did you work at that time?

24  A.   I went to the Mitsubishi/Yamaha dealership, which was

25  across the street from Big Red.

1  Q.   And so you started back in January of 2016, how long did

2  you stay that time?

3  A.   I stayed the entire time until roughly the summer of 2019,

4  and then I continued to buy cars through late in the year of

5  2019, so for three full years.

6            THE COURT:  When you say you continued to "buy cars,"

7  what do you mean by that?

8            THE WITNESS:  I would get paid to just go to the

9  auction and buy cars.  And I didn't get paid a salary anymore

10  or commission or profit off the dealership, they just paid me,

11  like, $200 for every car that I bought.

12  Q.   (BY MS. ANDERSON) So you said you worked as -- and tell me

13  if I'm wrong -- you worked as general manager at Norman

14  Mitsubishi until the summer of 2019?

15  A.   Yes.

16  Q.   Okay.  And then when did you quit or stop being general

17  manager?

18  A.   I went to Mexico and took off, like, 30 days during either

19  June or July, and then when I came back, I decided to start my

20  training.  And everything was so chaotic and crazy with the FBI

21  and all this stuff, that I just wanted to do something

22  different, so I bought cars, Chris would pay me to buy cars.

23  Q.   Okay.  But you quit your formal employment in --

24  A.   In June or July.

25  Q.   Sometime after your trip to Mexico?

1   A.   Yes, the day I got back.

2   Q.   Okay.  All right.  In your whole time working for

3   Mr. Mayes, did you ever work at Mayes Kia?

4   A.   No.

5   Q.   And when you came back that time, this is the January 2016

6   to summer 2019, were you the GM at Norman Mitsubishi the whole

7   time?

8   A.   Yes.

9   Q.   And is that a time when you were a platform GM for part of

10  the time?

11  A.   Yeah, for about six months, while Mayes Kia was open, our

12  store was really profitable, so Chris kind of put me over the

13  other ones for about six months and then that was removed.

14  Q.   Do you know if that was at the beginning or the end or

15  where that fell in your --

16  A.   It had to have been within a couple months of when I came

17  back, I'm guessing.

18  Q.   Okay.  So early 2016?

19  A.   Yeah, because once Donna came to work with us, that didn't

20  happen after that.

21  Q.   Okay.

22  A.   It happened before.

23  Q.   Okay.  Are you familiar with Norman Pawn & Gun?

24  A.   Yes.

25  Q.   What's that?

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    264

```
 1  A.    Norman Pawn & Gun was an entity that was created to

 2  basically -- King Cash went away, it didn't exist anymore, but

 3  our business was suffering because, you know, bad-credit

 4  customers don't have cash down, without cash down, there's no

 5  deals, no profit, so Norman Pawn & Gun was made to be the

 6  second version of King Cash, which means that now there's

 7  actually an entity and we could say that we would pawn

 8  something from somebody and that would be the cash down.

 9  Q.    Okay.  So in June 2014, you got fired over total loss

10  letters?

11  A.    Uh-huh.

12  Q.    And Peak found out about King Cash; is that right?

13  A.    That's right.

14  Q.    And when did King Cash stop?

15  A.    I believe it started -- I mean, it stopped during the year

16  of 2015.

17  Q.    You got fired in June 2014 --

18  A.    Yeah, which --

19  Q.    -- King Cash stopped around when you were fired or when

20  did it stop?

21  A.    I believe that it probably -- I was gone, so I don't know

22  what happened, but I believe that it probably got halted

23  immediately.

24        The day I got -- when the King Cash stuff was coming up, I

25  remember when the -- when the total loss letters, that LeAnne
```

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    265

1  girl had taken them, we were thinking about all the things that

2  we could be in trouble with, so I believe accounting stayed up

3  removing all the back screen stuff out of Reynolds & Reynolds

4  on King Cash.

5      So I believe that it probably permanently stopped

6  altogether in early 2015, because I printed that one that I

7  showed you in January 2015.

8  Q.  Let's check that -- which number was that?  Exhibit

9  Number -- is it 26?

10 A.  Yeah, actually I printed it on January 2015 but the deal

11 date was July, so they could have stopped it.

12 Q.  Let's check that.

13     Let's look at Exhibit 26.  What's the date on the top

14 left?

15 A.  So the date on the top left is going to be November 2,

16 2015, and that was the day that I printed it.

17 Q.  Okay.

18 A.  But, actually, the deal date was 7/30/2014, so I'm

19 guessing they probably stopped doing King Cash probably during

20 2014, when the Peak deal happened, and it ended immediately.

21 Q.  Okay.  And when you came back in January 2015, was King

22 Cash still being used?

23 A.  No.

24 Q.  Okay.  Was that a problem or was that okay?

25 A.  Well, it hurt Big Red's business, that's for sure.

1  Q.   Okay.  And when you started back, was Norman Pawn & Gun

2  already being used?

3  A.   Norman Pawn & Gun in 2016 was being used, more at Big Red

4  than it was at Norman Mitsubishi and Yamaha, where I was at,

5  because we had a lot better credit.

6  Q.   Okay.  Whose idea was Norman Pawn & Gun?

7  A.   Chris Mayes and Chuck Gooch came up with it.

8  Q.   And what was the relationship with -- between it starting

9  and King Cash going away?

10  A.   It was a new way for us to be able to put cash down on a

11  contract when the customer did not have cash.

12  Q.   Okay.  And how did it work?

13  A.   So I remember when it first came out during the first

14  couple months, it was pretty strict:  A guy would come in, he

15  didn't have any money down, we would say "Do you have anything

16  that you can pawn."  The guy says, I've got a gun or I got a

17  couch or I got something.

18       And then we would go to Chuck and tell him what it is that

19  we had and he would assess the value.  He would be, like, you

20  got $300, you got $500, he would tell us what we have.

21       And we was, like, well, we need a thousand, and he was,

22  like, no, go get something else.

23       And that was in the beginning stages.

24       Once it started being used a lot, it just got to where,

25  literally, you would ask a customer "I need something to pawn"

 1   and they would say "I don't have anything," and he was, like,

 2   anything?  And, like, no.  And they're, like, I got this and

 3   you're, like, I need a thousand, put it on the paper, do the

 4   deal.

 5        It just became a process of doing deals again.  It was the

 6   new-age King Cash, except for there was some documentation now

 7   differently.  It wasn't King in back screen, it was Norman Pawn

 8   & Gun.

 9   Q.   So you go to Dealertrack, what would you put into

10   Dealertrack?

11   A.   How much cash down we needed to get the loan done, and

12   then they would give us an approval, and then if the customer

13   didn't have that amount of money, we would just put the

14   difference down that we needed, as, like, a pawn, but we

15   wouldn't tell the bank it was a pawn, we would tell the bank it

16   was cash down.

17   Q.   Okay.  So in Dealertrack, you always put "cash down"?

18   A.   Yeah.

19   Q.   All right.  And you said there were documents --

20   A.   Uh-huh.

21   Q.   -- for the pawn, what kind of documents?

22   A.   So there was a pawn book in the office and basically a

23   manager, if he needed something for $1,500, he would write down

24   "$1,500," and then write down what it is.  It would be, like,

25   what did you pawn?  And it would be, like, "Apple Watch," you

 1  know.

 2      And then that would go into the deal and then that would

 3  go to accounting and accounting would know that, again, the

 4  salesman wasn't getting paid off the dollar amount for the pawn

 5  because it wasn't real money, it was fake.

 6  Q.   So who wrote the pawn tickets?

 7  A.   So the managers a lot of the times after -- in the

 8  beginning, it was Chuck Gooch.  He wrote every pawn slip, he

 9  wrote every pawn ticket, he was right there with us, it was a

10  very strict system.

11      Once it started being used a lot, managers would fill it

12  out and then put it in the deal, and then I'm guessing he would

13  sign it later because he wasn't there and present during the

14  deal.

15  Q.   Okay.  And was this something that happened at all the

16  dealerships?

17  A.   Yeah.  Oh, yeah.

18  Q.   Okay.  And how was it decided what value to put on the

19  pawn ticket?

20  A.   So in the beginning, it was Chuck, you know, because Chuck

21  was there.  But once things got really humming and going, I

22  mean, Chuck wasn't around anymore, it was just write what you

23  need.  I mean, Apple Watch, need 5,000, write "5,000."

24  Q.   And it's if the lender needed 5,000?

25  A.   Yes, because we only would put what the bank was requiring

1  to us have that we didn't have.  Like, we didn't do it for fun,

2  we did it because we needed that bank to believe that that

3  customer really had that cash because they were requiring it or

4  else we wouldn't have done it.

5  Q.   And then what happened to the pawn ticket?

6  A.   The pawn ticket would just go to accounting and they would

7  do whatever they do in accounting with it.

8  Q.   Okay.  And then who looks at the deal and all the

9  paperwork after that?

10 A.   So after the finance, it would be accounting, which means

11 it would definitely be Chuck Gooch, it could be Courtney Wells,

12 it could be Faith, it could have been another woman working in

13 the accounting department that they had doing paperwork for

14 them, but it wasn't anybody that I didn't see them break down

15 the deals.

16 Q.   Okay.  And then before the packet got sent to the lender,

17 Mr. Gooch would review it, as compliance officer?

18 A.   Yes.

19 Q.   And so after he signed off on it, then -- on one of these

20 deals, what gets sent to the lender?

21 A.   Just the things that the lender needs to see and

22 everything else stays in the deal jacket with the company.

23 Q.   Okay.  Does the lender get anything telling them about the

24 pawn?

25 A.   Absolutely not.

1  Q.   Is there anything in the documents that go to the lender

2  that says that it's not actual cash?

3  A.   No.  If that happened, there wouldn't be -- there wouldn't

4  be a car loan.

5  Q.   And so, then, once the lender gets the documents, what

6  happens?

7  A.   They review all the paperwork, just kind of like in the

8  beginning, if it was King Cash, remember how I said we would

9  coach the customers on what they would need to say if the bank

10 called them, we would do the same thing in a pawn.

11      We'd be, like, hey, you tell the bank that you pawned

12 something, you're not going to have a car, so you need to tell

13 them that you put this down as cash down.  We would coach them

14 and then they would pass the interview, hopefully, when they

15 got the call.

16 Q.   Who was it that was coaching the customers?

17 A.   Every single person that worked in finance.  And if there

18 was a person who, you know, wasn't a person that we could trust

19 to coach, it would go to specific finance people who we knew

20 would handle it right.

21 Q.   Okay.  And was this happening at every dealership?

22 A.   Yes.

23 Q.   Did you ever talk to Chris about it, Chris Mayes?

24 A.   All the time.

25 Q.   What did you talk about?

1  A.   Just about what we're pawning, you know, because how -- I

2  mean, most of the pawns never came in.  I mean -- so when

3  somebody wrote something down on the pawn sheet, just because

4  they said they pawned it didn't mean it got brought in.  I

5  mean, half the time this stuff never showed up.

6       So it would be, like, are we really getting our pawns, you

7  know, what's going on, you know, let's not get too crazy with

8  it, you know, just stuff like that.

9  Q.   Okay.  And what was the answer on "Are we really getting

10 our pawns"?

11 A.   No.

12 Q.   And --

13 A.   I mean, they're just busted TVs, people dropping off TVs

14 in the parking lot that are shattered.  I mean, most of the

15 time -- I mean, occasionally you got a gun or something and it

16 would go to Chris, all guns were brought to Chris or Chuck.

17 Q.   And so when there were pawn items brought in, where were

18 they brought?

19 A.   Just to the salesperson.

20 Q.   And then what did they do with them?

21 A.   They would go and we had a room, it was just like a --

22 Chuck had an office and a lot of the times it was locked and he

23 wasn't there so we'd just go throw them up there by his room,

24 or they would sit on the showroom floor for a couple of months.

25 I mean, just whatever, whatever somebody brought in.  But most

```
 1  of the time we ended up throwing them away.
 2  Q.   Okay.  Did you ever go to an actual -- was there an actual
 3  building, Norman Pawn & Gun?
 4  A.   There was a bar that was owned by Chris.  It was a bar.
 5  That was the address for the Norman Pawn & Gun.  It was old, it
 6  was shut down, and that was the address for the Norman Pawn &
 7  Gun, so there was never a pawn shop.
 8  Q.   Okay.  And did you take the pawned items to that place?
 9  A.   No.
10  Q.   Okay.  Did you ever go into that place as a pawn shop?
11  A.   No.
12  Q.   Where was Mr. Gooch working at the time?
13  A.   He was just wherever Chris needed him.  I mean, there was
14  not a pawn shop, so there was not a pawn shop.
15  Q.   And then what happened to that pawn ticket when the stuff
16  went to the lenders?
17  A.   I have no idea.  I'm guessing it's somewhere in
18  accounting.
19          THE COURT:  Don't guess.
20      Next question.
21          THE WITNESS:  Okay.
22  Q.   (BY MS. ANDERSON) Did you ever see a customer get cash for
23  their item?
24  A.   No.
25  Q.   Did you ever see a customer get a check for their item?
```

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                          273

```
 1   A.   No.
 2   Q.   Was it possible for a customer to come in, pawn an item,
 3   and not buy a car?
 4   A.   No.
 5   Q.   About how many of the items, just ballpark, do you think
 6   were legitimate items of value?
 7   A.   Maybe two out of ten.
 8   Q.   If somebody didn't bring in their pawn item, what would
 9   happen?
10   A.   Nothing.
11   Q.   Did any customers come back to get their pawned item?
12   A.   There was, like, one or two times where somebody had come
13   back and bought back, like, a gun or something that they had
14   given us because it was like -- I mean, one or two times.
15   Q.   And did you ever see the pawned items being sold?
16   A.   Never.
17   Q.   I'm going to direct your attention to what's been marked
18   as Government Exhibit 32.
19              THE COURT:  What exhibit number?
20              MS. ANDERSON:  Thirty-two.
21   Q.   (BY MS. ANDERSON) Do you recognize that?
22   A.   Yeah, that's the bar.  It says it's Norman Pawn & Gun.
23   Q.   Is that the place you were just talking about?
24   A.   Yes.
25   Q.   All right.
```

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    274

```
 1              MS. ANDERSON:  Your Honor, the government moves to
 2   admit Exhibit 32 and publish it to the jury.
 3              MR. BEHENNA:  No objection, Your Honor.
 4              MR. SHANNONHOUSE:  No objection, Your Honor.
 5              MR. ADLER:  No objection, Your Honor.
 6              THE COURT:  It will be received.
 7   Q.   (BY MS. ANDERSON) All right.  This is the place that you
 8   mentioned was the address that was on the pawn tickets?
 9   A.   Yes, I believe so.
10   Q.   Okay.  Did you ever go there?
11   A.   We drove by it a couple times, but we just knew it was the
12   old bar.
13   Q.   Did you ever go inside?
14   A.   Like, one time.  It was just all closed down.
15   Q.   Okay.  If you recall, were there ever cars out there or
16   people around there?
17   A.   No.
18   Q.   Did you ever know of anyone who worked at the -- this
19   building, this pawn shop?
20   A.   No.  Except for when it was a bar, Chuck used to work
21   there.
22   Q.   Okay.  I'm going to direct your attention to what's been
23   marked as Government Exhibit 18.  If you could flip through and
24   make sure you're familiar with it.
25   A.   Yes.
```

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                       275

1    Q.   Do you recognize this?

2    A.   Yes, I do.

3    Q.   What is this?

4    A.   These are the pawn slips that we've been speaking about.

5    Q.   Just a group of 15 or so pawn slips?

6    A.   Uh-huh, yes, ma'am.

7    Q.   All right.  And these are the types of things that were

8    being created at the dealerships when Norman Pawn & Gun was

9    being used?

10   A.   Yes.

11   Q.   In the ordinary course of business at those dealerships at

12   the time?

13   A.   Yes.

14            MS. ANDERSON:  Your Honor, the government moves to

15   admit Government Exhibit 18 and to publish it to the jury.

16            MR. SHANNONHOUSE:  No objection.

17            MR. BEHENNA:  I think there's a stipulation to this

18   already, Your Honor, but may I have a moment to look at that?

19            THE COURT:  Well, is there an objection right now?

20            MR. BEHENNA:  As long as it's the same ones we

21   stipulated to before, then, no, Your Honor.

22            MR. ADLER:  Same announcement.

23            THE COURT:  Okay.  Is it covered by the stipulation,

24   Ms. Anderson?

25            MS. ANDERSON:  Your Honor, I believe it is.  I think

1   all of the Norman Pawn & Gun records are in a stipulation and

2   there's a stipulation as to authenticity and business records

3   exhibits, and admissibility.

4           MR. BEHENNA:  And admissibility, Your Honor.

5           THE COURT:  It will be received.

6           MS. ANDERSON:  Thank you.

7   Q.   (BY MS. ANDERSON) At the top of this one, is that the

8   address that we were talking about, if you know?

9   A.   Yes.

10  Q.   It says "Norman Pawn & Gun" and then it has a customer

11  name, who would that be?

12  A.   Crystal Bustillos.

13  Q.   Is that somebody buying a car?

14  A.   That is somebody buying a car.

15  Q.   Okay.  And then there's a spot for a stock number, do you

16  know what that corresponds to?

17  A.   Yeah, that would be the stock number of the car that this

18  pawn is a part of.

19  Q.   Okay.  And then what's the collateral on this one?

20  A.   A One Touch; looks like a little iPad or something.

21  Q.   Is it Alcatel One Touch?

22  A.   Looks like a phone.

23  Q.   Okay.  A phone.  And it says -- what's the description, if

24  you can read it?

25  A.   It says, "Super nice, Chuck, you'll love it."

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                        277

1  Q.   All right.  And on this one, was that collateral received?

2  A.   It says "Yes."

3  Q.   Okay.  And you see the signatures on the bottom, do you

4  recognize either of those signatures?

5  A.   One of those looks like it's Chuck's signature.

6  Q.   The one on the top or the one on the bottom?

7  A.   The broker signature.

8  Q.   Okay.  And what's the appraisal value for this Alcatel One

9  Touch phone?

10  A.   $500.

11  Q.   What's that marked to the right?

12  A.   That's a check number.  It looks like -- looks like a

13  check that they issued out of accounting, or that was a number

14  attached to a check.

15  Q.   Okay.  Let's go to the next page.

16       So for this one, what's the collateral that's being

17  offered?

18  A.   Alcatel One Touch Android phone.

19  Q.   All right.  And what's the value at the bottom?

20  A.   Thousand dollars.

21  Q.   Okay.  Go to the next page.

22       What's the description of this pawn item?

23  A.   It's a BB gun.

24  Q.   All right.  And the price -- there are a couple prices up

25  there, what are those?  Can you tell us?

1  A.   Yeah, I was looking here.  It looks like it's either 4,500

2  or 2,250.

3  Q.   Okay.  And you don't know which one was used?

4  A.   Huh-uh.

5        THE COURT:  Let me know when you get to a convenient

6  stopping point, we'll take our midday break.

7        MS. ANDERSON:  Thank you, Your Honor.

8  Q.   (BY MS. ANDERSON) Let's flip to the next one.

9        Same name of customer as the last one; is that right,

10 Cuesta Irvin?

11 A.   Yeah, I see now.  It looks like there was two pawns on

12 this one, or at least it looks like it, but it's the same name.

13 This one is a Mitsubishi TV for 2,250.

14 Q.   Okay.  And let's go to the next one.

15       What's this pawn item?

16 A.   A PlayStation 3 for $4,700.

17 Q.   Okay.  How about the next one?

18 A.   A flash programmer -- looks like a programmer for a car

19 for $5,500.

20 Q.   And the next one?

21 A.   This is a weed eater for $4,700.

22 Q.   The next one?

23 A.   Ozark Trail outdoor equipment, looks like a tent.  It's a

24 tent for $6,000.

25 Q.   Okay.  And the next one.

1  A.   This is an iPhone, black iPhone, for $2,000.

2  Q.   And on that "Received collateral" --

3  A.   It says "No."

4  Q.   Okay.  And let's see the next one.

5  A.   This is a fax machine for $7,940.

6  Q.   Okay.  Do you recognize that signature at the bottom of

7  that one?

8  A.   That looks like Chuck Gooch.

9  Q.   And let's look at the next one.

10      What's this -- what's the pawn item on this one?

11  A.   It's a controller to a Play Station for $6,000.

12  Q.   Is it PlayStation 4 and controller?

13  A.   Oh, silver PS4 and a black controller for $6,000.

14  Q.   Okay.  And let's go to the next page, which is 18.12.

15  A.   Cell phone for 2,750, $2,750.

16  Q.   All right.  And the next one, 18.13.

17  A.   A Springfield XD9 subcompact.  Looks like a 9mm.  Says on

18  the model, it says "9mm" for $2,000.

19  Q.   Okay.  And I just have two more left.

20      Is the next one a chainsaw?

21  A.   Yeah, 16-inch chainsaw for $3,300.

22  Q.   And the next one?

23  A.   This is a DVD player, a Progressive DVD player for $3,900.

24  Q.   Do those prices surprise you, based on your experience

25  with the Norman Pawn & Gun pawn tickets?

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    280

1   A.    No.

2          MS. ANDERSON:  Your Honor, I think we're at a good

3   stopping place.

4          THE COURT:  Very well.

5      Members of the jury, we'll take our midday break at this

6   time.  I think an hour and 20 minutes will be sufficient, so

7   let's plan on resuming here in the courtroom at 25 minutes

8   after 1:00.

9      During this break, please do remember my usual admonition,

10  which I will not repeat at this time.  I hope you have a good,

11  relaxing lunch.

12     All persons in the courtroom will please remain seated

13  while the jury departs.

14     (JURY EXITS THE COURTROOM.)

15          THE COURT:  Okay.  Could somebody -- okay, that door

16  closed.

17     Anything we need to take up before we take our midday

18  break?

19     What says the government?

20          MS. ANDERSON:  No, Your Honor.

21          THE COURT:  What say the defendants?

22          MR. BEHENNA:  No, Your Honor.

23          MR. SHANNONHOUSE:  No, Your Honor.

24          MR. ADLER:  No, Your Honor.

25          THE COURT:  Very well.

1          Court will be in recess.

2          (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING PROCEEDINGS

3     WERE HAD IN OPEN COURT AND WITHIN THE PRESENCE AND HEARING OF

4     THE JURY.)

5               THE COURT:  Welcome back, members of the jury.

6          We're resuming in United States of America v. Bobby Chris

7     Mayes, Charles Gooch, and Courtney Wells, with the parties

8     present with counsel, as before.

9          Ms. Anderson, you may continue.

10              MS. ANDERSON:  Thank you, Your Honor.

11    Q.   (BY MS. ANDERSON) Before the break, we were talking about

12    your first stint at Big Red Sports & Imports from December 2012

13    to mid 2014; is that right?

14    A.   Yes.

15    Q.   June 2014.

16         And during that time period, you were making fake

17    documents in King Cash?

18    A.   Yes.

19    Q.   Okay.  And of those fake documents, who was creating

20    those?

21    A.   They were created by everybody in management and a lot by

22    the finance department.  It was a culture of people.

23    Q.   So who was making the total loss letters?

24    A.   That would be everybody.  And then also I was included in

25    saying to make them, but there was a girl in accounting, her

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    282

```
 1   name was LeAnne at the time, she was helping make them.  There

 2   was a guy in RT and finance.

 3       All the documents together were made -- the total loss

 4   letters were by anybody and everybody who had access to a

 5   template.

 6   Q.   And who knew about it?

 7   A.   Everybody.

 8   Q.   Did Chris Mayes know?

 9   A.   Yes.

10   Q.   And in that time period, you were a general manager?

11   A.   Yes.

12   Q.   And you mentioned before the break that in 2013 you made

13   how much money?

14   A.   700 grand.

15   Q.   Okay.  And how much of that was your salary?

16   A.   My salary was 20 or 25 grand a month.  I think it was 20

17   or 25, so...

18   Q.   Okay.  So help me with the math.

19   A.   I had about a 400 grand to a 450 salary.

20   Q.   And the rest was that percentage of profits?

21   A.   Yes.

22   Q.   And it was -- so about $300,000 was the --

23   A.   Commission.

24   Q.   -- commission?

25       And that's 3 to 5 percent of the dealership's profits?
```

1   A.   Yeah, what I got paid off of.

2   Q.   Okay.  And so in 2013, the dealership made a lot of

3   profits; is that fair?

4   A.   Oh, yeah.

5   Q.   And that at the time -- or I guess Big Red was owned by

6   Chris Mayes --

7   A.   Yes.

8   Q.   -- is that right?

9        Anyone else own it at the time?

10  A.   No, he said he had a partner in the beginning, but I don't

11  know the behind-the-scenes stuff.

12  Q.   Okay.  I direct your attention to what's been marked as

13  Government Exhibit 50.

14       Do you recognize that document?

15  A.   Yes, I do.  That is a -- it's a -- an approval.

16  Q.   All right.  An approval on Dealertrack?

17  A.   Yeah, a Dealertrack bank approval.

18  Q.   Okay.  And is this something that was part of all the

19  deals that you worked while employed at Big Red Sports &

20  Imports?

21  A.   Yes, every single deal had to have one of these in it to

22  get booked and go to accounting.

23  Q.   All right.

24            MS. ANDERSON:  Your Honor, the government moves to

25  admit Government Exhibit 50 and to publish it to the jury.

```
 1            THE COURT:  Any objection?

 2            MR. BEHENNA:  Again, Your Honor, previously admitted

 3  by stipulation.

 4            MR. SHANNONHOUSE:  No objection, Your Honor.

 5            MR. ADLER:  No objection.

 6            THE COURT:  On these documents that are covered by

 7  the stipulation, when you offer the document, if you know that

 8  it is covered by the stipulation, please make that

 9  announcement, because if you make that announcement, then I'm

10  not going to -- I will depend on defense counsel to jump up

11  quickly if there is an objection, otherwise, we'll just -- it

12  will be admitted and we'll go forward.

13            MS. ANDERSON:  Thank you, Your Honor.

14       Can I have just a moment?

15  Q.   (BY MS. ANDERSON) All right.  Now, this is a Dealertrack

16  document.  Which lender does this one relate to?

17  A.   Global Lending Services.

18  Q.   And can you tell who the customer name is -- who the

19  customer is?

20  A.   Tony Clanton.

21  Q.   Okay.  And on this one, in particular, what's the total

22  amount that's approved for financing?

23  A.   19,067 for the front end.

24  Q.   Okay.  And is that just front end or does that include

25  tax, title and license and other fees?
```

1   A.   That just means that whatever you're going to include, it

2   needs to include all of that because the bank won't loan more

3   than 19,057 on this specific vehicle.

4   Q.   And what's the vehicle that Mr. Clanton was buying?

5   A.   A 2016 Kia Forte.

6   Q.   Okay.  And what cash down does the lender see that he's

7   putting?

8   A.   One thousand.

9   Q.   And who provides this information that's over here on the

10   right on the financing?

11   A.   The dealership.

12   Q.   Okay.  And then what's the trade-in?

13   A.   $200.

14   Q.   All right.  Is there also a rebate in this one?

15   A.   $2,000.

16   Q.   Okay.  And so the dealer provides this information and

17   then was this one -- were these terms accepted by Global

18   Lending Services?

19   A.   Yes.

20   Q.   And how do you know that?

21   A.   Because it says that it's approved.  It says "amount

22   approved" at the top, and then down at the bottom, it says

23   "Comments from credit analyst."  It just says that everything

24   is good, you get a flat.

25       And then under "stipulations," if you'll look in the

1  middle, it says what it will need to actually fund.  But the

2  structure of the numbers, they're approved.

3  Q.   Okay.  So the structure on the top right is approved, and

4  before the money gets sent to the dealership, the stuff in the

5  stipulations has to be satisfied in that package that gets

6  sent?

7  A.   Yes, ma'am.

8  Q.   Okay.  And so some of those stipulations are they need

9  references, proof of residence, and pay stubs?

10  A.   Yes.

11  Q.   Okay.  All right.  I'm going to direct you to Exhibit 51,

12  which I believe is admitted by stipulation.

13             THE COURT:  It is received.

14  Q.   (BY MS. ANDERSON) What's this document?

15  A.   That is the retail purchase agreement.  It's basically a

16  bill of sale with all the numbers.

17  Q.   And does this one get generated before or after the last

18  document we looked at where the lender approved the deal?

19  A.   This one gets generated after.

20  Q.   Okay.  So are the terms here the same terms that had been

21  approved by the lender in terms of the cash down, net trade-in,

22  total amount financed?

23  A.   Yeah.  The only thing that's different is the extended

24  service plan is on there for $500 -- or for 2,500.

25  Q.   Okay.  And that's over on the right side, right?

1    A.    Yes.

2    Q.    Okay.  So we have top left, this is for Tony Clanton, same

3    guy?

4    A.    Yes.

5    Q.    All right.  And then on the middle of the left side,

6    that's the car he's buying; is that right?

7    A.    Yes.

8    Q.    All right.  And then let's look at the right side.

9          So on the top right, what's the cash price for that 2016

10   Kia Forte?

11   A.    $22,108.

12   Q.    Okay.  And on this one, what is -- for the down payment,

13   in lines 10 and 11, what's the down payment shown on this

14   contract?

15   A.    The trade allowance is 200 and then the partial down

16   payment deposit is 1,000, so it puts a total of $1,200 down.

17   Q.    Okay.  And on "deposit receipt," what does that mean, in

18   the middle of that right side?

19   A.    Deposit receipt?  Sorry, I just don't see it.

20          MS. ANDERSON:  Karen, can you zoom into that deposit

21   receipt that's on the right side?

22          THE WITNESS:  Oh, I'm sorry, I see it now.

23          The dealer hereby acknowledges the receipt of $1,000 that

24   they did put their money down for the vehicle.

25   Q.    (BY MS. ANDERSON) Okay.  And if we zoom out and then zoom

 1  in the little box below that, "trade-in record," what does it

 2  say Mr. Clanton was trading in for that $200 trade-in

 3  allowance?

 4  A.    A 2004 Dodge.

 5  Q.    All right.  I direct you to what has been previously

 6  admitted as Government Exhibit -- or previously stipulated to

 7  as Government Exhibit 52.

 8         MS. ANDERSON:  And, Your Honor, just to check my

 9  bases, is this -- we want to offer this into admission and I

10  believe there's a stipulation that it's admissible.

11         THE COURT:  I've heard no objection, and with these

12  ones that you represent to the Court and the jury and counsel

13  to be covered by the stipulation, I will rely on defense

14  counsel to set us straight if that's not so.  And in the

15  absence of a prompt objection, it will be received.

16      It is received.

17         MS. ANDERSON:  Thank you, Your Honor.

18  Q.    (BY MS. ANDERSON) What is a retail installment sale

19  contract, like this one you see here?

20  A.    So that's going to have basically the car they're buying,

21  all the numbers that go with the deal, front end and back, if

22  there's any back-end products.

23      It's going to have an interest rate, it's going to have a

24  term, it's going to have a monthly payment, it's going to have

25  the total number of payments, the amount financed.  It's going

1   to have everything.

2   Q.   And so for this one, it's Mr. Clanton at Big Red Sports &

3   Imports at the top, right?

4   A.   Yes.

5   Q.   Okay.  And then if we see this itemization of amount

6   financed on the left side in the middle, that big box, are

7   those the same numbers we've seen before?

8   A.   Yes.

9   Q.   Okay.  And that's includes --

10           MS. ANDERSON:  Can we zoom in on the itemization of

11   amount financed, please.

12       Thank you.

13   A.   (BY MS. ANDERSON) So for this, we have the cash price in

14   line 1; is that right?

15   A.   Yes, ma'am.

16   Q.   And then the down payment.  What's shown as the down

17   payment?

18   A.   200 -- or wait, down payment is 1,000.

19   Q.   Okay.  Let's break that down.

20       So there's a trade-in amount --

21   A.    -- of 200.

22   Q.    -- $200?

23       And then what's the cash?

24   A.   Cash, 1,000.

25   Q.   And then there's a line for "other"; is that right?

1   A.   Yes, and that will be manufacturer rebates for 2,000 and

2   this will put a total of 3,200 total with the trade, the down

3   payment and the rebates, total amount.

4   Q.   And with all the back-end stuff below that, you get to the

5   amount financed of -- at the bottom of that, 22,367; is that

6   right?

7   A.   Yes.

8   Q.   All right.  And then if we go up above that, under this

9   "Federal Truth in Lending disclosures," so in the top third,

10  under the description of the vehicle --

11       MS. ANDERSON:  To the left side, please.  Just the

12  top part.  There we go.

13       Thank you.

14  Q.   (BY MS. ANDERSON) All right.  So for this one, how many

15  payments is Mr. Clanton going to have to make?

16  A.   Seventy-two months.

17  Q.   Okay.  And with the -- how much were those payments were

18  supposed to be?

19  A.   553.

20  Q.   Okay.  And so the total amount financed is above that,

21  22,367; is that right?

22  A.   Yes, ma'am.

23  Q.   Okay.  And then what's the total finance charge, if you

24  take the 72 times the 553.60?

25  A.   39,859.

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    291

1  Q.   Okay.  And so that's -- sorry, I think you're looking at

2  the total of payments?

3  A.   Oh, that was total of payments, sorry.

4  Q.   So that's the amount financed, plus the 21 percent APR and

5  the finance charge; is that right?

6  A.   Yes.

7  Q.   Okay.  So this ends up being for Mr. Clanton a $39,000

8  contract?

9  A.   Yes.

10  Q.   And for this one --

11        MS. ANDERSON:  Will you zoom out again?  Sorry.

12  Q.   (BY MS. ANDERSON) At the very bottom, who is the lender on

13  this?

14  A.   Global Lending Services.

15  Q.   Okay.  Is that the same lender we saw on Exhibit 50, that

16  Dealertrack?

17  A.   Yes, ma'am.

18  Q.   Okay.  I'm going to direct your attention to what's been

19  stipulated as admissible, which is Government Exhibit 53.

20        THE COURT:  It is received.

21  Q.   (BY MS. ANDERSON) What's this?

22  A.   That is the down payment for the Tony Clanton deal.

23  Q.   Okay.  And what did Mr. Clanton provide as his down

24  payment?

25  A.   It says an Xbox 360 that wasn't received.

1   Q.   Okay.  And what's the dollar amount for that Xbox 360 that

2   wasn't received?

3   A.   $1,000.

4   Q.   Okay.  And, next, I'm going to direct you to what I think

5   has been marked as Exhibit 55 and there's a stipulation as to

6   admissibility.

7          THE COURT:  It is received.

8   Q.   (BY MS. ANDERSON) Now, what is this?

9   A.   This is what's called a "deal recap sheet" and it says a

10  "car cost sheet."

11         Basically, it will have the stock number, the name, the

12  salesperson who sold the vehicle, the date.

13         At the top right, it will have the deal number.

14         Under "we owe," it would have the bank fee.  You can see

15  where it says "fee 1975" and basically it goes down all the

16  numbers on the left side.

17         At the bottom, as far as sales price, all the stuff that

18  we've already gone over.  The only addition that we would see

19  is it says "plus ACV."  It says "$1."  That would be what they

20  valued the vehicle at, what they gave the customer for the

21  vehicle.  That's what they would put on there.

22  Q.   For the traded-in vehicle?

23  A.   Yeah, for the traded-in vehicle.

24  Q.   Okay.  So the trade allowance is $200 above that, but the

25  dealership is treating it as $1.

```
 1   A.   One dollar.

 2   Q.   Does this sheet go to the lender?

 3   A.   No.

 4   Q.   So this is an internal document that shows that the trade-

 5   in is actually worth a dollar?

 6   A.   Yes, ma'am.

 7   Q.   Okay.  And can you tell on the marked-out sales price over

 8   there what happened between marking it out and putting

 9   different numbers in?

10   A.   They just inflated the price by $200.

11   Q.   Okay.  And so the trade allowance before, before it got

12   marked out, was what?  Zero dollars?

13   A.   Yeah, zero dollars.

14   Q.   And so when they added a $200 trade --

15   A.   -- they raised the sales price.

16   Q.   -- they raised the sales price to account for that?

17   A.   Yes, ma'am.

18   Q.   I'm going to direct you to Government Exhibit 58, which

19   has been -- we have a stipulation as to admissibility.

20            THE COURT:  It is received.

21   Q.   (BY MS. ANDERSON) What is this document?

22   A.   This is a dealer participation form.  And what it's saying

23   is that the dealership -- the standard rate is 2 percent, is

24   what you could make on markup, and it just kind of shows how

25   much spread markup on the rate the dealership is getting.
```

 1        And on this one, it says -- I think it says right here,
 2   "zero percent," and then it is signed by the compliance
 3   officer.
 4   Q.   Okay.  So on this one, it has Tony Clanton at the top,
 5   right?
 6   A.   Yes, ma'am.
 7   Q.   And then the lender is Global Lending; is that right?
 8   A.   Yes, ma'am.
 9   Q.   It says, "Standard dealer participation rate 2 percent,
10   final dealer participation rate zero percent."  What does that
11   mean?
12   A.   That just means that they didn't mark up the rate on this
13   one, whether they didn't have the opportunity to do it and the
14   bank didn't allow it because it was a bad deal, like a deal
15   they didn't want profit to be made on.  It means, we just
16   basically sold the rate to the customer at the rate the bank
17   gave us.
18   Q.   Okay.  And so you weren't able to --
19   A.    -- mark it up.
20   Q.    -- add interest for the dealership on this one?
21   A.   Yeah.  Like, if it was 21 percent on this deal, we
22   couldn't mark it to 23 percent.
23   Q.   Okay.  And there's a reviewer on the right side, who
24   reviewed this one?
25   A.   Chuck Gooch, from compliance.

 1  Q.   Okay.  I'm going to direct you to Government Exhibit 60,

 2  which has been stipulated to its admissibility.

 3       What's this document?

 4  A.   This is a deal jacket cover sheet.  This would be the

 5  packet that's going to go to the finance office.  This is the

 6  sheet that is on top of that folder so that everybody will know

 7  what's in that folder.

 8       And then it's signed off on, which means this deal would

 9  have gone through accounting and Chuck would have signed off on

10  it, that it's okay to book it -- or send it.

11  Q.   And so that big red mark is Mr. Gooch's initials or

12  signature?

13  A.   Yeah, that's his initials.

14  Q.   Okay.  And so this is on top of a physical file folder --

15  A.   -- of all the documents.

16  Q.   -- of all the documents and this is saying Gooch has

17  signed off on this; is that right?

18  A.   Yes, ma'am.

19  Q.   Okay.  All right.  And after this paperwork is done and

20  things are sent, what documents get sent to the lender?

21  A.   The retail installment, the payment form that has all the

22  payments on it.  Basically, there's probably 10 or 15 forms

23  that are -- that the banks want that are all contracts but

24  there's some front-end paperwork that the dealership requires

25  the customer to sign that never leaves the store, it just stays

1   with us, and those could be like hail waivers, we-owes,

2   anything that protects the dealership.

3   Q.   Okay.  And so for this one, did the pawn ticket -- would

4   the pawn ticket be sent to the lender?

5   A.   No, the pawn ticket would not be sent to the lender, that

6   would stay back.

7   Q.   So what the lender sees in terms of what was provided for

8   this deal is on Exhibit 52; is that right, in the middle of 52,

9   where it says $1,000 in cash and $200 in trade-in?

10  A.   Yes.  And -- yes, that's right.

11  Q.   Okay.  I'm going to direct you to Government Exhibit 65,

12  which we have a stipulation as to admissibility.

13          THE COURT:  And it is received.

14  Q.   (BY MS. ANDERSON) All right.  What's this one?

15  A.   This is an approval for Shaniece Ormand.

16  Q.   Okay.  And what kind of car is Shaniece Ormand buying?

17  A.   2006 Honda Accord with 165,000 miles.

18  Q.   Okay.  And what's the down payment that Ms. Ormand is

19  making?

20  A.   3,700.

21  Q.   And how is that divided up?

22       What has the lender approved for the components of that

23  down payment?

24  A.   It shows it's about 30 percent down, roughly.  The --

25  basically the collateral value of the vehicle is 6,800 at the

1    top, but it says that the sales -- the sales price is 9,447.

2    Q.   Okay.  And the down payment, is it cash or what is it, on

3    this, as far as the lender knows?

4    A.   It is cash.

5    Q.   Okay.  So this one is approved with a $3,700 cash down

6    payment; is that right?

7    A.   Yes; no trade-in.

8    Q.   No trade-in.  Okay.

9         And if we turn to the next page of that one.

10        This one is another Dealertrack document?

11   A.   Yes, ma'am.

12   Q.   And does it show that it was funded?

13   A.   Yes.

14   Q.   Let's go to Government Exhibit 66, which we have a

15   stipulation as to admissibility.

16            THE COURT:  And it is received.

17   Q.   (BY MS. ANDERSON) Is this the retail purchase agreement

18   for Shaniece Ormand's purchase of a 2008 Honda Accord?

19   A.   Yes.

20   Q.   And on -- is this something that goes to the lender?

21   A.   Yes, this is.

22   Q.   Okay.  And what does it have for the down payment on this

23   contract?

24   A.   3,700.

25   Q.   And is that both on line 11 on the right side; is that

1  where you're getting that?

2  A.   Yeah, line 11, deposit or partial payment, 3,700.

3  Q.   All right.  And then is there also a deposit receipt

4  section?

5  A.   Yes, there is.  It says 3,700.

6  Q.   Okay.  And that says -- if I read it, it says, "Dealer

7  hereby acknowledges receipt of the sum of $3,700 as a deposit";

8  is that accurate?

9  A.   Yes, ma'am.

10 Q.   Okay.  And at the bottom of these, who signs these?

11 A.   The bottom of these would normally be the finance manager.

12 Q.   Okay.  And then the customer?

13 A.   And, of course, the customer, yes, ma'am.

14 Q.   Let's go to Government Exhibit 67, which is we have a

15 stipulation as to admissibility.

16          THE COURT:  And it is received.

17          MS. ANDERSON:  All right.  If we could zoom in on

18 that middle box, the itemization of amount financed.

19 Q.   (BY MS. ANDERSON) And, actually, I should have checked, is

20 this the Shaniece Ormand --

21 A.   Yes.

22 Q.   -- retail installment sale contract?

23 A.   Yes.

24 Q.   Okay.  And does this also show the same numbers, $3,700 in

25 a cash down payment?

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                          299

1   A.    Yes, $3,700 cash down payment.

2   Q.    Okay.  Let's look at what's been marked, and I believe we

3   have a stipulation as to admissibility, Government Exhibit 68.

4         THE COURT:  It is received.

5   Q.    (BY MS. ANDERSON) What is this?

6   A.    Authorization for a payoff form.  It just means that if

7   somebody has a loan on a car, that we have authority to call

8   and get the payoff because sometimes they won't give it to us.

9   And then, obviously, if somebody does trade in a car, we need

10  to have a ten-day payoff on here when we do the loan.

11  Q.    And had Ms. Ormand traded in a car or had a payoff?

12  A.    No.

13  Q.    So why is that signed?

14  A.    It's front-end paperwork.  A lot of stuff, even if

15  somebody didn't have anything that had anything to do

16  pertaining to their deal, we would still have them sign it.

17  Q.    Okay.  And then what's the bottom of that document?  Says

18  "power of attorney"?

19  A.    Yeah, it's just a power of attorney for the customer.

20  Q.    Okay.  And what does it say?  It says, "I, Shaniece

21  Ormand, do hereby appoint" -- is there somebody that they're

22  appointing with power of attorney?

23  A.    I guess it's Big Red -- or nobody -- it looks like it's

24  not filled in.

25  Q.    So there's not a person that's --

```
 1   A.   No.

 2   Q.   -- named the power of attorney; is that right?

 3   A.   That's right.

 4   Q.   Okay.  And it's to sign any and all papers in connection

 5   with the sale and transfer of the following -- is that part

 6   completed?

 7   A.   No.

 8   Q.   Okay.  Why is this in the file?

 9   A.   So there's a series of documents even -- like, if a car --

10   if somebody bought a car and it didn't have hail damage on it,

11   we would have them sign a form that said, "I acknowledge my car

12   has hail damage."

13        Like, there was lots of different forms that people still

14   sign and it's just part of the paperwork that Chris would want

15   everybody to sign on every deal.

16   Q.   Okay.  I direct you to Government Exhibit 69; we have a

17   stipulation as to admissibility.

18            THE COURT:  And it is received.

19   Q.   (BY MS. ANDERSON) What's this?

20   A.   That's a Pawn & Gun, it's a pawn slip for Shaniece Ormand.

21   Q.   Okay.  And what did she pawn?

22   A.   An iPhone 5 and an Amazon tablet for $3,700.

23   Q.   Okay.  And is that $3,700 listed as the appraisal value?

24   A.   Yes.

25   Q.   Does this document go to the lender?
```

```
 1   A.   No.
 2   Q.   I'm going to direct you to Government Exhibit 71; we have
 3   a stipulation as to admissibility.
 4          THE COURT:  And it is received.
 5   Q.   (BY MS. ANDERSON) This document.
 6   A.   This is a deal recap sheet.  This is -- stays in the file
 7   for the accounting office that shows all commissions paid and
 8   how much the deal made and everything.
 9   Q.   Okay.  And is this for Shaniece Ormand?
10   A.   Yes, ma'am.
11   Q.   And her name is in the bottom left corner, right?
12   A.   Yes.
13   Q.   Okay.  And the lender is American Credit Acceptance; is
14   that right?
15   A.   Yes, ma'am.
16   Q.   And on the right side, it has at the top the selling price
17   of 12,988; is that right?
18   A.   Yes, ma'am.
19   Q.   And in the down payment section, what does it say?
20   A.   It says "3,700" and then it has "NPG" initialed next to
21   it, Norman Pawn & Gun.
22   Q.   And why is that here?
23   A.   Sometimes they would label, you know, that it's -- that
24   it's Norman Pawn & Gun money and then sometimes they wouldn't.
25   Q.   Why would they initial it as Norman Pawn & Gun money?
```

1  A.   Because it's fake money, so it's not really receiptable

2  money.

3  Q.   Okay.  And so if -- if this deal didn't go through, would

4  Ms. Ormand get $3,700?

5  A.   No.

6  Q.   And so earlier we saw documents from Reynolds & Reynolds

7  where it said "King."  Is this "NPG" serving the same purpose?

8  A.   Yeah, it's just a replacement.

9  Q.   And so can you walk us through the bottom half of this

10  document?  What is this showing?

11      So on the left bottom, where there's that corner, it has a

12  description of the 2008 Honda Accord; is that right?

13  A.   Yes.

14  Q.   And then below that, it has the price of the vehicle in

15  there; is that right?

16  A.   Yeah, 12,988.

17  Q.   And then the cost of the vehicle?

18  A.   4,700.  4,700.

19  Q.   And does that include a pack?

20  A.   That would include a pack.

21  Q.   Okay.  And then is there an additional pack listed here?

22  A.   Yeah.  So it says "pack" and "we owe" and that looks like

23  that could either be a bank fee or a pack or both, combined.

24  Which if you look over to the right, at the bottom, you see

25  where it says "pack 450" and then it says "we owe," line 1,

1   "750."

2          THE COURT:  Excuse me.

3       Just generically say again what "pack" means.

4          THE WITNESS:  It's just to offset the compensation to

5   the salesperson, so they add money on top of the cost of a

6   vehicle so that the salespeople don't get paid off of it.  It's

7   basically just an additional reserve to the dealer.

8          THE COURT:  All right.

9   Q.   (BY MS. ANDERSON) So in that cost of the vehicle, that

10  $4,700, that's inflated so that the profit on the deal is

11  smaller when they calculate commissions; is that right?

12  A.   Right.  Right.

13  Q.   Okay.  And on this particular one, you have the left-hand

14  side which has a profit and it has a commission listed there.

15  What's the commission?

16  A.   The commission is $1,220.

17  Q.   Okay.  And so the dealership, correct me if I'm wrong,

18  would get the difference between that commission and the profit

19  in that bottom left corner; is that right?

20  A.   Yeah.  You see where there's a payable gross, you see

21  that?

22  Q.   Yes.

23  A.   I think that says "4,880"; is that right?

24  Q.   Yes.

25  A.   So that's the payable gross, the 5,000.

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                          304

1   Q.   Okay.  And then all this stuff on the top and to the

2   right, what is that stuff?

3        Sorry.  I just meant in the part that we were still

4   looking at.

5   A.   On the reserve?

6   Q.   Yeah.  So there's the -- there's a finance reserve and a

7   physical damage and a service contract of $3,000, there's a

8   premium column, a cost column, what are those?

9   A.   So the finance reserve of, like, a hundred dollars, that's

10  probably the flat that the bank paid us to do the loan with

11  them.

12       I know that the net F&I reserve, it looks like they sold a

13  $3,000 warranty, so the profit -- looks like it was, like,

14  1,600, so it was probably like a $1,400 warranty or something.

15  Q.   So, actually, when we look at "service contracts," it has

16  a premium, $3,000, and at cost, $1,882?

17  A.   There we go, yeah, so that would be the cost, was 1,882.

18  Q.   And that's what the dealership pays for the service

19  contract; is that right?

20  A.   Yes, ma'am.

21  Q.   Okay.  And when you subtract them out, the dealership is

22  making $1,118 in profit off of the extended service contract?

23  A.   Yes, ma'am.

24  Q.   And that's on the far right side?

25  A.   Yes.

1   Q.   Okay.  And so on the far right side, is that a calculation

2   of additional profits to the dealership --

3   A.   Yes.

4   Q.   -- on this car sale?

5   A.   Yes.

6   Q.   So they're making money off of the car itself and that's

7   where a commission for the salesperson is calculated, that's

8   the bottom left; is that right?

9   A.   Yes, ma'am.

10  Q.   And then you add to that the F&I stuff to get more money

11  for the dealership?

12  A.   Yeah, 6,952.

13  Q.   Okay.  And then there's a net profit figure, which I

14  haven't done the math, but is that subtracting out the

15  commission to the salesperson?

16  A.    It looks like it's $1,200 and it looks like the $1,200

17  commission is the salesperson, so it looks like that is the

18  net, yes, ma'am.

19  Q.   Okay.  Does this deal recap go to the lender?

20       I may have asked that and I can't recall.

21  A.   No, ma'am.

22  Q.   And I'm going to direct you to Government Exhibit 72,

23  which we have a stipulation as to admissibility.

24            THE COURT:  And it is received.

25  Q.   (BY MS. ANDERSON) Is this the cover sheet that was on the

1   outside of the deal jacket for Shaniece Ormand?

2   A.    Yes.

3   Q.    And does it show Mr. Gooch signed off on it?

4   A.    Yes, ma'am.

5   Q.    All right.  And is that his initials in the top middle?

6   A.    Down at the bottom right, it looks like "RTB," ready to

7   book.

8   Q.    Okay.  The bottom right.  Is that also his at the top

9   middle?

10  A.    Yes, booked by -- or at the top by the deal number, I'm

11  sorry, above the ACA.

12  Q.    And his initials here means he has looked through this

13  whole deal and approved it; is that right?

14  A.    Yes, ma'am.

15  Q.    Let's go to Government Exhibit 105; we have a stipulation

16  as to admissibility.

17        THE COURT:  And it is received.

18  Q.    (BY MS. ANDERSON) Who is the customer on this one?

19  A.    Mandi Chambers.

20  Q.    And for Ms. Chambers, who is the lender that approved this

21  one?

22  A.    Santander.

23  Q.    What kind of car was she buying?

24  A.    2012 Dodge Journey.

25        THE COURT:  A Dodge what?

1           THE WITNESS:  Journey, J-O-U-R-N-E-Y, Journey.

2  Q.   (BY MS. ANDERSON) And on this one, what is Ms. Chambers'

3  down payment made up of?

4  A.   $500 cash down.

5  Q.   And that's what the lender agreed to, based on this

6  Dealertrack page?

7  A.   Yeah, that's what their approval was for.

8  Q.   Okay.  Government Exhibit 106, which we have a stipulation

9  as to admissibility.

10          THE COURT:  It is received.

11 Q.   (BY MS. ANDERSON) Is this the retail purchase agreement

12 for Ms. Chambers?

13 A.   Yes, ma'am.

14 Q.   And this would go to the lender too; is that right?

15 A.   Yes, ma'am.

16 Q.   And what does it show her deposit amount?

17 A.   $500.

18 Q.   Okay.  And go to Government Exhibit 107, which we have a

19 stipulation as to admissibility.

20          THE COURT:  It is received.

21          MS. ANDERSON:  Could you please zoom in on the

22 itemization of amount financed.

23 Q.   (BY MS. ANDERSON) On this retail installment contract for

24 Ms. Chambers, does it show a cash down payment?

25 A.   $500, yes.

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    308

1  Q.   And this went to the lender?

2  A.   Yes, ma'am.

3  Q.   All right.  And if we look at that Truth in Lending

4  disclosure above it, for this one, Ms. Chambers' total amount

5  of payments would be $15,468; is that right?

6  A.   Yeah, 15,968 -- or, yeah, 468, yes, ma'am.

7  Q.   Okay.  And the lender got this; is that right, with the

8  packet that came from the dealership?

9  A.   Yes, ma'am.

10  Q.   All right.  Let's go to Government Exhibit 108, we have a

11  stipulation as to admissibility.

12          THE COURT:  It is received.

13  Q.   (BY MS. ANDERSON) What is this?

14  A.   A Norman Pawn & Gun sheet that we fill out and it says

15  that they traded in an Apple iPad for $500 value.

16  Q.   All right.  And is this for Ms. Chambers?

17  A.   Yes, ma'am.

18  Q.   Does it say whether or not the iPad was ever received?

19  A.   It says it was never received.

20  Q.   Would this have been sent to the lender?

21  A.   No, ma'am.

22  Q.   Let's go to Government Exhibit 110, which I believe we

23  have a stipulation as to admissibility.

24          THE COURT:  It is received.

25  Q.   (BY MS. ANDERSON) What's this document?

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                          309

```
 1   A.   It shows it's a deposit, but I have never seen this form

 2   before.

 3   Q.   Okay.  All right.  It's a cash receipts inquiry on

 4   Ms. Chambers?

 5   A.   Yeah, for $500, so...

 6   Q.   Okay.  And let's go to Government Exhibit 112; we have a

 7   stipulation as to admissibility.

 8            THE COURT:  It is received.

 9   Q.   (BY MS. ANDERSON) This is the deal recap for Ms. Chambers?

10   A.   Yes.

11   Q.   And over on the right side, where it shows a cash deposit,

12   does it have a notation next to it?

13   A.   Yeah, "Norman Pawn & Gun."

14   Q.   Okay.  And, again, would this deal recap be sent to the

15   lender?

16   A.   No, ma'am.

17   Q.   Did the lender -- did you send anything to the lender that

18   said "pawn" on it?

19   A.   No.

20   Q.   Okay.  Go to Government Exhibit 120, which we have a

21   stipulation as to admissibility.

22            THE COURT:  It is received.

23   Q.   (BY MS. ANDERSON) A deal recap for a deal with a customer

24   named Fermin Avila; is that right?

25   A.   Yes, ma'am.
```

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                              310

1   Q.   And who is the lender on this one?

2   A.   American Credit Acceptance.

3   Q.   On this one, what's the total down payment shown on this

4   -- the structure of this deal with American Credit Acceptance?

5   A.   Total down payment would be $8,300, 8,300.  It shows here

6   a trade-in of 5,500 and cash of 2,800.

7   Q.   Okay.  At the bottom of this one, there's this chart with

8   tiers.

9   A.   Uh-huh.

10  Q.   Tier 1 base, Tier 1 total, Tier 2 base, Tier 2 total.

11  What is that?

12  A.   So you can -- you can alter the numbers inside of the

13  computer to see what can get you the biggest net check.

14       If you look at the bottom of the top right, under

15  "financing information," you'll see a net check number, and

16  you'll actually move these numbers around and it will tell you

17  how much down you have to have on the trade-in, how much cash

18  to get the biggest net check.

19       So you'll play with it until you can max out your net

20  check.  So it's a scale chart showing you some of the numbers,

21  the different tiers.

22  Q.   Okay.  And, earlier, when we were talking about tinkering

23  with Dealertrack and the numbers in that, is this one way that

24  you would tinker with the numbers?

25  A.   Yes, ma'am.

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    311

1  Q.   And for this guy, Mr. Avila, based on the net check at the

2  top right, the structure of the deal, is it the option with the

3  highest net check that was elected here?

4  A.   Yes.

5  Q.   Let's go to Government Exhibit 121; we have a stipulation

6  as to admissibility.

7           THE COURT:  It is received.

8  Q.   (BY MS. ANDERSON) Now, on Mr. Avila's retail purchase

9  agreement, what kind of car was Mr. Avila buying?

10 A.   A 2010 Chevy Malibu with 70,000 miles.

11 Q.   And this is in January of 2017; is that right?

12 A.   Yes, ma'am.

13 Q.   All right.  On the top right side, does it show -- what

14 does it show as his trade-in allowance?

15 A.   It says that his trade-in allowance is $5,500.

16 Q.   Okay.  And his cash down payment?

17 A.   $2,800.

18 Q.   Okay.  And in the deposit receipt section, does it show

19 the dealership received $2,800?

20 A.   Yes, ma'am.

21 Q.   And then on the trade-in record, which is a little below

22 that --

23 A.   Yeah, 5,500.

24 Q.   On the right side, towards the middle bottom, what kind of

25 vehicle was Mr. Avila trading in, according to this contract?

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    312

```
 1   A.    A 1997 Buick Le Sabre with 201,000 miles.

 2   Q.    Okay.  And the allowance he was given?

 3   A.    5,500.

 4   Q.    Does that sound right to you?

 5   A.    No.

 6   Q.    Why not?

 7   A.    Because it's just the number they needed to put the deal

 8   together, so they made it that number.

 9   Q.    How do you know that?

10   A.    Because they put that on the Dealertrack when it was

11   submitted that it has a $5,500 value.

12   Q.    Let's go to Government Exhibit 122; we have a stipulation

13   as to admissibility.

14         THE COURT:  It is received.

15   Q.    (BY MS. ANDERSON) Does this have the same information we

16   saw on the contract with the trade-in and $2,800 in cash?

17   A.    Yes, ma'am.

18   Q.    And at the top of this one, above that, in the federal

19   Truth in Lending, is Mr. Avila ultimately supposed to pay

20   $26,745 for this 2010 Chevy Malibu?

21   A.    Yes, ma'am.

22   Q.    Okay.  Let's go to Government Exhibit 123; we have a

23   stipulation as to admissibility.

24         THE COURT:  It is received.

25   Q.    (BY MS. ANDERSON) What is this?
```

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    313

 1  A.    That would be a receipt that shows the customer putting

 2  money down.

 3  Q.    And how much -- does it show how much cash he put down?

 4  A.    $500 is what it says.

 5  Q.    Okay.  And when someone brought actual cash, how was that

 6  documented?

 7  A.    Sometimes we would take a copy of it -- like, we would --

 8  like, put the cash on a copy machine and literally just copy it

 9  or we would give them a receipt just like this.

10  Q.    Okay.  Let's go to Government Exhibit 124; we have a

11  stipulation as to admissibility.

12          THE COURT:  It is received.

13  Q.    (BY MS. ANDERSON) Is this a pawn ticket for Mr. Avila?

14  A.    Yes, for $2,300.

15  Q.    For $2,300, what did Mr. Avila provide according to this

16  document?

17  A.    A Sony PlayStation 4.

18  Q.    Okay.

19  A.    Or a video game console, I'm sorry.  It says "Description

20  of item sold," it says "video game console" for 2,300.

21  Q.    And is that what a Sony PlayStation 4, a video game

22  system?

23  A.    Oh, sorry, yes.

24  Q.    And so if we add those together, the $500 cash receipt and

25  the $2,300, does that make up the $2,800 cash down payment paid

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    314

1   on the contract?

2   A.   Yes, ma'am.

3   Q.   Let's go to Government Exhibit 126, which we have a

4   stipulation as to admissibility.

5           THE COURT:  It is received.

6   Q.   (BY MS. ANDERSON) Is this the vehicle that Mr. Avila

7   purchased, if you can tell?

8   A.   Yes, it's a 2010 Chevy Malibu with 70,000 miles, the same

9   car, and it has a trade-in value of the vehicle -- or the

10  value.

11  Q.   Okay.  And so the car he's purchasing, what did the

12  dealership value that car at?

13  A.   So this book shows that NADA valued it at $7,125.

14  Q.   Okay.  And if we look back at Government Exhibit 121, how

15  much was -- Mr. Avila sold the Chevy Malibu for?

16  A.   19,200.

17  Q.   I'm going to direct you to Government Exhibit Number 127,

18  we have a stipulation as to admissibility.

19          THE COURT:  It is received.

20  Q.   (BY MS. ANDERSON) It's the deal recap sheet for Mr. Avila?

21  A.   Yes.

22  Q.   And does it show the same information there?

23  A.   Yes, ma'am.

24  Q.   Okay.  And how much is it showing as a profit on this sale

25  for the salesperson?

```
1   A.    $100.
2   Q.    Okay.  And on the left side of this one, at the bottom,
3   where it has the trade-in allowance of $5,500 --
4   A.    Yes, ma'am.
5   Q.    -- what's that "ACV of trade" underneath it?
6   A.    It's the actual cash value of that vehicle for $1.
7   Q.    Okay.  Does that mean that the dealership did not believe
8   that Mr. Avila's 1997 Buick Le Sabre with 200,000 miles on it
9   was worth $5,500?
10  A.    Right.  Yes, ma'am.
11  Q.    It was just worth a dollar?
12  A.    One dollar.
13  Q.    Okay.  And did the bank -- would you send the pawn ticket
14  or any records relating to the pawn to the lender?
15  A.    Absolutely not.
16  Q.    Okay.  And why not?
17  A.    Because they wouldn't fund the loan.
18  Q.    How do you know that?
19  A.    Because if it's not cash, I mean, they're going to kick
20  the deal back, or else we would have just sent the pawn sheet
21  down.
22  Q.    Let's look at Government Exhibit 130.  And we have a
23  stipulation as to admissibility.
24              THE COURT:  It is received.
25  Q.    (BY MS. ANDERSON) Is this a Dealertrack sheet for
```

```
 1   Mr. Brandon Clark?

 2   A.   Yes, ma'am.

 3   Q.   For this one, what does it show as his cash down?

 4   A.   It's $1,000.

 5   Q.   And was this approved?

 6   A.   Yes, it is.

 7   Q.   Let's go to Government Exhibit 131, which we have a

 8   stipulation as to admissibility.

 9            THE COURT:  It is received.

10   Q.   (BY MS. ANDERSON) Is this Mr. Clark's retail purchase

11   agreement?

12   A.   Yes, ma'am.

13   Q.   What was he buying?

14   A.   A 2013 Hyundai Accent.

15   Q.   Okay.  And according to this contract, how much cash down

16   did Mr. Clark have?

17   A.   $1,000.

18   Q.   All right.  And signed by the dealer also?

19   A.   Yes, ma'am.

20   Q.   Okay.  And the deposit receipt on the right side is

21   completed to show the dealer received $1,000?

22   A.   Yes, ma'am.

23   Q.   Go to Government Exhibit 132; we have a stipulation as to

24   admissibility.

25            THE COURT:  It is received.
```

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    317

1   Q.   (BY MS. ANDERSON) On this retail installment sales

2   contract -- let's see, this one is --

3        What's going on here?

4        So this one -- this is a retail installment sales contract

5   for Mr. Clark?

6   A.   Yes, ma'am.

7   Q.   All right.  And on this one, does it show any cash down

8   payment or trade-in?

9   A.   No, it does not.

10  Q.   Okay.  Direct you to Government Exhibit 133, which we have

11  a stipulation as to admissibility.

12          THE COURT:  It is received.

13  Q.   (BY MS. ANDERSON) Is this a different retail installment

14  sale contract for Mr. Clark?

15  A.   Yes, it is.

16  Q.   Okay.  Is it for the same purchase of a 2013 Hyundai

17  Accent?

18  A.   Yes, ma'am.

19  Q.   With the same VIN number?

20  A.   Yes.

21  Q.   Okay.  And on the second one, does it show a cash down

22  payment?

23  A.   Yes, it does, of $1,000.

24  Q.   Why do you think there are two different retail

25  installment sales contracts?

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    318

```
1              MR. ADLER:  Objection; calls for speculation.

2              THE COURT:  Answer if you know.

3              THE WITNESS:  The bank required cash down.

4    Q.  (BY MS. ANDERSON) In your experience, did you ever have a

5    deal go to a lender and then get kicked back?

6    A.  Yes, ma'am.

7    Q.  All right.  And when that happens, what would you do?

8    A.  Get the car back or readjust the numbers to fit the bank.

9    Q.  Okay.  And if you readjusted the numbers, you would then

10   send the retail installment sale contract back to the bank?

11   A.  Yes, ma'am.

12   Q.  And on this one, at the bottom of 133, can you tell who

13   this lender is?

14   A.  Global Lending Services.

15   Q.  Okay.  And if we go back to 132, who is the bank on that

16   one?

17   A.  Prestige Financial Services.

18   Q.  Okay.  And when we looked at 130, we looked at the

19   Dealertrack for Global Lending Services; is that right?

20   A.  Yes, ma'am.

21   Q.  Okay.  So the one that ultimately got funded, you tell me

22   if I'm wrong on this, looks like it's the one shown in 133?

23   A.  Yeah, Global Lending Services.

24   Q.  Okay.  I direct you to Government Exhibit 134; we have a

25   stipulation as to admissibility.
```

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    319

```
 1              THE COURT:  It will be received.
 2   Q.   (BY MS. ANDERSON) Is this a pawn ticket for Mr. Clark?
 3   A.   Yes, ma'am.
 4   Q.   And what does it say he pawned?
 5   A.   An Internet WiFi hotspot for $1,000.
 6   Q.   The initials over $1,000, can you tell who those are?
 7   A.   Chuck Gooch.
 8   Q.   Let's look at Government Exhibit 136; we have a
 9   stipulation to admissibility.
10              THE COURT:  It is received.
11   Q.   (BY MS. ANDERSON) We've looked at one of these before.  Is
12   this a dealer participation certification form for Mr. Clark?
13   A.   Yes, ma'am.
14   Q.   And who is signing off on this one on the right side?
15   A.   Chuck Gooch.
16   Q.   Let's look at Government Exhibit 137; we have a
17   stipulation for admissibility.
18              THE COURT:  It is received.
19   Q.   (BY MS. ANDERSON) It's the deal recap statement for
20   Mr. Clark?
21   A.   Yes, ma'am.
22   Q.   And on the top right, does it show a down payment of
23   $1,000?
24   A.   Yes, it does.
25   Q.   And let's go to Government Exhibit 138; we have a
```

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                                320

```
 1   stipulation as to admissibility.
 2             THE COURT:  It is received.
 3   Q.   (BY MS. ANDERSON) This cover sheet for Mr. Clark was --
 4   did Mr. Gooch sign off on this deal?
 5   A.   Yes, ma'am.
 6   Q.   And can you see in the middle what's happening there where
 7   it has "Prestige" with a line through it and then it has
 8   "Global Lending"?
 9   A.   Yes, it means it got kicked back from the bank and we
10   switched lenders.
11   Q.   And ended up going through the deal with Global Lending?
12   A.   Yes, ma'am.
13   Q.   I have to switch my books.
14        Look at Government Exhibit 145, which we have a
15   stipulation to admissibility.
16             THE COURT:  What was that number again?
17             MS. ANDERSON:  145.
18             THE COURT:  It is received.
19   Q.   (BY MS. ANDERSON) It's a Dealertrack form for a car sale
20   with Ms. Brittany Cox?
21   A.   Yes, ma'am.
22   Q.   And how much cash down did Santander approve this deal
23   for?
24   A.   $1,500.
25   Q.   Let's go to Government Exhibit 146; we have a stipulation
```

1    as to admissibility.

2              THE COURT:  It is received.

3    Q.   (BY MS. ANDERSON) Ms. Cox -- what kind of car was she

4    buying here?

5    A.   A 2014 Mitsubishi Outlander.

6    Q.   And on this contract, does it show that she made a $1,500

7    cash down payment?

8    A.   Yes, ma'am.

9    Q.   All right.  And it has an acknowledgement on the right

10   side that the dealer hereby acknowledges receipt of $1,500?

11   A.   Yes, ma'am.

12   Q.   Okay.  And like the others, is it signed by the customer

13   and the dealer?

14   A.   Yes, ma'am.

15   Q.   And this would be sent to the lender?

16   A.   Yes, ma'am.

17   Q.   Let's look at Government Exhibit 147; we have a

18   stipulation as to admissibility.

19             THE COURT:  It is received.

20   Q.   (BY MS. ANDERSON) Is this the retail installment sales

21   contract for Ms. Cox and her Mitsubishi Outlander?

22   A.   Yes, ma'am.

23   Q.   Does it also show a $1,500 cash down payment?

24   A.   Yes, ma'am.

25   Q.   Go to Government Exhibit 148, which we have a stipulation

```
 1   as to admissibility.  I'm sorry.
 2           THE COURT:  It will be received.
 3   Q.   (BY MS. ANDERSON) What is this?
 4   A.   A Norman Pawn & Gun form and it's -- a 32-inch TV was
 5   received for $1,500 -- or it was -- sorry -- it was not
 6   received, but it was valued at $1,500.
 7   Q.   Okay.  And this is the pawn that got her her $1,500 down
 8   payment; is that right?
 9   A.   Yes, that's right.
10   Q.   And do you recognize those initials at the bottom?
11   A.   Yes; Chuck Gooch.
12   Q.   And that indicates he approved $1,500 for this 32-inch
13   television?
14   A.   Yes, ma'am.
15   Q.   Government Exhibit 150, which we have a stipulation as to
16   admissibility.
17           THE COURT:  It is received.
18   Q.   (BY MS. ANDERSON) And on this dealer participation
19   certification form, who signed off on it on the right side?
20   A.   Chuck Gooch.
21   Q.   And that's for Brittany Cox?
22   A.   Yes, ma'am.
23   Q.   And Government Exhibit 151; we have a stipulation as to
24   admissibility.
25           THE COURT:  It is received.
```

1  Q.   (BY MS. ANDERSON) On this document, on the right side,

2  what does it show for the cash deposit or the down payment?

3  A.   1,500 NPG.

4  Q.   And that notation means what?

5  A.   Norman Pawn & Gun, that it's a pawn.

6  Q.   Okay.  And does this sheet with the "NPG" on it go to the

7  lender?

8  A.   No, ma'am.

9  Q.   All right.  And let's look at Government Exhibit 152,

10  which we have a stipulation as to admissibility.

11         THE COURT:  It is received.

12  Q.   (BY MS. ANDERSON) Based on this cover sheet, did Mr. Gooch

13  sign off on Ms. Cox's deal?

14  A.   Yes, ma'am.

15  Q.   Okay.  And this cover sheet, does that go to the lender?

16  A.   No.

17  Q.   I think we spoke about it before, but Mr. Mayes knew about

18  the pawn shop?

19  A.   Yes, ma'am.

20  Q.   And whose idea was it?

21  A.   Chris Mayes and Chuck Gooch.

22  Q.   And how do you know?

23  A.   Because whenever they rolled it out to everybody, they

24  explained to us that this is how we're going to start selling

25  more cars again because we had did away with King Cash.

1  Q.   Okay.  And did you have any understanding of how the pawn

2  shop was doing this?

3  A.   In the beginning, it just seemed like they opened a pawn

4  shop.  It was really tight for the first month or two.  Chuck

5  was there in the tower every day, "I want to see the pawns,"

6  and then it just became the next King Cash.

7  Q.   And did Ms. Wells know about it?

8  A.   Yes.

9  Q.   What happened to the pawn shop?

10 A.   We -- someone had sent out a bunch of bank packets to all

11 the banks that had information about fake down payments, et

12 cetera, stuff like that, and it was a panic; we thought that

13 the pawn shop had gotten out.  We started getting cut off by

14 some banks and that was the beginning of it.

15 Q.   How do you know that someone sent out packets to banks?

16 A.   Because Chris told me.

17 Q.   And what did he do?

18 A.   We tried to call all the banks that it had happened with

19 and try to build relationships with them because we were

20 getting cut off by some.

21      And we slowed down on the pawn shops.  Chuck tightened up

22 again.  He got back involved, more than he was than just

23 signing on folders.  And then it -- that was the beginning of

24 it descending down.

25 Q.   At some point, did the pawns stop, you stopped using the

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    325

1   pawn shop?

2   A.   Yeah, eventually once the FBI lingo started running

3   through the whole dealership, it -- it became (sic) to a halt.

4   Q.   Before that happened, when you were tightening things up

5   with the pawn shop or when Mr. Mayes was tightening things up

6   or Mr. Gooch was tightening things up, what did that mean?

7   A.   So while Big Red and Mayes Kia and Norman Yamaha at one

8   point were -- Norman Mitsubishi were all just doing as many as

9   they could, you know.  It was very freely.  Nobody even had to

10  have a pawn to get a pawn sheet.  It went back to where

11  somebody had to have a couch if you're going to receive a

12  thousand dollars, where they wanted to see the pawns start

13  coming back in the store.

14  Q.   Okay.  And at any point, did people go to that building we

15  looked at earlier?

16       I think it was Exhibit 32; is that right?

17  A.   No.

18  Q.   No one went to that building?

19       Did Mr. Mayes send anybody to that building?

20  A.   Whenever it got really tight, Chuck Gooch did go and open

21  the building up and put some shelves in there and sat down.

22  And Chris told him to occupy that building, because the FBI,

23  banks, whoever, is going to be going to that location because

24  the pawn shop is out in the open now.

25  Q.   And when the pawns stopped, who made the decision to stop

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    326

1   using pawns?

2   A.   Chris.

3   Q.   And how did he get the word out?

4   A.   He told everybody, the managers, me, to -- no longer will

5   we use pawns again.

6   Q.   All right.  Did that affect the business at all?

7   A.   Absolutely.

8   Q.   How so?

9   A.   Well, we didn't have the down payment that we used to have

10  for customers that needed it.

11  Q.   Okay.

12  A.   So before a deal would be a deal with down payment, but

13  now if they didn't have money down, it's not a deal.  And we

14  could use trade-ins, but no more pawn and gun.

15          THE COURT:  Roughly, when was that?

16          THE WITNESS:  I believe it was in 2017.

17  Q.   (BY MS. ANDERSON) Are you familiar with something called

18  an "in-and-out transaction" or a "dollar buyback"?

19  A.   Yes, ma'am.

20  Q.   What is that?

21  A.   That's what I was talking to you about.  It started with

22  King Cash, then it went to Norman Pawn & Gun, and then it went

23  to more of a trade-in.

24          It was -- cash down is really important, but now since

25  cash couldn't be used, we used a trade-in.  If somebody has a

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                                    327

1  car on if you showed the bank that somebody had a car, if it

2  showed that it was paid off, well, you could still put it on a

3  contract and it would make it look like they had all that money

4  down.

5       And "in-and-out" is where someone actually does not have a

6  trade-in, but we are treating it like they have a trade-in,

7  like, if they had a car that was paid off and it was worth a

8  dollar sitting in a field, we could show it worth ten grand on

9  the contract and then we would just tell them we'll sell it

10  back to them for a dollar.

11 Q.   Okay.  And when you did that, what does the lender see

12 happening for a down payment?

13 A.   They just see a paid off trade-in and the dollar amount we

14 give for it.

15 Q.   And the value.

16      So when you just mentioned you could say it was worth

17 $10,000 --

18 A.   Yes, ma'am.

19 Q.   --- the lender would see a $10,000 trade-in?

20 A.   Yes, ma'am.

21 Q.   And then you said you would sell it back to the customer

22 for a dollar?

23 A.   Yes, so that's what we would tell them.  If, you know,

24 they had a car, like, we don't really need it, we just need it

25 for the deal, so if you can use it as a trade-in.

1      And then a lot of the times people didn't even have trade-

2 ins and we would put -- I mean, multiple times there's cars

3 that didn't have VIN numbers on them, people say, yeah, I think

4 I got a car, and you would just put that on there.

5 Q.   Okay.  How does that conversation go with a customer?

6 A.   We need money down, you don't have it.  I need a trade-in.

7 You know, you think you got one?  Let's just say you do.

8      Maybe they do have one and it's in a field and they're,

9 like, look, I had this car ten years ago, I don't even know

10 where it's at.

11      Well, see if you can get me a VIN number later, and we'll

12 just assume, do the deal and send it out.  And that was how we

13 would show money on the contract.

14      Sometimes there was a real car, sometimes there wasn't.

15 Q.   And so did the car need to be brought to the dealership?

16 A.   No.

17 Q.   What did the dealership need to do one of these?

18 A.   Just a year, make, model.

19      Now, they needed a VIN number.  Towards the end, it got

20 really tight.  They started tightening up.  We needed VIN

21 numbers, we needed titles, you know, they wanted ownership

22 paperwork.

23      Once again, the FBI deal got tighter and tighter, Faith

24 needed more documents in order to process these deals.  But in

25 the beginning, it was anything.  You get a VIN number, you got

```
 1   a deal.
 2   Q.   And you said "Faith needed more documents," who is Faith?
 3   A.   Faith was in accounting.  She was an accounting lady,
 4   accounting manager.
 5   Q.   Okay.  And so did the dealership need, like, odometer
 6   readings for the trade-in?
 7   A.   Yeah.  What they wanted was just proof of registration or
 8   a copy of the title and proof that it was paid off towards the
 9   end.  So we'd call the tag office and get faxes back just to
10   show that it was actually in this person's name that was
11   trading it, but in the beginning, that was irrelevant.
12   Q.   In the beginning, you didn't check their ownership?
13   A.   No.
14   Q.   In the beginning, did you check the odometer?
15   A.   No.
16   Q.   Did -- for an in-and-out, did the dealership assess the
17   condition of the car or do an appraisal?
18   A.   No, we never saw most of them.
19   Q.   Did Mr. Mayes know about in-and-outs?
20   A.   Absolutely.
21   Q.   How do you know that?
22   A.   Because we talked about them.
23   Q.   And what do you mean?  What did you talk about?
24   A.   Like, whenever things started getting really tight, he
25   was, like, make sure you guys get your paperwork showing these
```

1    customers -- these are actually their cars now.

2    Q.    And before that, did he know about it?

3    A.    Yes.

4    Q.    How do you know?

5    A.    Because we did all of our deals and we spoke about it.

6    Q.    And you were friends with him at the time?

7    A.    Absolutely.

8    Q.    And I think earlier you said that in that 2012-to-2014

9    time period, you didn't see him that much?

10   A.    No, during that time, maybe an hour a week.  It was -- on

11   this time, we were spending four or five hours a day together.

12   Q.    Okay.  What did you do together?

13   A.    Every day, we had the same routine.  It was we'd wake up,

14   work out, I spent most of my day with him.

15   Q.    Okay.

16   A.    We'd go to work, we'd hang out on the weekends, we were

17   together all the time.

18   Q.    And was that true when the pawn shop was operating?

19   A.    Yes, ma'am.

20   Q.    And so did you talk about the pawn shop in those days that

21   you spent with him?

22   A.    Yes.

23   Q.    And then you guys were still spending that time together

24   when the in-and-outs were revving up?

25   A.    Yes, ma'am.

1   Q.   Okay.  And you were talking about the in-and-outs as those

2   were replacing the pawn shop; is that --

3   A.   Yeah, not really that they're replacing, but it was just a

4   new form way to get deals done on special-finance customers.

5   Q.   Okay.  Thank you.

6        I direct your attention to Government Exhibit 40, which we

7   have a stipulation as to admissibility.

8            THE COURT:  It will be received.

9   Q.   (BY MS. ANDERSON) Is this a Dealertrack call-back sheet

10   for a customer named Tamia Gray?

11   A.   Yes, ma'am.

12   Q.   And on this, who is the lender?

13   A.   Global Lending Services.

14   Q.   And on the right side, are those the terms of the deal

15   approved by Global Lending Services?

16   A.   Yes, ma'am.

17   Q.   And what kind of down payment is part of this deal?

18   A.   So there's no cash down, it's just $1,000 for a trade-in.

19   Q.   Okay.  Let's look at Government Exhibit 41; we have a

20   stipulation as to admissibility.

21            THE COURT:  It will be received.

22   Q.   (BY MS. ANDERSON) On this contract for Ms. Gray, what kind

23   of car was she buying?

24   A.   A 2015 Kia Soul.

25   Q.   And on the right side, does it show a trade-in?

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    332

1    A.    A 1998 Honda Accord.

2    Q.    What's the VIN number for this '98 Honda Accord?

3    A.    It's just 17 one-digit numbers.

4    Q.    What does that mean to you?

5    A.    That just means they just entered in anything.

6    Q.    What's the -- what does it say the mileage is on this '98

7    Honda Accord?

8    A.    234,000 miles.

9    Q.    And it's a $1,000 trade-in allowance?

10   A.    Yes, ma'am.

11   Q.    And this goes to the lender?

12   A.    Yes, ma'am.

13   Q.    And supports the deal on that recap -- sorry -- the

14   call-back sheet from Global Lending Services on Dealertrack; is

15   that right?

16   A.    Yes, ma'am.

17   Q.    Let's go to Government Exhibit 42; we have a stipulation

18   as to admissibility.

19         THE COURT:  It is received.

20   Q.    (BY MS. ANDERSON) Is this Ms. Gray's retail installment

21   sale contract --

22   A.    Yes, ma'am.

23   Q.    -- for her purchase of a 2016 Kia Soul?

24   A.    Yes.

25   Q.    And on this, does it show her down payment and itemization

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    333

1  of amount financed?

2  A.   Yes.  This one shows trade-in of $1,000 and then a cash of

3  $500.

4  Q.   Okay.  And these retail installment contracts, if we go to

5  the second page, they're signed by whom?

6  A.   By the finance manager and the customer.

7  Q.   Okay.  And so this one is signed and dated January of

8  2016; is that right?

9  A.   Yeah, January of 2016.

10  Q.   Okay.  And this goes to the lender; is that right?

11  A.   Yes, ma'am.

12  Q.   All right.  And then let's go to Government Exhibit 43; we

13  have a stipulation as to admissibility.

14         THE COURT:  It is received.

15  Q.   (BY MS. ANDERSON) Is this Ms. Gray's down payment of $500?

16  A.   Yes, yes, it is.

17  Q.   Okay.  And does a personal check work for a cash down

18  payment?  Does that count as cash, in your experience?

19  A.   Yes.

20  Q.   Let's look at Government Exhibit 44, which we have a

21  stipulation as to admissibility.

22         THE COURT:  It is received.

23  Q.   (BY MS. ANDERSON) What is this page?

24  A.   It's an as-is form.  And what it states is this vehicle

25  sold as is, regardless of manufacturer warranty, Big Red has

1   not applied a warranty onto this vehicle, so it says that it's

2   sold as is.  And all vehicles are sold as is.

3        These problems can include but are not unlimited to, and

4   then it's complete engine failure, complete transmission

5   failure, wheels and tires falling off, engine noise,

6   transmission noise or slipping, lemon law buy-back title, repo

7   title, flood damage title, inoperable window regulators, paint

8   flaws or body damage.  This vehicle may have frame damage.

9   This vehicle may have unit body damage, interior damage, wear

10  and tear, and the cruise control may not work.  Also, it could

11  have hail damage.

12  Q.   Okay.  And how frequently are these as-is agreements put

13  into the documents signed by customers?

14  A.   These are in every deal.

15  Q.   In every deal.

16       And who is the manager on this one?

17  A.   It says "Chris Mayes."

18  Q.   Let's go to Government Exhibit 45; we have a stipulation

19  as to admissibility.

20            THE COURT:  It is received.

21  Q.   (BY MS. ANDERSON) What is this?

22  A.   It's a vehicle extended service agreement contract.

23  Q.   And this is also for Ms. Gray?

24  A.   Yes, ma'am.

25  Q.   And Number 7, how much was she paying for an extended

1  service contract?

2  A.    $2,500.

3  Q.    All right.  And if you go up to the Number 3, what kind of

4  coverage was she getting for her $2,500 extended service?

5  A.    Comprehensive.

6  Q.    And on the next page, 45.2, what is included in

7  comprehensive coverage?

8         MS. ANDERSON:  If you could actually do the top third

9  of this, please.

10 Q.    (BY MS. ANDERSON) So at the bottom of that highlighted

11 part, it says "comprehensive coverage"?

12 A.    Yeah, it says -- are you asking about comprehensive

13 coverage?

14 Q.    Yeah, does that include all the stuff above it:  Power

15 train, plus high-tech, plus additional stuff?

16 A.    Yeah, it looks like it does.

17 Q.    So it includes -- under the power train coverage, it

18 includes, like, engine failure --

19 A.    -- transmission.

20 Q.    -- transmission failure?

21 A.    Yes, ma'am.

22 Q.    Okay.  And let's go back to the front page of that one, if

23 we could, in the top part.

24        So -- and this is for Ms. Gray's purchase of a 2015 Kia

25 Soul; is that right?

1   A.   Yes, ma'am.

2   Q.   With the lenders over on this, too, Global Lending

3   Services; is that right?

4   A.   Yes, ma'am.

5   Q.   Okay.  Can you explain to me:  Why is there an as-is form

6   and also a $2,500 extended service agreement?

7   A.   The service agreement would be sold to make profit.  The

8   as-is form, the car could have a mile on it, we had everybody

9   sign it, because Chris wanted everybody to sign one.

10  Q.   And what was it used for?

11  A.   Protection.

12  Q.   So if the engine actually failed on this, what would

13  happen?

14  A.   If they didn't have a warranty, then they're screwed.

15  Q.   Okay.  And if they have this extended service agreement?

16  A.   Then they would be able to get it warrantied.

17  Q.   All right.  And so how does that as-is agreement come into

18  play?

19  A.   It's just an additional agreement that Chris has put on

20  every deal for protection against the dealer, in case he went

21  to court or something, he has it signed.

22  Q.   So would that -- could that be used to say the engine

23  isn't going to be fixed, for example?

24  A.   Yeah, it could say two different things.

25  Q.   Let's go to Government Exhibit 46; we have a stipulation

 1  as to admissibility.

 2          THE COURT:  It is received.

 3  Q.   (BY MS. ANDERSON) This is one of those dealer

 4  participation certification forms for Tamia Gray with Global

 5  Lending; is that right?

 6  A.   Yes.

 7  Q.   And who signed off on this one?

 8  A.   Chris Mayes.

 9  Q.   Okay.  And that's on the bottom right?

10  A.   Yes, ma'am.

11  Q.   And his title?

12  A.   Owner.

13  Q.   Let's look at Government Exhibit 47, which we have a

14  stipulation as to admissibility.

15          THE COURT:  It is received.

16  Q.   (BY MS. ANDERSON) What's this?

17  A.   This is called a bill of sale.  It's a wholesale bill of

18  sale.  And, basically, the '98 Honda Accord that the previous

19  purchase order had, the '98 Accord with the 17 one-digit

20  numbers, this would be that car.

21      And what it means is that we put a dollar on it.  It's

22  selling it out of our inventory, so it doesn't stay on our

23  inventory sheet like we have this car in stock.

24  Q.   Okay.

25  A.   So it's showing that we're selling it back to the customer

1    for a dollar.

2    Q.   Okay.  And so this is a separate deal -- at the

3    dealership, is it a separate deal jacket?

4    A.   Yeah, it's a separate transaction.

5    Q.   Okay.  And this one, it's Ms. Gray repurchasing from the

6    dealership the Honda Accord she had traded in?

7    A.   Yeah.

8    Q.   Okay.  Now, when you did this, did you require the

9    customer to provide a dollar?

10   A.   No.  No, we just -- it was -- I actually don't know how it

11   was handled, it just got handled in accounting.

12   Q.   Okay.

13   A.   And they -- the car disappeared off the inventory sheet.

14   Q.   Okay.  Let's go to Government Exhibit 48; we have a

15   stipulation as to admissibility.

16             THE COURT:  It is received.

17   Q.   (BY MS. ANDERSON)  It's the deal recap for Ms. Gray?

18   A.   Yes, ma'am.

19   Q.   All right.  And over on the top right, does it show the

20   $1,000 trade allowance?

21   A.   Yes, ma'am.

22   Q.   Okay.  And then in the middle of this, do you see those

23   handwritten letters?

24   A.   IO, for in-and-out.

25   Q.   What does that mean?

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    339

 1   A.   That means it's not really a trade-in.

 2   Q.   And so why is that written on here?

 3   A.   Because sometimes they would document it, sometimes they

 4   won't.  In this case, they did, so that everybody would be

 5   aware that there's really not a trade-in.

 6   Q.   Okay.  And does this page go to the lender?

 7   A.   No.

 8   Q.   All right.  So is there anything that goes to the lender

 9   that shows that this vehicle wasn't actually traded in?

10   A.   No.

11   Q.   Why not?

12   A.   Because then you wouldn't have a deal.

13   Q.   Let's go to Government Exhibit 52.

14        We looked at this one earlier, I think.

15        This is the Tony Clanton retail installment sale contract;

16   do you remember this one?

17   A.   Yes, ma'am.

18   Q.   On this one, if we zoom in on the itemization of amount

19   financed, does it show a $200 trade-in?

20   A.   Yes, ma'am.

21   Q.   All right.  And this went to the lender; is that right?

22   A.   Yes, ma'am.

23   Q.   And let's go to Government Exhibit 59; we have a

24   stipulation as to admissibility -- or we may have already

25   covered this one.

1          MS. ANDERSON:  Is this one in?

2          THE COURT:  Is 59 in?

3          COURTROOM DEPUTY:  No, it's not.

4          MS. ANDERSON:  We have a stipulation as to

5   admissibility for Government Exhibit 59.

6          THE COURT:  It is received.

7   Q.   (BY MS. ANDERSON) So, earlier, we looked at Mr. Clanton's

8   deal and we focused on the pawn ticket.

9        Do you see in the top right?

10  A.   Yes.

11  Q.   What does it show as Mr. Clanton's cash down payment?

12  A.   $1,000.

13  Q.   And is there a notation next to that?

14  A.   It says "Norman Pawn & Gun."

15  Q.   And above that, does it have a trade allowance for him?

16  A.   For $200.

17  Q.   Okay.  And on the left side, does it show what his trade-

18  in purportedly was?

19  A.   A 2004 Dodge SX.

20  Q.   Let's look at Government's Exhibit 57; we have a

21  stipulation as to admissibility.

22          THE COURT:  It is received.

23  Q.   (BY MS. ANDERSON) What is this?

24  A.   That's an in-and-out for Tony Clanton on his '04 Dodge.

25  Q.   And so this is the paper showing that the dealership sold

1  that purported trade-in back to Mr. Clanton for a dollar; is

2  that right?

3  A.   Yes.

4  Q.   Was that disclosed to the lender?

5  A.   No.

6  Q.   And I think we may have previously looked at it.  Did we

7  look at Exhibit 60?

8       So for Mr. Clanton on these documents, there's both a pawn

9  and an in-and-out; is that right?

10 A.   Yes.

11 Q.   And on Document 60, did Mr. Gooch sign off on

12 Mr. Clanton's deal?

13 A.   Yes, ma'am.

14 Q.   I direct you to Government Exhibit 75; we have a

15 stipulation as to admissibility.

16            THE COURT:  It is received.

17 Q.   (BY MS. ANDERSON) This is the Dealertrack for Jeffrey

18 Davis?

19 A.   Yes, ma'am, its approval.

20 Q.   And this is an approval, you said?

21 A.   Yes.

22 Q.   And what is shown for Mr. Davis' down payment?

23 A.   $3,000 in cash and $2,000 in a trade-in.

24 Q.   And that's the -- those are -- the structure of the deal

25 that American Credit Acceptance approved?

1   A.   Yes, ma'am.

2   Q.   And at the bottom, can you tell which option was chosen

3   for -- of these different tiers, Tier 1 or Tier 2?

4   A.   Yeah, they picked the top one, which is a Tier 1, because

5   it got them the biggest net check.

6   Q.   Okay.  And what's the difference between that Tier 1 and

7   Tier 2?  What changed to get you a bigger net check?

8   A.   Actually, 1 and 2 look the same, but -- no, I see, my bad.

9   I was looking at Tier 1 and Tier 1.

10       Okay.  The difference is $800 in down payment.

11  Q.   Okay.  So the bottom ones, if you add those cash down and

12  trade equity, it's $4,200; is that right?

13  A.   Right, yeah.

14  Q.   And the top ones get you to $5,000?

15  A.   That's right.

16  Q.   Okay.  And the one approved by American Credit Acceptance

17  in the top right is a total down payment of $5,000; is that

18  right?

19  A.   Right.  That's right.

20  Q.   Let's look at Government Exhibit 76; we have a stipulation

21  as to admissibility.

22       THE COURT:  It is received.

23  Q.   (BY MS. ANDERSON) For Jeffrey Davis, what was he buying?

24  A.   A 2011 Ford regular cab.

25  Q.   And on this retail purchase agreement, what ends up being

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    343

1   the down payment shown on here?

2   A.   5,000.

3   Q.   Okay.  And how do you get to that?

4   A.   $4,800, it looks like.

5   Q.   $4,800 as a --

6   A.   -- as a trade-in and then $200 in cash.

7   Q.   Okay.  And that gets you to the 5,000 required on that

8   Dealertrack sheet?

9   A.   That's right.

10  Q.   And when you look down, how much was cash on that deposit

11  receipt?

12  A.   200.

13  Q.   And then what was the trade-in?

14  A.   4,800.

15  Q.   Okay.  And what kind of car was it that was traded in?

16  A.   Oh, I'm sorry, it was a 1994 Chevrolet.  Doesn't say what

17  it is, aside from Chevrolet.

18  Q.   Let's go to Government Exhibit 77; we have a stipulation

19  as to admissibility.

20          THE COURT:  It is received.

21  Q.   (BY MS. ANDERSON) Is this Mr. Jeffrey Davis' retail

22  installment sale contract?

23  A.   Yes, ma'am.

24  Q.   And on the itemization of amount financed, does it show

25  $4,800 trade-in, $200 cash?

1   A.   Yes, ma'am.

2   Q.   Okay.  And so this -- the lender sees this and they see a

3   $5,000 down payment; is that right?

4   A.   Yes, ma'am.

5   Q.   Okay.  Let's go to Government Exhibit 78; we have a

6   stipulation as to admissibility.

7           THE COURT:  It is received.

8   Q.   (BY MS. ANDERSON) And what is this?

9   A.   It's a receipt for $200 and it looks like -- earlier, I

10  was telling you how we would copy money, looks like they copied

11  some money.

12  Q.   Okay.  And that would be the $200 component of his down

13  payment; is that right?

14  A.   It looks like it.

15  Q.   Okay.  And let's look at Exhibit 79; we have a stipulation

16  as to admissibility.

17          THE COURT:  It is received.

18  Q.   (BY MS. ANDERSON) What is this?

19  A.   This is a -- it's a worksheet -- it's showing us

20  communicating with the customer about what we can work out in

21  terms:  Down payment, monthly payment, et cetera.

22  Q.   On the left side, can you see what he is trading in?

23  A.   Looks like he has two trades:  One of them is a '94 Chevy

24  Silverado and the second one, it looks like there is an '03

25  Kawasaki 500 bike.

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    345

1   Q.   Okay.  And can you tell what's going on, on the right

2   side, with this blue marker?

3   A.   Yeah.  He's saying, the manager, with the trade-in and

4   $3,000, the payment -- $3,000 cash down -- the payment will be

5   389 a month.

6        And then it looks like the customer put $200 next to the 3

7   grand, saying that that's where they're committed.

8   Q.   Okay.  So they could -- they couldn't put $3,000 down in

9   cash, they can put down $200 in cash?

10  A.   Correct.

11  Q.   And do you remember on that Dealertrack sheet what the

12  lender was requiring here?

13  A.   5,000.

14  Q.   Okay.  And so then we have, on the retail installment sale

15  contract, which was Exhibit 77 we already looked at, the trade-

16  in value given to this Chevy Silverado was $4,800; is that

17  right?

18  A.   Yes, ma'am.

19  Q.   And that makes up the difference for the lack of cash?

20  A.   Yes, ma'am.

21  Q.   And does $4,800 make sense to you, as someone in the car

22  industry, for a '94 Chevy Silverado with 175,000 miles on it in

23  -- what's the date on this one -- what's the date on this one

24  -- in 2016?

25  A.   No, ma'am.

1  Q.   Why would it -- why would it show $4,800 for that?

2  A.   Because that's what they need for the bank approval.

3  Q.   Okay.  Let's look at Government Exhibit 80; we have a

4  stipulation as to admissibility.

5          THE COURT:  It is received.

6  Q.   (BY MS. ANDERSON) What's this?

7  A.   It's a wholesale bill sheet selling this truck back to the

8  customer for one dollar, and then it says "INO" on it, in-and-

9  out.

10 Q.   Okay.  And this is in a separate deal jacket?

11 A.   Yes.

12 Q.   And does this get sent to the lender on the purchase of

13 the other car?

14 A.   No, ma'am.

15 Q.   Let's look at Government Exhibit 81; we have a stipulation

16 as to admissibility.

17         THE COURT:  It is received.

18 Q.   (BY MS. ANDERSON) It's one of those dealer certification

19 participation forms for Jeffrey Davis in this instance.

20     Who signed off on this one?

21 A.   Chuck Gooch.

22 Q.   Let's go to Government Exhibit 82; which we have a

23 stipulation as to admissibility.

24         THE COURT:  It is received.

25 Q.   (BY MS. ANDERSON) And is this Jeffrey Davis' deal recap?

```
 1   A.   Yes, ma'am.

 2   Q.   And on the bottom left corner, what does it show is the

 3   actual cash value of the trade, for the trade allowance of

 4   $4,800?

 5   A.   One dollar -- $2.

 6   Q.   Does it say $2?

 7   A.   It shows $2.

 8   Q.   Why would it show $2?

 9   A.   I don't know.  Maybe there was another -- that bike maybe

10   got traded in and they sold it back to the customer and we just

11   don't see that write-up sheet.  I'm not sure.

12   Q.   Okay.  And let's look at Government Exhibit 83; we have a

13   stipulation as to admissibility.

14           THE COURT:  It is received.

15   Q.   (BY MS. ANDERSON) Can you tell from this whether Mr. Gooch

16   signed off on Jeffrey Davis' deal?

17   A.   Yes, ma'am.  His initials are on it.

18   Q.   The red mark on it?

19   A.   Yes, ma'am.

20   Q.   Let's go to Government Exhibit 90; we have a stipulation

21   as to admissibility.

22           THE COURT:  Okay.  Is that on -- also on Mr. Davis?

23           MS. ANDERSON:  Ninety is not.

24           THE COURT:  Does that put you at a convenient

25   stopping point?
```

1          MS. ANDERSON:  Yes, Your Honor.

2          THE COURT:  Thank you.  You may be seated.

3      Members of the jury, we'll take our mid-afternoon break at

4  this time.  Twenty minutes seems to be working, and if not,

5  Lori will work with you on that.  So let's plan on resuming

6  here in the courtroom at 25 minutes after the hour, guided, as

7  always, by the clock on the wall, and, as always, please

8  remember my usual admonition, which I will not repeat at this

9  time.

10     All persons will please remain seated while the jury

11  DEPARTS.

12     (JURY EXITS THE COURTROOM.)

13         THE COURT:  The jury has left the courtroom.

14     Anything we need to address before we take our

15  mid-afternoon break?

16         MS. ANDERSON:  Nothing from the government, Your

17  Honor.

18         THE COURT:  Very well.

19     Court will be in recess.

20     (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING PROCEEDINGS

21  WERE HAD IN OPEN COURT AND WITHIN THE PRESENCE AND HEARING OF

22  THE JURY.)

23         THE COURT:  Welcome back, members of the jury.

24     We're resuming in United States of America v. Bobby Chris

25  Mayes, Charles Gooch, and Courtney Wells, with the parties and

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    349

```
 1   their counsel in place, as before.
 2        Ms. Anderson, you may continue.
 3             MS. ANDERSON:  Thank you, Your Honor.
 4   Q.  (BY MS. ANDERSON) I direct you to Government Exhibit 90;
 5   we have a stipulation to admissibility.
 6             THE COURT:  It is received.
 7             MS. ANDERSON:  Thank you.
 8   Q.  (BY MS. ANDERSON) Now, does this one have two names on the
 9   top left?
10   A.  Yes, ma'am.
11   Q.  And who are -- who are they?  What are their names?
12   A.  Coretta Post and Charles Miller.
13   Q.  Okay.  And this is a Dealertrack -- is this accepting a
14   loan by American Credit Acceptance?
15   A.  Yes, they did a counteroffer and this is their approval.
16   Q.  Okay.  And on this one, what does it show for the down
17   payment?
18   A.  $6,800 as a trade-in and $2,200 as cash down, so a total
19   of 9,000.
20   Q.  Okay.  Let's go to Government Exhibit 91; we have a
21   stipulation to admissibility.
22             THE COURT:  It will be received.
23   Q.  (BY MS. ANDERSON) On this retail purchase agreement, what
24   were Ms. Post and Mr. Miller purchasing?
25   A.  A 2010 F-150 with 157,000 miles.
```

```
1    Q.   Okay.  And does it show a trade-in allowance here?

2    A.   Of $6,800.

3    Q.   All right.  And in the trade-in record, does it have any

4    information about what they were trading in?

5    A.   No, it says "NA," which is, like, not available.

6    Q.   Okay.  And this is signed at the bottom by the dealership

7    and by Ms. Post and Mr. Miller?

8    A.   Yes, ma'am.

9    Q.   Okay.  Let's look at Government Exhibit 92; we have a

10   stipulation as to admissibility.

11          THE COURT:  It will be received.

12   Q.   (BY MS. ANDERSON) On the retail installment sale contract,

13   does it show a trade-in of $6,800 on this as well?

14   A.   Yes, ma'am.

15   Q.   Okay.  And this one is -- at the bottom, can you tell --

16   or at the top, either way, top or bottom --

17          MS. ANDERSON:  Karen, take your pick.

18   Q.   (BY MS. ANDERSON) Is this at -- what dealership is this

19   one at?

20   A.   Mayes Kia.

21   Q.   Did you work at Mayes Kia?

22   A.   No, ma'am.

23   Q.   Okay.  And the lender on this was American Credit

24   Acceptance?

25   A.   Yes, ma'am.
```

1  Q.   All right.  And this was sent to the lender?

2  A.   Yes, ma'am.

3  Q.   Let's go to Government Exhibit 93, which we have a

4  stipulation as to admissibility.

5        THE COURT:  It is received.

6  Q.   (BY MS. ANDERSON) I don't think we've seen one of these

7  before.  What is this?

8  A.   This is a credit application.

9  Q.   And so who is this a credit application for?

10  A.   This one is for Coretta Post.

11  Q.   And what kind of information is on this?

12  A.   Name, date of birth, social security number, address, how

13  long she had been at her house, what's her rent or mortgage,

14  where she works, what's her position at the job, how long she's

15  been there, work phone number, normal phone number, and how

16  much money that person makes.

17  Q.   And what does it show for Ms. Post?

18  A.   One dollar at Heavenly Hands.

19  Q.   A $1 salary?

20  A.   A $1 salary.

21  Q.   Okay.  And the signatures at the top, there's one for the

22  applicant, is there another signature up there?

23  A.   Yes, for Charles.

24  Q.   And let's go to 93.2.

25        What is this?

1  A.   This is Charles' application and it has all the same

2  information, except for his date of birth, social security is

3  different.   And then he works at Allied Universal and he makes

4  2,700 a month as a security officer.

5  Q.   Okay.   And where -- when you're at the dealership as a

6  customer, where does -- how does this information get

7  documented?   Who puts this in?

8  A.   So this customer -- looks like they're from Ft. Worth,

9  Texas, so they could have done a credit application over our

10  website, and -- before they got there, or they could have just

11  pulled up and then we entered it in and pulled their credit.

12  Sometimes they will do it and a lot of the times the

13  salespeople do it.

14  Q.   Okay.   And where would the salespeople get the

15  information?

16  A.   By asking the customer.

17  Q.   Okay.   And then what's 93.4 of the same document?   What is

18  this?

19  A.   Looks like it's all the information on the vehicle that

20  they're buying, which is a 2010 Ford F-150, cash selling price

21  22 grand.

22  Q.   And does it have the net trade amount?

23  A.   Yeah.   It says the wholesale invoice, which is the trade-

24  in value, is $12,500.

25  Q.   And that's for the one they're purchasing or the one that

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    353

1   they're trading in?

2   A.   They're purchasing a 2010 F-150, with an invoice of

3   $12,500 and their sale price is 22,000.

4   Q.   And up above that, does it have the terms, in terms of

5   cash down, price, net trade?  Is the down payment on here?

6   A.   It says "zero cash down," but it says "6,800" for the

7   trade, so this one doesn't have cash down on it.

8   Q.   At the bottom of that page, what does it show they're

9   trading in?

10  A.   A 2002 Kia Rio.

11  Q.   And is this credit application something that goes to the

12  lender?

13  A.   Yes, ma'am.

14  Q.   Let's go to Government Exhibit 94, which we have a

15  stipulation as to admissibility.

16          THE COURT:  It is received.

17  Q.   (BY MS. ANDERSON) Now, is this information about -- on the

18  left side, what does it show they're trading in?

19  A.   A 2002 Kia Rio with 999,000 miles.

20  Q.   Okay.  And on the right side, it shows a trade-in

21  allowance of how much for that?

22  A.   $6,800.

23  Q.   And this is in 2016.  Does -- from your knowledge, does

24  that sound like a fair amount for a 2002 Kia Rio with 999,999

25  miles on it?

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    354

1   A.   No, ma'am.

2   Q.   Is it high, is it low?

3   A.   It's pretty high.

4   Q.   All right.  And let's look at Government Exhibit 95; we

5   have a stipulation as to admissibility on this one.

6           THE COURT:  It is received.

7   Q.   (BY MS. ANDERSON)  What is this document?

8   A.   This says that Coretta Post has sold their 2002 Kia Rio to

9   Mayes Kia for the amount of -- and it's just -- looks like a

10  purchase agreement.

11      I didn't see these down at Mitsubishi or Big Red, but it

12  looks like a purchase order that prints out on the front-end

13  paperwork showing that we're buying their trade as a trade-in.

14  Q.   Okay.  Why would -- I guess if you didn't do these, do you

15  know why they wouldn't put a dollar amount in there?

16  A.   I have no idea.

17  Q.   And let me direct you to Government Exhibit 96; we have a

18  stipulation of admissibility on this one.

19           THE COURT:  It is received.

20  Q.   (BY MS. ANDERSON)  So this is in the dealership file for

21  Mr. Miller.  What is this?

22  A.   It's a 2000 model Hyundai, looks like an Elantra, it's a

23  four-door sedan, 2000 model Hyundai sedan, and it looks like it

24  has a lien, a lien on it with U.S. federal Credit Union.

25  Q.   And does it have an issue date sometime in 2006?

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                                355

1  A.    Yeah.  They bought it back -- it looks like they bought it

2  back in '06.

3  Q.    And does it say how much the purchase price was for the

4  2000 Hyundai?

5  A.    $3,500 in '06.

6  Q.    And it has Mr. Miller's name on this; is that right?

7  A.    Yeah, Charles Miller, yes, ma'am.

8  Q.    And let's look at Government Exhibit 97; we have a

9  stipulation as to admissibility.

10          THE COURT:  It is received.

11  Q.    (BY MS. ANDERSON) What is this?

12  A.    This is an in-and-out, selling it back to the customer for

13  a dollar on the Hyundai.

14  Q.    Okay.  And that -- is that Hyundai the one we just saw the

15  title for?

16  A.    Yes, ma'am.

17  Q.    Okay.  And this would be in a separate deal jacket?

18  A.    Yes, ma'am.

19  Q.    And would this go to the lender?

20  A.    No, ma'am.

21  Q.    Government Exhibit 98; we have a stipulation as to

22  admissibility.

23          THE COURT:  It is received.

24  Q.    (BY MS. ANDERSON) For this Coretta Post sale, who signed

25  off on the dealer participation certification form?

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    356

```
 1   A.    Chuck Gooch.

 2   Q.    Go to Government Exhibit 99; we have a stipulation as to

 3   admissibility.

 4            THE COURT:  It is received.

 5   Q.    (BY MS. ANDERSON) The deal recap document for Ms. Post or

 6   Mr. Miller's sale?

 7   A.    The ACV -- or what is it?  Sorry.

 8   Q.    Is this a deal recap for --

 9   A.    Yes, this is the recap that shows the -- stays with the

10   dealership and it shows all the finance numbers and what the

11   profit is.

12   Q.    Okay.  And on this, does it show what they traded in?

13   A.    Yes.  Give me one second.  A 2000 Hyundai Elantra with

14   140,000 miles.

15   Q.    And is that what we saw on that title?

16   A.    Yes, ma'am.

17   Q.    Okay.  And at the top, it shows the trade allowance, what

18   does it show the trade allowance?

19   A.    One dollar.

20   Q.    Let's see, where are you looking?

21   A.    Oh, my bad.  Oh, a trade allowance.  I was looking at ACV.

22   Sorry.

23         $6,800 is the trade allowance.

24   Q.    Okay.  And then we can go to the bottom left.  What does

25   it show the actual cash value of that trade is, as valued by
```

1    the dealership?

2    A.    One dollar.

3    Q.    And did this to go the lender?

4    A.    No, ma'am.

5    Q.    And let's look at Government Exhibit 100; we have a

6    stipulation as to admissibility.

7              THE COURT:  It is received.

8    Q.    (BY MS. ANDERSON) Let's look at a couple things.

9          On this -- this is a Mayes Kia cover sheet; is that right?

10   A.    Yes, ma'am.

11   Q.    On the bottom right, in that green highlight, what does

12   that say?  What can you tell about the deal?

13   A.    It says -- so what it's saying is that there's some things

14   that are missing so the deal can be booked and that's the

15   reason why that's wrote there.

16         And it's saying that it needs a VIN number to the trade-

17   in.  It's labeling that it is an in-and-out, which means it's

18   not a real trade.  It is saying that it needs the registration

19   in the deal, and that was the title that we saw, and then the

20   VIN.  And it looks like they greened it all out once they got

21   it, so then that's why Chuck signed it.

22   Q.    Okay.  And Chuck signed it, where are you seeing that?

23   A.    Up at the top, where it says "deal number."

24   Q.    In red?

25   A.    In red, yes, ma'am.

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                        358

1   Q.   Okay.  And so that means he signed off on this deal as it

2   was structured with a $6,800 trade-in allowance; is that right?

3   A.   Yes, ma'am.

4   Q.   Let's look at Government Exhibit 155, which we have a

5   stipulation to admissibility.

6            THE COURT:  It is received.

7   Q.   (BY MS. ANDERSON) And is this a Dealertrack for a

8   customer?

9   A.   Yes, ma'am.

10  Q.   Who is the lender and who is the customer?

11  A.   Santander is going to be the lender and the customer is

12  going to be Deangelo Davis.

13  Q.   And what are the terms of this deal?

14  A.   It's a 2017 Kia Forte.  It looks like it's a new car with

15  12 miles.  The invoice is $18,000.  And they're putting 500

16  cash down, $3,000 in a trade-in, and $2,500 in manufacturer's

17  rebate.

18  Q.   And those are the terms that Santander signed off on?

19  A.   Yes, ma'am.

20  Q.   And when you're doing these deals, did different lenders

21  have different types of requirements or priorities?

22  A.   Yes.  In the stipulations box, they'll always kind of list

23  what you need and that's how you'll know what you need.

24  Q.   Okay.  Is there anything, in particular, you recall about

25  working with Santander?

1   A.   Yeah.  So they have a -- it's called a "real-time rehash,"

2   real-time rehash.  Do you see where it says "Click here for

3   real-time rehash" underneath the financing information?  You

4   can click on that and you can go in and add a trade, you can

5   add cash down, you can play with the numbers to -- like you

6   said earlier, tinker with them to figure out how to get the

7   structure or the car that you want.

8        Like, this one, under stipulations, it doesn't ask for

9   proof of income.  So it could have at one point, but then we

10  put something in, and now it's gone.  Because you can get to a

11  certain loan-to-value on this vehicle that may remove some

12  stipulations.

13  Q.   Okay.  And are you able to tell what gets used and not

14  have to provide proof of income, or is that something that you

15  just have to figure out at the time?

16  A.   Well, yeah, so there is a way.  And if you look at the

17  left side, where it says "vehicle information, 2017 Kia Forte

18  LX auto mile 12," there's a book invoice of $18,000, which is

19  the invoice on the new car.

20       So if you look over here on the total amount financed,

21  your best bet to get income to go away on an approval is to get

22  under that number, so it won't show a very big loan-to-value.

23       So if you look over back to the right, where it says

24  "amount financed, 17,759," so putting that number a couple

25  hundred dollars under that will usually trigger a good --

1    approval like that, where it will waive the POI.

2    Q.   And why would you want the POI to be waived?

3    A.   The customer doesn't make as much money as they need to

4    make to buy it, so you're putting in a higher number you can't

5    prove.

6    Q.   Okay.  Let's look at Government Exhibit 156; we have a

7    stipulation as to admissibility.

8             THE COURT:  It is received.

9    Q.   (BY MS. ANDERSON) What does it show on this credit

10   application for Deangelo Davis?

11   A.   That he works at Whataburger and he's been there three

12   months and he makes $4,500.

13   Q.   Okay.  And if we go to the -- and that's, I'm sorry,

14   $4,500 a month?

15   A.   I'm sorry.  He makes $4,500 salary a month.

16   Q.   Okay.  As a manager at Whataburger?

17   A.   Yes, ma'am.

18   Q.   All right.  From working with car buyers, does that sound

19   like an amount --

20             MR. ADLER:  Speculation.

21             COURT REPORTER:  Wait a minute.

22             THE COURT:  That was Mr. Adler.

23        Unless you can show me more of a foundation, that will be

24   sustained.

25             MS. ANDERSON:  That's fine, Your Honor.

```
 1                THE COURT:  Next question.

 2                MS. ANDERSON:  All right.

 3   Q.    (BY MS. ANDERSON) Let's go to page 156.3 of this document.

 4        What does it show -- what kind of vehicle is Mr. Deangelo

 5   Davis trading in?

 6   A.    A 2002 Nissan Frontier truck.

 7   Q.    Government Exhibit 157; we have a stipulation as to

 8   admissibility.

 9                THE COURT:  It will be received.

10   Q.    (BY MS. ANDERSON) This is Mr. Deangelo Davis' retail

11   purchase agreement?

12   A.    Yes, ma'am.

13   Q.    And does it show -- what does it show his down payment is

14   made up of?

15   A.    $3,000 and a trade-in allowance -- $3,000 is what his

16   trade is worth and then $500 cash down.

17   Q.    Okay.  And does it show a deposit receipt?

18   A.    Yes, of $500.

19   Q.    And what does it show for the trade-in description?

20   A.    $3,000.

21   Q.    Does it have anything on what kind of vehicle is being

22   traded in?

23   A.    No, it just says "NA."

24   Q.    Okay.  And this is signed by the purchaser and the dealer?

25   A.    Yes, ma'am.
```

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                         362

1  Q.   Let's go to Government Exhibit 158; we have a stipulation

2  as to admissibility.

3           THE COURT:  It is received.

4  Q.   (BY MS. ANDERSON) And this is Mr. Deangelo Davis' retail

5  installment sales contract?

6  A.   Yes, ma'am.

7  Q.   For the new 2017 Kia Forte?

8  A.   Yes, ma'am.

9  Q.   And does it have consistent information on down payment in

10 that itemization of amount financed?

11 A.   Yeah, it's all the same.

12 Q.   Same --

13 A.   6,000 down total, with the rebates, cash and trade.

14 Q.   Okay.  Let's go to Government Exhibit 159; we have a

15 stipulation as to admissibility.

16          THE COURT:  It is received.

17 Q.   (BY MS. ANDERSON) What is this?

18 A.   It is a receipt for $100.

19 Q.   Is that the kind of receipt that you would generate for

20 actual cash?

21 A.   Yeah, we would just write a receipt if they gave us cash.

22 Q.   And then what about the second page of this 159.2?

23 A.   Looks like copied money on a copier and then there's a

24 debit card that they ran for 135.

25 Q.   Okay.  And on that contract, what did it show as the cash

1   down payment for Mr. Davis?

2   A.   500.

3   Q.   Okay.  And so do you get to 500 with these two pages?

4   A.   No.

5   Q.   All right.  Let's look at Government Exhibit 160, which we

6   have a stipulation as to admissibility.

7           THE COURT:  It is received.

8   Q.   (BY MS. ANDERSON) What is this?

9   A.   Vehicle service extended contract agreement.

10  Q.   And did Mr. Deangelo Davis get the comprehensive coverage?

11  A.   Yes, ma'am.

12  Q.   And what did he pay for that?

13  A.   Sorry, I'm looking here.  Oh, $2,000.

14  Q.   Okay.  And let's look at Government's Exhibit 161; we have

15  a stipulation as to admissibility.

16          THE COURT:  It is received.

17  Q.   (BY MS. ANDERSON) What is this?

18  A.   This is the as-is form that we covered previously on the

19  used car, but now it's on a new car, stating that it's all

20  as-is.

21  Q.   Why would Mr. Deangelo Davis sign an as-is for a new car?

22  A.   It's just -- it was in every folder, every new car that we

23  sold, it was in there.  And people had to sign it or they

24  didn't buy a car.

25  Q.   Let's go to Government's Exhibit 162; we have a

```
 1   stipulation as to admissibility.

 2           THE COURT:  It is received.

 3   Q.  (BY MS. ANDERSON) What is this?

 4   A.  It's a purchase order for the 2002 Nissan.

 5   Q.  What kind of a Nissan?

 6   A.  It said on the other form it was a Frontier, but this one

 7   just says "Nissan."

 8   Q.  2002 Nissan Nissan?

 9   A.  I'm sorry, yes.

10   Q.  Does it have a price for it?

11   A.  No, ma'am.

12   Q.  Let's go to Government's Exhibit 163; we have a

13   stipulation on admissibility on this one as well.

14           THE COURT:  It will be received.

15   Q.  (BY MS. ANDERSON) What is this?

16   A.  It's an in-and-out -- or it's a bill -- wholesale bill of

17   sale, stating that we're selling this truck back to Deangelo

18   for $1.

19   Q.  Would this go in a separate deal jacket?

20   A.  Yes, it would.  It would not go to the bank.

21   Q.  Okay.  Let's look at Government Exhibit 164, please, which

22   we have a stipulation for admissibility.

23           THE COURT:  It is received.

24   Q.  (BY MS. ANDERSON) And who signed the dealer participation

25   certification form for Mr. Deangelo Davis' deal with Santander?
```

1    A.    Chuck Gooch, compliance.

2    Q.    Government Exhibit 165; we have a stipulation as to

3    admissibility.

4            THE COURT:  It is received.

5    Q.    (BY MS. ANDERSON) It's the deal recap for Mr. Deangelo

6    Davis?

7    A.    Yes, ma'am.

8    Q.    And does it -- at the top of the page, does it have the

9    $3,000 trade allowance and $500 cash?

10   A.    Yes, it does.

11   Q.    All right.  And then the bottom left, what does it show

12   about that trade-in?

13   A.    $3,000 trade-in; ACV of trade-in, NA.

14   Q.    Okay.  So not applicable for the value of the trade-in?

15   A.    Yes, ma'am.

16   Q.    And let's look at Government Exhibit 166; we have a

17   stipulation as to admissibility.

18           THE COURT:  It is received.

19   Q.    (BY MS. ANDERSON) From this Big Red cover sheet, can you

20   tell if Mr. Gooch signed off on Deangelo Davis' deal with

21   Santander?

22   A.    Yes, I can.  His signature -- or his initials are next to

23   the deal number, it's in the red writing.

24   Q.    Okay.  And let's look at -- when you were talking to a

25   customer, did you collect proof of income from them regularly?

1  A.   Not unless we needed it.

2  Q.   Okay.  If there's proof of income in dealership files, how

3  does it get there?

4  A.   It gets there because we needed it, but we try not to put

5  it in there unless it's needed, because if it accidentally got

6  sent to the bank and it was wrong, then we wouldn't have a

7  deal.

8  Q.   Let me direct you to Government Exhibit 168; we have a

9  stipulation as to admissibility.

10         THE COURT:  It is received.

11  Q.   (BY MS. ANDERSON) This is the proof of income for Deangelo

12  Davis from Whataburger?

13  A.   Yes, ma'am.

14  Q.   And on this first page -- so this is for -- what's the pay

15  period on the top right?

16  A.   Pay period 4/25 through 5/1, so one week.

17  Q.   And what does it show his net pay was for that week?

18  A.   $132.

19  Q.   Okay.  If we go a little below that, do you see -- do you

20  see where it says "net pay"?

21  A.   $121.

22  Q.   Let's go to the next page of that, 168.2.

23         What is the pay period for this?

24  A.   4/18 to 4/24 and he netted $52 that week.

25  Q.   Okay.  And if we look at the next page, 168.3?

 1  A.   Yeah, same answer, he netted $95 that week on 4/11 through

 2  4/17.

 3  Q.   Okay.  Now, do you recall what Mr. Davis' salary was in

 4  the credit application?

 5  A.   4,500.

 6  Q.   Do these documents support that?

 7  A.   No, ma'am.

 8  Q.   And so let's go back to Government Exhibit 155, please.

 9       Does it matter to you when proof of income is required on

10  a deal?

11  A.   Absolutely.

12  Q.   Why is that?

13  A.   Because if it is required and, like, this guy, can't

14  produce it, then you have no deal.

15  Q.   Okay.  And on this one, did you need to send those

16  Whataburger pay stubs to Santander?

17  A.   No, ma'am.

18  Q.   And I think you previously answered, but did that Document

19  163 need to go to -- or did it go to Santander?

20  A.   163, which is the bill of sale on the '02 Nissan Frontier

21  that we sold back for a dollar, does not go to the bank.

22  Q.   Let's look at Government Exhibit 170; and we have a

23  stipulation as to admissibility for this one.

24            THE COURT:  It is received.

25  Q.   (BY MS. ANDERSON) Whose Dealertrack call-back is this?

```
 1   A.    Global Lending Services from Norman Mitsubishi.

 2   Q.    And who is the customer?

 3   A.    Brian White.

 4   Q.    And what kind of car was he buying?

 5   A.    A 2015 Dodge Ram.

 6   Q.    And on the terms that Global Lending Services approved,

 7   what was the down payment?

 8   A.    500 cash down, 500 for a trade-in.

 9   Q.    And let's look at Government Exhibit 170 -- I'll do 171;

10   we have a stipulation as to admissibility.

11              THE COURT:  It is received.

12   Q.    (BY MS. ANDERSON) This is a credit application that would

13   go to Global Lending Services for Mr. White?

14   A.    Yes, ma'am.

15   Q.    Okay.  Let's look at Government Exhibit 172, which we have

16   a stipulation as to admissibility on.

17              THE COURT:  It is received.

18   Q.    (BY MS. ANDERSON) This is the retail purchase agreement

19   for Mr. White?

20   A.    Yes, ma'am.

21   Q.    And what does it show for his down payment?

22   A.    500 for cash, 500 for trade.

23   Q.    And on the right side, is there an acknowledgement of

24   receipt of $500?

25   A.    Yes, ma'am.
```

1  Q.   And what is -- what is he trading in?

2  A.   An '03 Mercury Marquis.

3  Q.   And this goes to the lender?

4  A.   Yes, ma'am.

5  Q.   Let's look at Government Exhibit 173; we have a

6  stipulation as to admissibility.

7           THE COURT:  It is received.

8  Q.   (BY MS. ANDERSON) This retail installment sale contract

9  for Mr. White consistent with what we just saw?

10  A.   Yes, ma'am; total of a thousand down, 500/500.

11  Q.   Okay.  And that goes to the lender?

12  A.   Yes, ma'am.

13  Q.   Let's look at 174, please; we have a stipulation as to

14  admissibility.

15           THE COURT:  It is received.

16  Q.   (BY MS. ANDERSON) And what does this documentation

17  support?

18  A.   It's a receipt for 500 cash down.

19  Q.   And there was 500 shown on the contract?

20  A.   Yes, ma'am.

21  Q.   Okay.  Let's look at Government Exhibit 175; we have a

22  stipulation as to admissibility.

23           THE COURT:  It is received.

24  Q.   (BY MS. ANDERSON) What is this?

25  A.   It's a wholesale bill of sale, in-and-out form, and we're

1  selling it back to Brian White for $1.

2  Q.   Okay.  And that's the trade-in that was listed as a $500

3  trade-in?

4  A.   Yes, ma'am.

5  Q.   Okay.  And would this go to the lender?

6  A.   No, ma'am.

7  Q.   Let's look at Government Exhibit 176; we have a

8  stipulation as to admissibility.

9        THE COURT:  It is received.

10  Q.   (BY MS. ANDERSON) Now, this deal recap for Mr. White, this

11  is an internal document at the dealership; is that right?

12  A.   Yes, ma'am.

13  Q.   And does it go to the lender?

14  A.   No, ma'am.  It stays with the dealership.

15  Q.   And on this, can you tell anything about Mr. White's $500

16  trade-in?

17  A.   It says that -- at the bottom left, it has an ACV of a

18  dollar.  That's what he was given, was $500 cash for it, but it

19  says an ACV of a dollar.

20  Q.   So the dealership actually valued that trade-in as $1 and

21  not 500; is that right?

22  A.   Right.

23  Q.   And why is that being tracked on here?  What's being

24  calculated?

25  A.   It's really just something -- they just put a dollar in

1  there because there's nothing -- there is -- I mean, it should

2  just be zero because there is nothing.

3  Q.   Okay.  All right.  Let's look at Government Exhibit 180;

4  we have a stipulation as to admissibility.

5             THE COURT:  It is received.

6  Q.   (BY MS. ANDERSON) All right.  What is this one?

7  A.   An approval for Angela Barnes on a brand-new Kia Forte and

8  she's putting $3,000 from a trade-in and then $3,000 from a

9  rebate, which is a total of 6 grand.

10 Q.   And Santander approved those terms?

11 A.   Yes, ma'am.

12 Q.   Let's look at Government Exhibit 181, which we have a

13 stipulation as to admissibility on.

14            THE COURT:  It is received.

15 Q.   (BY MS. ANDERSON) Does this look like the credit

16 application that went along with Ms. Barnes' purchase?

17 A.   Yes, ma'am.

18 Q.   Okay.  And let's look at Government Exhibit 182; we have a

19 stipulation as to admissibility on that one.

20            THE COURT:  It is received.

21 Q.   (BY MS. ANDERSON) For Ms. Barnes' purchase, what does it

22 show on this document about her trade-in?

23 A.   It says that is a 2002 Dodge Intrepid that she got $3,000

24 for.

25 Q.   This is signed by Ms. Barnes and also the dealership?

1   A.   Yes, ma'am.

2   Q.   And goes to the lender?

3   A.   Yes, ma'am.

4   Q.   And let's look at Government Exhibit 183; we have a

5   stipulation as to its admissibility.

6           THE COURT:  It is received.

7   Q.   (BY MS. ANDERSON) On this retail installment sale

8   contract, does it show the same terms that we just looked at,

9   with a $3,000 trade-in allowance?

10  A.   Yes, ma'am.

11  Q.   For Ms. Barnes?

12  A.   Yes, ma'am.

13  Q.   And does this document go to the lender?

14  A.   Yes, ma'am.

15  Q.   And on the third page of this, if we could, please, who is

16  the lender on this one?

17  A.   Santander.

18  Q.   Okay.  And this retail installment sale contract gets

19  signed by both the customer and the dealership; is that right?

20  A.   Yes, ma'am.

21  Q.   Let's go to Government Exhibit 184; we have a stipulation

22  as to its admissibility.

23          THE COURT:  It is received.

24  Q.   (BY MS. ANDERSON) What is this?

25  A.   That she's selling her '02 Dodge Intrepid to Big Red

```
 1   Sports & Imports.
 2   Q.   And that's Angela Barnes?
 3   A.   Yes, ma'am.
 4   Q.   And this purchase agreement doesn't have a dollar amount
 5   on it, does it?
 6   A.   No, it doesn't.
 7   Q.   And let's look at Government Exhibit 185, for which we
 8   also have a stipulation of admissibility.
 9           THE COURT:  It is received.
10   Q.   (BY MS. ANDERSON) What is this?
11   A.   Angela Barnes getting sold back her '02 Dodge Intrepid for
12   $1, for an in-and-out.  That's why it says "INO."
13   Q.   And does this document go to the lender?
14   A.   No, ma'am.
15   Q.   Let's look at Government Exhibit 186, which we have a
16   stipulation as to its admissibility.
17           THE COURT:  It is received.
18   Q.   (BY MS. ANDERSON) This is a deal recap for Ms. Barnes; is
19   that right?
20   A.   Yes, ma'am.
21   Q.   And on the bottom left, can you tell me anything about the
22   trade allowance on this one?
23   A.   Yeah.  It says "A.C.V. OF TRADE 1.00 OVER-ALLOW 2,999."
24   Q.   And does that information go to the lender?
25   A.   No, ma'am.
```

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                     374

1   Q.   And let's look at Government Exhibit 187, for which we

2   have a stipulation as to admissibility.

3            THE COURT:  It is received.

4   Q.   (BY MS. ANDERSON) What can you tell from this?

5   A.   That Chuck signed off on it when it was ready to go to the

6   bank.

7   Q.   Okay.  So he signed off on the terms and paperwork and

8   everything for Angela Barnes' purchase of the 2017 Kia Forte?

9   A.   Yes, ma'am.

10  Q.   And how can you tell he signed off on it?

11  A.   Because his red signature is right next to the Deal Number

12  114392.

13  Q.   We've looked at several of these in-and-outs.  Who all at

14  the dealership -- which dealerships were doing in-and-outs?

15  A.   Mitsubishi, Big Red, Mayes Kia, every dealership.  The

16  answer would be every dealership.

17  Q.   And which salespeople or sales managers were doing in-and-

18  outs?

19  A.   Every single person.

20  Q.   And so who knew about the in-and-outs at the dealerships?

21  A.   Everybody.

22  Q.   Did Mr. Mayes know about the in-and-outs?

23  A.   Absolutely.

24  Q.   How do you know he knew?

25  A.   Because we talked about them.

1    Q.    And was this when you were spending most of your days with

2    him?

3    A.    Yes.

4    Q.    What about Mr. Gooch, did he know about the in-and-outs?

5    A.    Absolutely.

6    Q.    How do you know?

7    A.    Because there's no way anybody would have -- well, we

8    talked about it, number one, but there is no way he would have

9    signed off on these deals without -- with -- he's a compliance

10   guy, they wouldn't have let this go through.

11   Q.    And what about Ms. Wells?

12   A.    Yes, she's aware of everything.

13   Q.    How is she aware?

14   A.    Because she's in accounting and she's in almost every

15   single meeting with me, Chris, Gooch and managers.  Anything

16   that has to do with money and back-end, she's involved in it.

17            THE COURT:  What do you mean by "back-end"?

18            THE WITNESS:  In accounting, off of sales floor, up

19   in the accounting office.

20            THE COURT:  Okay.

21            THE WITNESS:  Sorry.

22   Q.    (BY MS. ANDERSON) And that involves booking the deals and

23   tracking them in their computer systems; is that right?

24   A.    Yeah, because all that -- those people in there were

25   monitored by her.

1  Q.   Okay.  She was a supervisor for the accounting staff?

2  A.   Yeah.

3  Q.   Mr. Elliott, how did this investigation get started, if

4  you know?

5  A.   With Donna Mullins.  It got started with Donna Mullins.

6       Do you want me to start, like, with what happened with her

7  or what -- how we started with her?

8  Q.   Who is Donna Mullins?

9  A.   Donna Mullins was a loan officer at Tinker Federal Credit

10 Union.

11 Q.   And how did you know her?

12 A.   I've known her since back in our Hudiburg days, like, in

13 2004, 2005.  She was a loan officer at Tinker back then and my

14 managers would do business with her.  And she -- she was always

15 around the dealership.  Like, you know, we knew who she was

16 because we did a lot of business with Tinker.  She was, like,

17 the buyer.  So Chris knew her, you know, everybody knew her.

18 Q.   And at some point, did she move away?

19 A.   Yes.

20 Q.   And then did she come back?

21 A.   Yes.

22 Q.   And where were you working when she came back?

23 A.   I was working at Bob -- I was working at Big Red, and then

24 I went to Bob Howard, and then I came back in 2016 to start

25 working at Mayes Kia -- I mean, I'm sorry -- at Norman

1   Mitsubishi and Norman Yamaha in 2016 when I came back, and she

2   was the buyer for the company, she was -- for Tinker.

3       And there's different loan officers that can buy deals,

4   but she was, like, oh, I'm your buyer, and I hadn't seen her in

5   ten years.  She disappeared.

6       So she moved back, she got a divorce, and we started a

7   relationship, again.  And I would go and I would do Bible study

8   with her on Saturday mornings.

9   Q.   So I think you said this was when you went to Norman

10  Mitsubishi in January 2016; is that right?

11  A.   Yes, ma'am.

12  Q.   Okay.  And when you say you started a relationship, what

13  kind of relationship?

14  A.   Like, we're friends again, and then we would go and she's,

15  like, hey, I'm a Christian, and I'm, like, oh, my God, you

16  know, I got saved in 2011, we started talking and we just were,

17  like, hey, we want to try to be better people.  We would go and

18  do Bible study on Saturday morning.

19  Q.   Okay.  And you said she was the buyer for Norman

20  Mitsubishi.  How was that going?

21  A.   So she would buy car loans and she was more personable,

22  easier to get along with when you're calling in and trying to

23  get a favor on a bank loan.  So we liked her to take the call,

24  if we could.  You don't get to decide who picks it up, but we

25  would always call her extension.

1        She started doing some loans with us, we started becoming
2  more profitable, and then we started paying her to do loans for
3  us.
4  Q.   And when you say "we," who are you talking about?
5  A.   Me and Chris, and then Courtney would give me the money
6  every Friday.
7  Q.   Okay.  How did that come about?
8  A.   So we had a Yamaha store that was not very profitable at
9  this time.  We had a lot of inventory.  It wasn't making money.
10  And we found this loophole how to start making a lot of money.
11  So we needed these loans to get bought.  And she was our magic
12  person to go to, to buy them.
13        So -- and, obviously, we wanted to sell more used cars
14  because the facility at Norman Mitsubishi was Yamaha on this
15  side and then cars on this side, so she could buy both.
16        So if we had customers over here or customers over here,
17  we knew that we could, a lot of the times, pick up the phone
18  and get her to buy them.  So we motivated her with money to buy
19  loans.
20  Q.   And who decided to motivate her with money?
21  A.   Chris.
22  Q.   How did that come about?
23  A.   He said we'll pay her money.
24  Q.   Who did he say that to?
25  A.   Me.

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                            379

1   Q.    And how did that conversation happen?

2   A.    We're becoming more profitable at Mitsubishi and Yamaha,

3   we're starting to -- at that point, we were almost making more

4   money than Big Red and -- which is, like, the mothership, and

5   here we are, some little craphole over here, and we've started

6   to find this little niche.

7         Well, it just -- she was our buyer.  Even the Tinker reps

8   were coming over and they're, like, man, you guys are doing,

9   like, 90 deals a month with us, like, this is crazy.  I mean, I

10  can't believe -- we're just blowing up with you guys.

11        Well, we had her in our pocket.

12  Q.    And you said you found a loophole, could you tell us more

13  about that?

14  A.    So -- well, on the buying side, obviously, she was enticed

15  to buy more loans with us because we were giving her more money

16  on the car side.

17        On the Yamaha side, we had a Yamaha franchise, we found

18  that Tinker had a deal called "purchase price" on their buying

19  grid, called a "buying grid," and it wasn't a loan-to-value,

20  like we've been talking about, like, 18 grand is what this is

21  worth, so they'll give you this much money, it just said

22  "purchase price," which means we would literally take a $6,000

23  motorcycle and sell it for $26,000, and we could send it over

24  and they would give us the money.  So we needed -- we needed to

25  get those deals to Donna.

1   Q.    Why did you need to get them to Donna?

2   A.    Because we needed to make sure that those deals got bought

3   because that's how we were going to make money.

4   Q.    And were you worried about what if those deals went to

5   somebody else there?

6   A.    Well, we made sure they didn't go to somebody else.

7         What we would do is that we would do the deals through the

8   week, and then she would let us know when she's available and

9   then she would jump in and buy them.

10        And then on the weekends, all the business we'd do on the

11  weekends, we would do 20 deals on the weekends, and then on

12  Sunday she would buy a lot of the deals, on Sunday, on her day

13  off, just to make sure that she could get to them and then

14  still get to work on Monday, or she would let me and the

15  finance people know Monday morning and we would start slowly

16  sending them over.  Like, we'll send you four now, and then in

17  two more hours, we'll send you another four.

18        And we would make sure -- and we would put in the notes to

19  the credit analyst at the bottom, we'd put, like, hey, Donna,

20  this is the deal we talked about; hey, Donna, this is that one

21  deal you wanted to see.  Stuff like that.

22  Q.    Let's pull up Government Exhibit 191.

23             THE COURT:  Is that one in?

24             COURTROOM DEPUTY:  Yes.

25             THE COURT:  Go ahead.

1  Q.   (BY MS. ANDERSON) Is this what you were talking about with

2  the pricing grid?

3  A.   Yes, ma'am.

4  Q.   And where -- in the top part, it says "loan-to-value based

5  on purchase price new"?

6  A.   "New," yeah.  And the key was "new," "purchase price new,"

7  because NADA is on every used thing out there, but these --

8  these didn't have -- I mean, we had a crate sheet that showed

9  what we paid for them, but there wasn't really a real MSRP

10 running around out there, so there was a real gray area on

11 this.  And it said "purchase price," so, I mean, that could

12 mean 50 grand.  It could mean 200 grand.  I mean, if somebody

13 would click the green check button, we're going to sell it.

14 Q.   And who noticed this?

15 A.   Chris, me, the managers, we all found that there was a

16 hole here and we just started going crazy.

17 Q.   And when you -- on the motorcycle deals, were you also

18 using Dealertrack?

19 A.   Yes, we were.

20 Q.   Okay.  So walk us through that.

21      What were the prompts in Dealertrack?

22      Did Dealertrack ask you for purchase price?

23 A.   So Dealertrack would ask us for the purchase price and so

24 we would put what we wanted to sell it for in there.  The

25 tricky part was when it asked for the invoice, right?

1        Because when you're submitting a deal on Dealertrack,

2   you're going through their name, their social, their date of

3   birth, where they work, and then you're going to what it is

4   that they're buying, and then you're putting in a sale price.

5        But the banks need to know an invoice, a loan-to-value.

6   They need something.  Something has to trigger them to believe

7   that this is worth this.

8        And since they say "purchase price," our loophole was,

9   when it said "invoice," we would just put in a really high

10  invoice amount, because there wasn't one, and then we would

11  just make one and send it.

12       And because there really wasn't one because we made one,

13  they didn't know what they were doing.  And that was our --

14  that was how we tricked them.

15  Q.   So in the first instance, you put information into

16  Dealertrack; is that right?

17  A.   Yes, ma'am.

18  Q.   And they give you an approval based on the information you

19  put in?

20  A.   Uh-huh, invoice, MSRP, because it's new.

21  Q.   Okay.

22  A.   Yeah, there would be invoice and MSRP, are the two boxes

23  that it would ask for.

24  Q.   And would it ask for MSRP on these new motorcycles on

25  Dealertrack?

1  A.   Yeah, it would ask for the value, the invoice and the

2  MSRP, yes, because it's new.

3  Q.   Okay.  And when it had an MSRP input prompt, what

4  information did you put in?

5  A.   We would just put in something higher than the purchase

6  price or something equal to -- higher or equal to.

7  Q.   And then when the documents get sent to the lender for it

8  to be funded, what gets sent over there?

9  A.   We would send a fake invoice because we wanted just -- we

10  wanted the funding not to ask any questions because there were

11  a lot of money made on these deals.

12  Q.   Let's look at Government Exhibit 36, which I think has

13  already been admitted, and 36.5 specifically.

14       What is this?

15  A.   This is a Yamaha sheet.  And at the top, it says "Norman

16  Yamaha Motorsports."

17       And what we would do is -- this is a template and we would

18  just fill in the stock number, the year, make, the model, the

19  VIN, the purchase price, and then down at the bottom, we would

20  fill out the dealer list price and we could just do these on

21  the fly.

22  Q.   And are these the fake invoices you were talking about?

23  A.   Yes.

24  Q.   Okay.  And so if you flip through, let's look through a

25  few of them.

1              MS. ANDERSON:  Okay.  Just scroll down.

2    Q.   (BY MS. ANDERSON) Who made these?

3    A.   Everybody made them, but they were primarily made in the

4    finance department because it was just a template.  We knew

5    sending these to Tinker, when we were making these big, big

6    monies, that we needed to put something in there where they

7    didn't ask any questions.

8    Q.   And so this was what you provided to support the purchase

9    price on the lending grid?

10   A.   Right.

11   Q.   And so let's go back to -- how did -- how did you and

12   Chris first get -- you and Mr. Mayes first start talking about

13   cash for Ms. Mullins?

14   A.   Well, so, number one, because of this Yamaha situation --

15   like, on a car, making 2-, 3-, 4 grand was, like, awesome.

16   That's great.

17        These bikes, these -- these -- these deals, you know, you

18   made $800 on these things, you know what I'm saying?

19        So when we were able to take, like, this '15 Yamaha, this

20   whatever it is -- it looks like this is probably a 4-grand

21   bike, 5-grand bike -- long story short, we could send this over

22   for $25,000 and we'd get a check for 25 grand.  I mean, you

23   could make $20,000 on one of these.

24        And when that could happen, we got really excited,

25   everybody did.  Our salespeople were making tons of money, we

1   were making tons of money, so we decided that we needed Donna

2   to make sure that these loans went through.  It was a new way

3   to make a lot of money.

4   Q.   And so who first thought of giving her cash?

5   A.   Chris.

6   Q.   And did you talk about how much cash?

7   A.   No, we just said we'll come up with an amount.  So we just

8   started paying her a thousand a week.  She was always

9   struggling with money, complaining, so we felt like this would

10  really just send her right up to buy all our business.

11  Q.   And did it seem to affect her decision-making once you

12  were giving her cash?

13  A.   Absolutely.

14  Q.   How so?

15  A.   Well, we rarely did not get a deal bought.  Rarely.  So if

16  we submitted -- I mean, you could look to our look-to-book back

17  then in those days when Donna was with us and we would send her

18  ten deals, she would buy nine, you know.  Where before, Tinker

19  was -- we were sending ten, they were buying one.  So

20  everything flipped 360.  She was giving us full approvals and

21  it was -- it was just really easy.

22  Q.   How does cash get out of the dealership?  I mean, how did

23  this -- the mechanics?

24  A.   Courtney Wells.

25  Q.   Okay.  So walk me through that.

1  A.   Okay.  So every Friday, Courtney would bring me cash and

2  then I would give it to Donna.

3  Q.   Okay.  Did you talk to Ms. Wells about this cash you were

4  getting?

5  A.   Yes.  Yes, she was with me and Chris the day that we

6  decided to start doing it and we agreed that every Friday

7  she'll just bring it over and then I'll give it to Donna.

8       And we started giving her a thousand bucks a week and then

9  we ended up doing, like, 2,000 a week, up until she got fired

10 from Tinker.

11 Q.   Okay.  And had you ever given -- have you ever bribed a

12 loan officer before that?

13 A.   Not bribed a loan officer, but we have paid bird dogs to

14 loan officers many of times before, outside of the dealership,

15 to get loans done back in, like, 2005, 2010.  This was, like,

16 under-the-table cash.

17 Q.   Sorry, the bird dog was under-the-table cash or this was

18 under-the-table cash?

19 A.   This was under-the-table cash.

20 Q.   What's a "bird dog"?

21 A.   So, like, I used to work for David Stanley back in, like,

22 2007, something like that, and they weren't signed up with

23 Tinker Credit Union, so there was a lady that we would drive

24 over to when -- because they weren't a lender of ours and we

25 would pay her $200 referrals to do loans for us because these

1  are loans that we couldn't get done at the dealership.  That's

2  wrong.  But we would pay and then she would do the loans.  And

3  the dealership would cut the check out and, you know, it was,

4  like, no big deal.

5      I got -- at Carter County Dodge, when I worked down there,

6  Tinker would do loans down there sometimes that they couldn't

7  get done in the store and we would drive down and give this

8  lady, you know, $200 to do loans for us.  And the dealership

9  would pay that money to do these loans.

10  Q.   Okay.  And on a bird dog, the dealership would do it by

11  check; is that what you said?

12  A.   I mean, this is over 10 or 15 years ago.  I believe so,

13  yes.

14  Q.   Okay.  So what happened with Ms. Mullins at Tinker?

15  A.   She got fired for taking cash.  They said that she --

16          THE COURT:  Wait, wait, wait, wait.

17          THE WITNESS:  I'm sorry.

18          THE COURT:  Next question.

19  Q.   (BY MS. ANDERSON)  Okay.  She got fired, is that what you

20  said?

21  A.   Yes, ma'am.

22  Q.   And how do you know?

23  A.   Because she came straight to the dealership and said, "I

24  just got fired."

25  Q.   And who did she tell?

1  A.   Me and Chris.

2  Q.   And what did Mr. Mayes say about that?

3  A.   "We got to give her a job immediately."

4  Q.   Okay.  And so what happened?

5  A.   She came to work for us.  And we wanted her to stay quiet

6  and Chris wanted to contain her.

7  Q.   How do you know that?

8  A.   Because he told me.

9  Q.   What did he say?

10 A.   He said:  We need to have her keep her mouth shut and we

11 need to make sure that she stays close to us so that she

12 doesn't go around running her mouth.

13 Q.   And how -- did you talk about how to keep her mouth shut?

14 A.   Yeah.  Well, number one -- there was two ways:  One,

15 letting her know that, as long as she stayed close to Chris,

16 Chris would always protect her and he would pay for her

17 attorney, he would do anything and everything he needed to do

18 to make sure that she was okay and that she's safe.  And then

19 "She never took any money," wink-wink, "you know what I'm

20 talking about."

21      And then the second part was put the fear of God in her,

22 that if she talks and she tells somebody and she goes and runs

23 her mouth, which she already did admit to taking it, but we

24 need to say that she got hot-boxed, that she was having a

25 nervous breakdown, she had a meltdown, she was having a midlife

 1  crisis, she needed to own that because she didn't get any money

 2  from us.

 3      So I'll give her a job, you control her, you contain her,

 4  and if she goes rogue, then we'll just say she's crazy and me

 5  and you will run the same story.

 6  Q.   And that's all stuff that Mr. Mayes told you?

 7  A.   Yes.

 8  Q.   And at the time --

 9  A.   It was a daily deal.  He told me to keep her mouth shut

10  every day.

11  Q.   And at the time, where were you working?

12  A.   I was working for Chris at Norman Mitsubishi, Norman

13  Yamaha.

14  Q.   And who did you report to?

15  A.   Chris Mayes.

16  Q.   And where were you having these conversations?

17  A.   Every single day we would have meetings in Chris's office.

18  Q.   And was the information that you discussed information you

19  learned within the scope of your employment at Norman

20  Mitsubishi?

21  A.   Say that one more time.

22  Q.   So was this all related to your job when you talked to

23  Mr. Mayes about this?

24  A.   You mean everything about us -- I mean, not losing my job

25  or --

1  Q.   About Donna Mullins and what to do about her, was that

2  related to the work you were doing at Norman Mitsubishi?

3  A.   No.  I mean, it was related -- yeah, it was related to the

4  job because we were afraid we were going to get in trouble by

5  the feds because she was a federal loan officer.

6  Q.   Okay.  And so at some point, once -- and I'm sorry, I

7  don't know if I asked this -- did Ms. Mullins ultimately come

8  to work at the dealership?

9  A.   Yes, she did.

10  Q.   All right.  And at some point while she was working at the

11  dealership, did you go to Sonic with her?

12  A.   Yes.

13  Q.   And, later, did you find out that that had been recorded?

14  A.   Yes, ma'am.

15  Q.   I'm going to direct you to what's been marked as

16  Government Exhibit 9.

17      Do you recognize this document?

18  A.   Yes, I do.

19  Q.   What is it?

20  A.   This is a -- it's where I was being recorded.  It's the

21  entire video where we were at Sonic together.

22  Q.   Is it excerpts of that video from June 21, 2017?

23  A.   Yes, ma'am.

24  Q.   And have you watched it?

25  A.   Yes, I have.

1    Q.   How do you know?

2    A.   Because I signed it, I initialed it, after I watched it.

3    Q.   Okay.  And this recording was made while you were working

4    at the dealership?

5    A.   Yes.

6    Q.   And the information was things you had talked about at the

7    dealership with Mr. Mayes?

8    A.   Yes.  She says she needs to come talk to me.  I talked to

9    Chris and Chris told me you better tell her to keep her mouth

10   shut, I'm not playing.  He's like -- and just scare the life

11   out of her.

12   Q.   And does this video truly and accurately reflect the

13   conversation you had with Ms. Mullins that day?

14   A.   Yes, ma'am.

15           MS. ANDERSON:  Your Honor, the government moves to

16   admit Government's Exhibit 9 into evidence.

17           MR. BEHENNA:  Your Honor, at this time, we'd object

18   and request a bench conference.

19           THE COURT:  Very well.  We'll have a bench

20   conference.

21      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND OUT

22   OF THE HEARING OF THE JURY.)

23           THE COURT:  Counsel, stand down just a minute.

24      We're having a technical difficulty with the wireless

25   equipment and we're having trouble remembering how to do it the

1    old-fashioned way.

2         And so I'm going to ask Lori to take the jury across the

3    hall, to Judge DeGiusti's conference room.  It's just right

4    across the hall.  And if you will, wait in there.

5         Obviously, please remember my usual admonition.  Wait in

6    there so that we can take something up with counsel.

7         Judge DeGiusti's conference room is much nicer than mine,

8    but -- and so don't think that I have that nice a conference

9    room.

10        And if you will, please, Lori, proceed with the jury to

11   Judge DeGiusti's conference room.

12        (JURY EXITS THE COURTROOM.)

13             THE COURT:  Okay.  Is there an objection?

14        The pending offer is a Government Exhibit 9.

15             MS. BEHENNA:  Your Honor, maybe the witness should be

16   excused.

17             THE COURT:  Yes, sir, Mr. Elliott, if you would step

18   out in the hall.  And stay handy, but just step out in the

19   hall.

20        (Witness exits the courtroom.)

21             THE COURT:  Is there an objection to Plaintiff's

22   Exhibit 9?

23             MR. BEHENNA:  Your Honor, we've made a lot of records

24   about our objections to this, but I think, in consultation, we

25   are going to withdraw our objection as to hearsay, but we will

 1  stand on our objection under Rule 106, the rule of

 2  completeness.  If a party introduces all or part of a writing

 3  or recorded statement, an adverse party may require the

 4  introduction at that time of any other part or any other

 5  writing or recorded statement.  And we would ask that the

 6  entire thing be played, Your Honor.

 7          THE COURT:  How long is the entire thing?

 8          MR. BEHENNA:  Your Honor, I think this is the one

 9  that is 17 and 26 minutes, so one is 17 minutes.

10          THE COURT:  Well, I'm just asking about 9.  Is 9 the

11  17-minute one or what?

12          MR. BEHENNA:  Exhibit 10 is 17 minutes.

13          THE COURT:  So Exhibit 9 would be the one that is 26

14  minutes long?

15          MR. BEHENNA:  Yes, I believe that would be the

16  26-minute.

17          THE COURT:  And roughly how long, in terms of play

18  time, is the government's selected portion of it?

19          MS. ANDERSON:  About ten minutes, Your Honor.

20          THE COURT:  Okay.  Well, it may be provident that

21  we're doing this at this point because my inclination is -- and

22  I'll give everybody a chance to concisely object -- but my

23  inclination is to let the government play its part and then it

24  will be just about time to go home and the defendants can

25  designate what part they want to be played first thing in the

1    morning under Rule 106.

2        What would be wrong with that?

3        And by the way, I do have some discretion as to when the

4    additional part of it is played, as contemplated by Rule 106.

5            MR. BEHENNA:  Your Honor, it would be prejudicial to

6    have the jury hear cut-up parts of a video and then say, jury,

7    but here are other parts.

8        It would make more sense if the jury just heard it all at

9    one time, a one complete video, which is -- sorry, Your Honor,

10    I didn't mean to --

11            THE COURT:  Go ahead.

12            MR. BEHENNA:  This isn't like a puzzle that you fit

13    together that the jury should try to make sense of, well, here

14    is a part, the next morning is another part.

15        It's all one stated effort by Andy Elliott to bribe and

16    hush Donna Mullins and all of it together is what will make

17    sense to the jury.

18            THE COURT:  Okay.  Is this the one with the scrolling

19    transcript?

20            MS. ANDERSON:  No, Your Honor.  Exhibit 10 is the one

21    with the transcript.

22            THE COURT:  Okay.  Then why not just let her rip from

23    beginning to end?

24            MS. ANDERSON:  Your Honor, we can do that.  I'm not

25    sure that there are -- from our clips that there's anything

1  misleading that needs to be corrected by other excerpts.

2      We had planned to just play excerpts because they seem to

3  give the full flavor, and if there are things that are out of

4  context or they think would otherwise be misleading, then our

5  position is that, under Rule 106, the defense can identify what

6  is misleading and --

7              THE COURT:  Okay.  Well.

8              MS. ANDERSON:  -- ask for additional things.

9              THE COURT:  There's two considerations here.  Number

10 one, this could work out differently at a later stage, perhaps,

11 with other exhibits, but Mr. Behenna, as a general

12 proposition -- just in the nature of things, Mr. Behenna has a

13 point, that if there is a video that's 26 minutes long or --

14 and the government wants to play ten minutes of it, the -- and

15 the defendants believe that the other 16 minutes show important

16 context or otherwise would shed light on the overall gist of

17 the conversation and so forth and provide -- obviously provide

18 grist for cross-examination, then it's more intelligible if it

19 all comes in at once without being all chopped up.

20     The second consideration is we're sneaking up on taking as

21 much time talking about it as there would extra time would be

22 consumed by just playing the whole thing.

23     So we'll bring the jury in and we'll play the whole thing.

24     Plaintiff's Exhibit 9 is received on that basis.

25     (JURY ENTERS THE COURTROOM.)

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                    396

```
 1              MS. ANDERSON:  Your Honor, in looking at the files
 2   just now, it looks like it's 37 minutes long.
 3              THE COURT:  Well, we'll get started on it.
 4        The video we have is -- Plaintiff's Exhibit 9 is received
 5   and we need the witness back in the courtroom.
 6        (WITNESS ENTERS THE COURTROOM.)
 7              MS. ANDERSON:  Your Honor, may I sit while the video
 8   is playing?
 9              THE COURT:  You may.
10        (GOVERNMENT'S EXHIBIT NUMBER 9 PLAYED FOR THE COURT AND
11   JURY.)
12        (VIDEO PAUSED.)
13              THE COURT:  Stop for just a minute.  I think the jury
14   deserves to be refreshed as to when and where this video was
15   made.
16              MS. ANDERSON:  Yeah.
17   Q.   (BY MS. ANDERSON) So where is this?
18   A.   This is in the back of Norman Mitsubishi.
19   Q.   Okay.  And was this on June 21, 2017?
20   A.   Yes, it was.
21   Q.   And the voices we hear on this, whose voices are we going
22   to hear?
23   A.   Donna Mullins and mine.
24   Q.   Okay.  And she was working at the dealership at that time?
25   A.   Yes.
```

```
1              THE COURT:  You may proceed.

2              MS. ANDERSON:  Thank you.

3         Let's play it, please.

4         (GOVERNMENT'S EXHIBIT 9 CONTINUED.)

5              THE COURT:  Okay.  Please stop the video.

6         (VIDEO PAUSED.)

7              THE COURT:  We'll resume tomorrow morning.  And,

8    obviously, that was a rather arbitrary time to stop the video,

9    so my suggestion would be that when we resume the video in the

10   morning, you can back it up a minute or so, so that everyone

11   will have some understanding of where it left off.

12        But with that, members of the jury, we will take our

13   overnight recess.  We'll resume at 9:00 tomorrow morning.

14        There's a fair chance that next week, which is a four-day

15   week anyway, we'll be starting at 8:30 in the morning, but

16   we'll resume at 9:00 tomorrow morning.

17        Please do remember my usual admonition not to discuss the

18   case, not to undertake any form of independent investigation

19   and not to reach any conclusions about the case until it has

20   been given to you for your deliberations and verdict.

21        I sincerely thank you for another day of service to the

22   Court.  And let me repeat I do appreciate your punctuality and

23   I know Lori does.  So I look forward to seeing you so that we

24   can begin promptly at 9:00 tomorrow morning.

25        All persons will please remain seated while the jury
```

1   departs.

2        (JURY EXITS THE COURTROOM.)

3             THE COURT:  The jury has left the courtroom.

4        One thing I want to come back to, and that is -- we have

5   two more recordings; is that right, that we'll ultimately be

6   addressing?

7             MS. ANDERSON:  Yes, Your Honor.

8             THE COURT:  Okay.  Well.  Under -- Rule 106 is pretty

9   loosely worded.

10            MR. SNYDER:  Your Honor, could we excuse Mr. Elliott?

11            THE COURT:  Oh, you may step down, and we look

12   forward to seeing you promptly at 9:00 tomorrow morning.

13       (WITNESS EXITS THE COURTROOM.)

14            THE COURT:  Rule 106 is fairly loosely worded.  And

15   it states that the adverse party may require the introduction

16   of any other part of the recorded statement that "in fairness

17   ought to be considered at the same time."

18            Now, under the cases, I do have some discretion as to

19   the timing of it, but I don't really want to get into a

20   situation of playing the government's selected snippets and

21   then later playing the defendants' selected snippets that would

22   be fair game under Rule 106.

23       I think from the standpoint of the jury and the

24   comprehensibility of it and certainly from the standpoint of

25   the Court in avoiding unnecessary expenditure of time while we

1   discuss these matters, I think it would be far and away

2   preferable to have the parties collaborate not on the jury's

3   time, and for that matter, not on my time, on those portions

4   that would be designated by the defendants under Rule 106.

5        Now, again, is there any practical problem with that?

6        MS. ANDERSON:  Your Honor, for Exhibit 10, we have

7   prepared the clips with the transcript on them and we don't

8   have a way to play the full thing with the transcript on it and

9   it's otherwise very difficult to make out what's being said.

10       THE COURT:  And how long is that one?

11       MS. ANDERSON:  Well, the clips that we have are --

12   let's see -- the first one starts at -- looking at the time

13   stamp of it, it has a time stamp of 13:38 for the start and

14   14:26:45 for the end.

15       So I don't know the exact answer, but I think it's 226

16   minus 138, so about 50 minutes?  Math right?  I think it may be

17   about 50 minutes.  It could be --

18       THE COURT:  You're thinking the government's excerpts

19   run about --

20       MS. ANDERSON:  Our excerpts are less than that.  Our

21   excerpts are 17 -- how much?

22       I don't have my notes on the start and stop times, so I'm

23   not sure.  But we have for the next one 14 clips with the text,

24   and -- behind Tab 10, to show how much it is.  I think the full

25   recording is closer to 50 minutes.  This is less than that.

1  Maybe 20 minutes or so.

2          THE COURT:  Well, to me, this is pretty important,

3  for the reason I've already stated.

4      When will -- when do you anticipate offering Government

5  Exhibit 10?

6          MS. ANDERSON:  After we finish with Exhibit 9.

7          THE COURT:  Okay.  So that's going to be offered

8  tomorrow?

9          MS. ANDERSON:  Yes, Your Honor.

10          THE COURT:  Okay.  I want -- I'm not going home until

11  I find out how long the government's clips are and how long the

12  whole thing is, so I'm just going to sit right here.  We'll

13  stand down.

14          MR. BEHENNA:  Your Honor -- okay.

15      (SHORT PAUSE IN PROCEEDINGS.)

16          THE COURT:  Okay.  We'll go back on the record.

17          MS. ANDERSON:  The total video for the July 17, 2017

18  one is 49 minutes long.  And the clips that we've provided with

19  the running transcript are 14 minutes and 18 seconds.

20          THE COURT:  Okay.  And this is a recording of who and

21  who?

22          MS. ANDERSON:  It is an additional recording of Andy

23  Elliott and Donna Mullins.

24          THE COURT:  Okay.  And, obviously, I'm sure the

25  defendants have -- defendants' counsel have long since reviewed

1   it, so let me hear from defense counsel as to -- again, bearing

2   in mind I don't buy into the all-of-it-or-none-of-it argument.

3       Do defense counsel have an estimate as to how much of the

4   total clip -- total video that's not included in the

5   government's clips would fall within the category of material

6   that "in fairness ought to be considered at the same time"?

7           MR. BEHENNA:  Your Honor, I'm not saying this to be

8   glib, and I understand the Court's point.  I don't buy into

9   "all or nothing," but for us all of it.  It all discusses the

10  bribery.

11      And if you try to play, like, five to seven minutes and

12  then skip forward to 13 to 17 minutes, and then we have to fill

13  in and say, okay, at five to seven, here's five to nine, and

14  then the jury has to remember, well, wait, what was that first

15  five that led into that?  And then we're going to fill in

16  another gap.  It gets extremely confusing.

17      And point two that I want to make:  There is a transcript

18  already transcribed of the whole thing.  If we're worried that

19  the government has -- already has clips with transcription

20  already embedded, we could print out a transcript of -- what is

21  it -- 14, 15 copies?  We could have one for each of the jurors,

22  they could read along as they go.

23      But for us, Your Honor, it's the entire clip, the

24  substance of what's taking place.  And the jury needs to

25  understand it all in context.

ANDY ELLIOTT - DIRECT BY MS. ANDERSON                     402

 1        And it would be too hard for us -- we would wind up having

 2   to go listen to old parts just to lead into new parts and I

 3   think that would waste judicial time.  I think it would be

 4   faster just to do it all at once.

 5             THE COURT:  Ms. Anderson, for the reasons I mentioned

 6   a few minutes ago, within the outer bounds of reason, it is

 7   preferable not to chop up a recording if, in fact, there are

 8   other parts of it that ought, in fairness, to be considered at

 9   the same time within the meaning of Rule 106.

10        So is this -- I take it this is a transcript prepared by

11   the government?

12             MS. ANDERSON:  Yes, Your Honor, it was prepared by

13   the FBI a long time ago.

14             THE COURT:  Well, I've had an officer of the court

15   tell me that -- although he correct -- appropriately disclaims

16   adherence to the all-or-nothing -- the per se all-or-nothing

17   approach, he's telling me that, really, for this thing to be

18   understood, the jury needs to see it all.

19        And I'm hard-put -- and by the way, the parties have not

20   put me in a very good position to assess this -- I'm hard-put

21   to gainsay that.

22        And my inclination, if you want to present it at all, is

23   to give every member of the jury a copy of the transcript and

24   let it run again.

25        Does the government have any serious problem with that?

1          MS. ANDERSON:  No, Your Honor.

2          THE COURT:  Okay.  Well, fire up the copy machine.

3      And this -- okay.  So that covers Plaintiff's Exhibit 10.

4      Now, there's one more of these woolly boogers out there,

5  and I need somebody to tell me where we stand on that one.

6          MR. SNYDER:  Just from our perspective, that is the

7  interview between the FBI and Courtney Wells.  We've, again,

8  designated clips.  That's going to come in, we think, through

9  FBI Agent Clayton Johnson, who is one of our final witnesses,

10  so that is, timing-wise, a little further off.  But that

11  interview, I think, is two hours long.  And I don't -- I can't

12  tell you exactly -- so the full is two hours, we have clips

13  from that to be played.

14          THE COURT:  Okay.  Well --

15          MR. SNYDER:  But we can, I think, probably discuss

16  that with Mr. Gifford and try to find a way to expand our

17  clips, perhaps, or discuss it so we don't end up having to

18  bring this back to you.

19          THE COURT:  The minutes from today will state that

20  counsel for the government and the Defendant Wells are ordered

21  to collaborate on an agreed edited version of Government

22  Exhibit -- what is it?

23          MR. SNYDER:  Eleven, Your Honor.

24          THE COURT:  -- on an agreed edited version of

25  Government Exhibit 11.

1    I just -- this is no way to run a railroad.  And I just

2  don't want to have to deal with that when that one is offered.

3    Anything else we need to address before we take our

4  overnight recess?

5    What says the government?

6    MR. SNYDER:  One second, Your Honor.

7    Your Honor, we -- there is one thing; we've raised it with

8  defense counsel.

9    We have one witness, she's one of the customers who has

10  prepaid vacation, she's leaving the country on Saturday for a

11  little over a week, so we have planned to have her here

12  tomorrow, to try to fit her in somewhere so we can catch her

13  testimony before otherwise it becomes unavailable.

14    I don't know the best time to try to do that.  We,

15  frankly, thought we would be much further along than we are.

16  We're obviously about to get to cross of Mr. Elliott.  I'm

17  assuming that's going to take quite awhile.

18    THE COURT:  You don't say.

19    MR. SNYDER:  Call this experience.

20    So I just wanted to flag that as an issue that we may have

21  to try to find a way, if it's at all possible, to take a

22  witness out of order.

23    THE COURT:  Unless somebody has a compelling reason

24  that it sounds like a pretty decent reason to -- just to allow

25  her to be put on out of time as a pretty short witness, is

```
 1    there any objection to that?
 2            MS. BEHENNA:  No, Your Honor.
 3            MR. SHANNONHOUSE:  No objection, Your Honor.
 4            MR. ADLER:  No objection on behalf of Ms. Wells.
 5            THE COURT:  We can do that.
 6        Is that one of the customers covered in Counts 2 through
 7    13?
 8            MR. SNYDER:  It is, Your Honor; Tamia Gray, her name
 9    is.
10            THE COURT:  Well, she comes in in Count Number 2.
11    Yeah, that sounds like a workable, fair approach to it.
12            MR. SNYDER:  Thank you, Your Honor.
13            THE COURT:  Anything else we need to address before
14    we take our overnight recess?
15        Hearing nothing, we'll be in recess.
16            (COURT ADJOURNED FOR THE OVERNIGHT RECESS.)
17
18
19
20
21
22
23
24
25
```

```
 1                  CERTIFICATE OF OFFICIAL REPORTER

 2          I, Tracy Thompson, Federal Official Realtime Court

 3   Reporter in and for the United States District Court for the

 4   Western District of Oklahoma, do hereby certify that pursuant

 5   to Section 753, Title 28, United States Code, that the

 6   foregoing is a true and correct transcript of the

 7   stenographically reported proceedings held in the above-

 8   entitled matter and that the transcript page format is in

 9   conformance with the regulations of the Judicial Conference of

10   the United States.

11                  Dated this 14th day of January 2022.

12

13                  /S/ Tracy Thompson
                    ------------------------------
14                  Tracy Thompson, RDR, CRR
                    Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```